# CHARLESTON.

## Pegram *v.* Stortz.

Submitted September 15, 1887.—Decided February 28, 1888.

1. DAMAGES—SELLING SPIRITUOUS LIQUORS—ACTION FOR SALE TO HUSBAND.

By chapter 107, § 16, Acts 1877, p. 144, it is provided: "An action may be maintained [under specified circumstances] by the wife against the person selling or furnishing such spirituous liquors, as well for all such damages as the plaintiff has sustained by reason of the selling or giving such liquors, as for exemplary damages." By exemplary damages is meant, not additional damages given as a punishment of the defendant for selling intoxicating liquors to her husband illegally, but damages which shall not only compensate her for injury to her means of support, but also, in a proper case, damages which shall compensate her for her mental anguish. (p. 229.)

2. DAMAGES—SELLING SPIRITUOUS LIQUORS—ACTION FOR SALE TO HUSBAND.

Such exemplary damages can not be given to recompense her for her anxiety of mind, mortification, social degradation, and loss of her husband's society, by reason of his drunkenness and misconduct; but they can only be given where the defendant has not simply committed against her the tort of selling illegally intoxicating liquors to her husband, whereby she was injured in her means of support, but where the defendant made such sale under circumstances which showed actual malice, or wanton, deliberate, and willful disregard of her rights and known wishes. (pp. 338, 344.)

3. DAMAGES—SELLING SPIRITUOUS LIQUORS—ACTION FOR SALE TO HUSBAND—DEATH OF HUSBAND.

In such a case, no damage can be given the plaintiff because of injury to her means of support by the death of her husband caused by his intoxication, the consequence of liquors illegally furnished or sold to him by the defendant. (p. 339.)

4. DAMAGES—SELLING SPIRITUOUS LIQUORS—PLEADING—PLEADING AND PROOF.

It is sufficient, in a declaration in such a case, to allege generally, that the plaintiff was injured in her means of support in consequence of such intoxication; but under such a declaration the plaintiff could prove only the extent of the injury to her means of support which she had sustained as the necessary consequence of her husband's intoxication, as that resulting from his inability to labor while so intoxicated. (p. 340.)

5. DAMAGES—SELLING SPIRITUOUS LIQUORS—COMMON-LAW PLEADING —DECLARATION.

But, when the plaintiff wishes to prove that she has suffered damages in her means of support, the natural, but not the necessary, result of her husband's intoxication,—as when he, when drunk, expended his money with reckless prodigality, whereby she was injured in her means of support,—she must allege this in her declaration. · (p. 339.)

6. DAMAGES—SELLING SPIRITUOUS LIQUORS—NOTICE TO DEALER.

Under chapter 107, § 16, Acts 1877, the written notice required must be served on the defendant while he is engaged in the sale of intoxicating liquors for himself or for another as a business, or the plaintiff can not recover in a suit under this statute. (p. 318.)

7. DAMAGES—SELLING SPIRITUOUS LIQUORS—NOTICE TO DEALER— REQUIREMENTS OF.

Under this act it is also essential, to sustain an action, that, when such person was so served with notice, the husband named in the notice was in the habit of drinking to intoxication. (p. 318.)

8. DAMAGES—SELLING SPIRITUOUS LIQUORS—NEW TRIAL—EXCESSIVE DAMAGE.

Where the case is one in which a jury might properly and legally award to the plaintiff exemplary damages, the verdict will not be set aside on the ground that the damages are excessive, unless they are so enormous as to furnish evidence of partiality, passion, corruption, or prejudice on the part of the jury. (p. 341.)

9. DAMAGES—SELLING SPIRITUOUS LIQUORS—NEW TRIAL.

But where it is clear, upon the facts proven by the evidence introduced before the jury, that it is not a case, under the rule above laid down, where the jury could legally award such exem-

plary damages, and it is obvious from their verdict that it must have included exemplary damages, it is the duty of the court, on the motion of the plaintiff, to set aside such verdict, and award a new trial. (p. 342.)

10. APPEAL—BILL OF EXCEPTIONS—WHEN PART OF THE RECORD.

Where the clerk who certifies a record to which a writ of error and *supersedeas* have been awarded, copies into it as a part of the record a bill of exceptions marked "No. 2," which is apparently signed and sealed by the Circuit Court judge presiding at the trial, but no reference whatever is made to this bill of exceptions by any entry on the record-book, though there was on the record-book an entry that, on the trial of the case, one of the parties took a bill of exceptions marked "Bill of exceptions No. 1," which was signed, sealed, and saved to him, and made a part of the record, the appellate court will not regard this bill of exceptions, marked "No. 2," so inserted in the copy of the record by the clerk, as constituting any part of the record of the case. (p. 353.)

This was an action on the case, brought on February 27, 1885, in the Circuit Court of Mason county, by Nancy A. Pegram, the widow of Thomas Pegram, against John G. Stortz, under chapter 107, Acts 1877, p. 139, (see Warth's Amended Code, ch. 32, § 16, p. 216,) for injury to the plaintiff's means of support, as the wife of Thomas Pegram, caused by the sale or furnishing to him by the defendant, a saloon-keeper, of intoxicating liquors, whereby he became intoxicated, and by reason of such intoxication did injure her in her means of support by depriving her of food, clothing, and other necessaries and comforts of life; said sales or furnishing of intoxicating liquors to her husband by the defendant having been made in disregard of a written notice given by the plaintiff to the defendant not to sell or furnish her said husband any intoxicating liquors, he being, when said notice was given, an habitual drunkard.

The summons was served on the defendant on the day it was issued, the 27th of February, 1885. The declaration was filed at April rules, 1885. The defendant demurred to the declaration, and at the first term of the court, on May 13th, 1885, the court sustained the demurrer to the declaration, but gave the plaintiff leave to amend her declaration at the bar, which the plaintiff did forthwith; and the cause was continued.

At the next term of the court, on September 23, 1885, the

defendant demurred to the amended declaration, and each count thereof, in which the plaintiff joined; and the defendant also pleaded not guilty, and issue was joined on this plea.

At the next term of the court, on February 9, 1886, the court overruled the demurrer to the amended declaration, and to each count thereof; and the defendant pleaded the statute of limitations of one year, to which the plaintiff replied generally. The second count of the amended declaration stated that the plaintiff married Thomas Pegram, and continued his wife till March, 1884, when he lost his life by being drowned; that, when sober, he was kind, loving, and prosperous, and provided her a comfortable support, and that, prior to the —— day of ———, 1878, he had become addicted to drinking to excess, and on said day and thereafter was in the habit of drinking to intoxication; that on that day the defendant was engaged in the sale of intoxicating liquors in the town of Point Pleasant, in said county, and continued in this business till after March, 1884; that in 1878, while her husband, Thomas Pegram, was in the habit of drinking to intoxication, she served on the defendant a written notice not to sell or furnish to her said husband any intoxicating liquors, but in disregard of this notice, in March, 1884, and at other times prior thereto, the defendant sold and furnished to her said husband, an habitual drunkard, intoxicating liquors, by reason whereof he did on that day, and on sundry times prior thereto, become intoxicated, and by reason of such intoxication did injure the plaintiff in her means of support, by depriving her of food, clothing, and other necessaries and comforts of life, on the day last named, and at divers times prior thereto; and on the day last named, by reason of said intoxication, her said husband lost his life by drowning in the Kanawha river, by reason whereof she avers further injury to her means of support.

The first count was defective, in not alleging that her husband was an habitual drunkard, when she gave the defendant such written notice, or that the defendant was then engaged in selling intoxicating liquors as a business, when such notice was given him, or that she was in any way injured in

her means of support by the intoxication of her husband, except by his being drowned in March, 1884, by reason of his intoxication caused by intoxicating liquors sold or furnished him by the defendant, contrary to such written notice given to him by her long before that time. The damages claimed were $5,000.00.

The case, on the issues of not guilty and the statute of limitations of one year, was tried by a jury on February 13, 1886. The jury found for the plaintiff, and assessed her damages at $1,000.00. The defendant moved the court to grant him a new trial because this verdict was contrary to the law and the evidence, which motion the court overruled, and on February 19, 1886, rendered a judgment in favor of the plaintiff against the defendant for $1,000.00, the said damages assessed by the jury, and for her costs. The defendant excepted to this action of the court in overruling his motion for a new trial, and rendering this judgment, and took a bill of exceptions to this action of the court, in which all the evidence submitted to the jury is stated at length.

The plaintiff by her evidence proved that she married Thomas Pegram in the fall of 1870. He was a carpenter by trade. When sober, he was kind, sociable, a good workman, and was industrious and diligent, and could earn from $1.50 to $2.50 a day when he could get employment. But prior to his marriage, in 1870, and up to the time of his death, he was in the habit of getting drunk whenever he could get whisky; and when in Point Pleasant, or other towns where there were saloons, he frequently got drunk, in fact, when he came to town, almost always. These had been his habits before his marriage, and they continued such till his death, March 26, 1884. When drunk, he was negligent of his business, was cross, disagreeable and quarrelsome, squandered his money, and neglected his family. When drunk, he would sometimes beat his wife, and break up furniture and dishes in his house and kitchen. He was about 45 years old at the time of his death, March 26, 1884. He had no house of his own, and had accumulated nothing, his family depending on his day labor for their support; and they were frequently scant of food and clothing. When drunk, he would frequently squander two thirds of his earnings. He would frequently get so drunk on

Saturday night that he would do but two or three days' work the next week. The plaintiff's daughter, some time in 1878, drew up two written notices, at her mother's request, one directed to Capt. Hein, a saloon-keeper in Point Pleasant, and the other to John G. Stortz and Simon Stortz, the defendant, John G. Stortz, being then a partner of Simon Stortz in his business in Point Pleasant. These notices notified them not to sell Thomas Pegram any intoxicating liquors, as he was in the habit of drinking to intoxication; and she signed her mother's name to these notices, at her request, as she could not write. The plaintiff, by her own evidence, proved that in 1878 she herself gave one of these notices to the defendant, John G. Stortz. He told her, she says, "to go home and attend to her own business, and she cried and went home." No one was with her but a small child, who stated she did not remember what the notice was; that it was handed, not to John G. Stortz, the defendant, but to Simon Stortz; and that he told her to go home, and attend to her business. A sister of the plaintiff proved that the defendant stated to her in 1881 or 1882, he had before that gotten a written notice from the plaintiff not to sell Thomas Pegram any intoxicating drinks; and she (this sister) told the defendant then, in 1881 or 1882, that, if he did not quit selling whisky to Pegram, she would prose-cute him. He told her to go home; he would not bother her any more. Thomas Pegram drank frequently at the defendant's saloon, as well as at all the other saloons in Point Pleasant; and there are at least three of them. One of the defendant's witnesses proved that he saw the defendant refuse to let Thomas Pegram get a drink at his saloon; saying to him he dared not sell him any whisky. And another of the defendant's witnesses proved that he saw Thomas Pegram try to get a drink at the defendant's saloon on the night he was drowned, but the bar-keeper refused to let him have a drink. The plaintiff's evidence proved that Thomas Pegram did get drinks at the defendant's saloon a large number of times within 15 years before his death, in March, 1884; but the dates are left very vague by the statement of the witnesses. But there was evidence enough introduced by the plaintiff which, while vague as to date, yet proved that Thomas Pegram, within a

month of the time he was drowned, had got three or four drinks at the defendant's saloon. On the night of the 26th March, 1884, Thomas Pegram was in Point Pleasant very drunk, and he insisted on going across the Kanawha river in a skiff. He was put into the skiff by two of his acquaintances, and the skiff was rowed across the river by one of them, and, after he had got out, Pegram, who was in the rear of the skiff got up to get out of the skiff, staggered, and fell out of the skiff and was drowned. She testified: "She had taken her husband out of the defendant's saloon drunk several times; the last time was the fall before his death." Her only means of support was his daily labor. He once had a little home, but squandered it in drinking." When he was drinking, the family would not get one dollar out of five dollars. She got very few clothes, and had to sell her sewing-machine on account of her husband's drunkenness. She had seen him with $50.00, $80.00, $100.00, or $200,00, and sometimes with these sums he would leave home, and come back hatless and without a cent. His services were worth from $1.50 to $2.00 per day. She went to see J. R. Selbe, the salesman in defendant's saloon, after her husband's death, and asked him to give her something to live on. He said he had sold her husband liquors, but it was nothing more than the rest had done; and, if she got anything, she should get it by law. She denied that she ever had told him to sell her husband liquors. The defendant's witnesses proved that on the day the plaintiff's husband was drowned, Monday, March 26, 1884, he was on the other side of the Kanawha river from Point Pleasant, at work from 9 o'clock in the morning till sundown, when he came back to Point Pleasant; that he had left there that morning about 8 o'clock; that he was then sober; but he went into the saloon, in Point Pleasant, of one Hopkins, took two drinks, and bought a pint of whisky, which he took with him; he bought this on an order he had got some two weeks before on Hopkins; that, when he came back to Point Pleasant, he was seen to take one or two drinks at Hopkins's saloon, and to buy a pint of whisky there; that a person was seen to come out of another saloon in Point Pleasant, kept by Flanagan, that night, and give Thomas Pegram a pint of whisky.

The defendant himself testified, that some time within four months before Thomas Pegram was drowned he and his wife, the plaintiff, came into his saloon, and she told Selbe, his salesman, that they could let her husband, Thomas Pegram, have whisky when he was not drunk, or too much under the influence of it; and he testified that he had never received any written notice from the plaintiff not to sell intoxicating liquors to her husband. The fact that the plaintiff had told the defendant to let her husband have whisky when not drunk was testified to by the defendant and by three other witnesses, but it was positively denied to be true by the plaintiff. The purchase of a pint of whisky, on the morning he was drowned, by Thomas Pegram, and another pint that night, at the saloon of Hopkins, was proved by four witnesses, but the salesman at this saloon denied that, on the day Thomas Pegram was drowned, he bought more than a half pint or a pint of whisky at Hopkins's saloon. The defendant's witnesses proved, also, that no whisky had been sold to Thomas Pegram at the defendant's saloon on the day he was drowned. This was proved by the defendant only. But that Thomas Pegram had been refused a drink on that day at least three times by the salesman, Selbe, at the saloon, was proven by the defendant himself, and also by another witness other than his salesman, Selbe.

The court, at the close of this bill of exceptions, certified "that the defendant did, within a year before the bringing of this suit, cause some injury to the plaintiff's means of support by selling liquor to her husband when in a state of intoxication; but that he did not sell him the whisky which occasioned or caused his drowning; but there was some evidence tending in some degree (slight, however,) to prove a sale by the defendant to Thomas Pegram the day he was drowned."

There was a second bill of exceptions copied by the clerk into the record, setting out nine instructions given by the court to the jury, and five others given at the instance of the plaintiff, and to which the bill of exceptions, as it is called, shows that the defendant objected. But, as this bill of exceptions No. 2 is in no way referred to on the record-book of the court, it constitutes no part of the record, and its contents are therefore not stated.

From the order of the court refusing to grant the defendant a new trial, and from the judgment of the court entered up against him for $1,000.00 and costs, on February 19, 1886, the defendant obtained an appeal and *supersedeas.*

*Knight & Couch* and *J. B. Menager* for plaintiff in error.

*C. E. Hogg* for defendant in error.

GREEN, JUDGE:

This action was brought by the plaintiff, Nancy A. Pegram, against John G. Stortz, a saloon-keeper, for selling intoxicating liquor to her husband after he had been served by her with a written notice not to do so, whereby he became intoxicated, and by reason thereof injured her in her means of support. The action is given by a statute passed in 1877. See chapter 107, § 16, which is as follows :

"Any husband, wife, child, parent, or guardian, may serve upon any person engaged in the sale of intoxicating liquors a written notice not to sell or furnish such liquors to the wife, husband, child, parent, or ward of the person giving such notice; and thereafter, if the person so served with such notice shall, by himself or another, sell or furnish such liquors to the person named in said notice, and by reason thereof the person to whom the liquor is sold or furnished shall become intoxicated, and, while in that condition, do damage to another, or shall, by reason of such intoxication, injure any person in his or her means of support who may have the legal right to look to him therefor, upon due proof that such liquors were sold or furnished as aforesaid, and that the person mentioned in said notice was, at the time of the service thereof, in the habit of drinking to intoxication, an action may be maintained by the husband, wife, child, parent, or guardian of the person mentioned in said notice, or other person injured by him as aforesaid, against the person selling or furnishing him such liquor, as well for all such damages as the plaintiff has sustained by reason of the selling or giving such liquors as for exemplary damages; and if the person so proceeded against has given the bond and security hereinafter provided for, such suit may be brought and prosecuted upon such bond, against him and his sureties thereon."

The bond referred to is the bond provided for in the eighteenth section of said chapter, given when a license to sell such liquors is granted by the court.

Before considering the points arising in this case, it will be necessary to understand what is the meaning and scope of this statute; and especially what is the measure of damages to be recovered in a suit under it; and what facts or occurrences give to the plaintiff a right of action under it. It provides that the " plaintiff may recover as well for all such damages as he or she has sustained by reason of the selling or giving of such liquors, as for exemplary damages." What is meant as the measure of damages thus stated by this statute must be determined by the meaning to be given to the words "all such damages as the plaintiff has sustained," and by the words "as well as for exemplary damages." And, to determine the meaning of these words, we must look to the previous decisions of the cases of common-law torts, and especially of cases of common-law torts for interference with family relations, as this statute made a new actionable tort, unknown to the common-law,—the interference with the family relations by a person engaged in selling intoxicating liquors, in disregard of a written notice not to furnish such liquors to any member of the family who was an habitual drunkard when the notice was given, and thereby making him drunk, when the person giving such notice has sustained damages to his or her means of support.

A number of definitions have been given of the word "damages." Thus Blackstone defines it: "The money given to a man by a jury as a compensation for some injury sustained." 2 Bl. Comm. 438. The Civil Code of California of 1874 thus defines it: "Every person who suffers detriment from the unlawful act or omission of another may recover from the person in default a compensation therefor in money, which is called damages." See 2 Code of Cal. 384, § 3,281. Rutherford defines it: "Every loss or diminution of what is a man's own, occasioned by the fault of another." See Ruth. Inst. (Balt. Ed. 1832,) bk. 1, ch. 17, § 1. And Webster, in his dictionary, defines it as " the estimated reparation for detriment or injury sustained." These definitions are all substantially the same.

These damages for torts some of the courts divide into two classes, which cover all the damages which a court can in any case award; but other courts have added a third class, which they say, in certain cases, may be added in the discretion of the jury. These three classes have been variously designated; and much of the confusion as to the measure of damages has, I think, arisen out of the inappropriate language used to designate them.

The first class I will designate as determinate pecuniary loss, such as pecuniary loss directly sustained, as by the destruction of property, or consequently sustained, as, for instance, the pecuniary value of the time lost by the plaintiff from injuries inflicted upon him, the expenses incurred by him for medicine, physician's bills, pay for attendance and board while disabled from the injury inflicted upon him and sick on that account, and the like. This first class of damges, which I designate as determinate pecuniary loss, is often, but inappropriately, called in the text-books and designated actual loss, or remunerative or compensatory damages. It is certainly true that this determinate pecuniary loss is actual damages, or remunerative damages, or compensatory damages; but it is an inappropriate designation of this sort of damages, because it does not distinguish it from the second class of damages, of which I will speak hereafter,—indeterminate damages,—which is, as we shall presently see, as much actual loss or remunerative and compensatory damages as is this first class, the marked difference between the two classes being that the first class is capable of being calculated and ascertained with exact or at least proximate accuracy, while the second class, as we shall presently see, is from its very nature indeterminate, and can never be ascertained exactly, or with any approximation to exactness. This difference we will presently point out distinctly. It makes a marked difference between these two classes of damages; and, as the laws governing these two classes are strikingly different, it is unfortunate that the books and decisions have not kept these marked differences in the law always before us, by designating these two classes by distinct and appropriate names. On the contrary, they frequently designate this first class of damages, either as actual or remunerative

or compensatory damages, terms which in no way distinguish it from this second class. But, as these phrases have been so often used as if applicable to this first class peculiarly, the natural consequence of such inappropriate language has been to engender the notion that this second class was somehow not actual, remunerative, or compensatory damages.

But, before pointing out distinctly what I mean by indeterminate damages, I will consider what law has been laid down with regard to determinate pecuniary damages, our first class. First, then, this determinate pecuniary loss, which can be recovered for any tort of any description, must always be the natural and proximate consequence of the act complained of by the plaintiff. While this is universally admitted to be the law, yet the cases do not always agree as to whether, in particular cases, certain damages can not be regarded as the natural and proximate consequences of the act, the subject of the complaint. Whatever may be the difficulty, in particular cases, of determining whether certain damages suffered by the plaintiff were the natural and proximate consequence of the act of the defendant complained of, or whether they were the remote consequence of this act of the defendant, yet it is obvious that it is absolutely necessary to distinguish between the natural and proximate consequence and this remote consequence of the defendant's act, and to hold that he can never be mulcted in determining pecuniary damages, when it was only the remote consequence of his act. If the liability of a defendant for determinate pecuniary damages be not limited to the natural, direct, or proximate result of his action complained of, then it would seem almost impossible to fix any definite limit to his responsibility in any case ; for, in the language of Lord Bacon: "It were infinite for the law to judge the cause of causes, and their impulsion one on another. Therefore it contenteth itself with the immediate cause, and judgeth of acts by that, without looking to any further degree."

On this subject, Chief Justice Shaw says, in *Marble* v. *City of Worcester*, 4 Gray 395 : "The whole doctrine of causation, considered in itself metaphysically, is of profound difficulty, if it may not be said of mystery. It is a maxim, we believe, of the schoolmen, *causa causantis causa est cau-*

*sati*. And this makes the chain of causation by successive links endless. And this, perhaps, in a certain sense is true. Perhaps, no event can occur which may be considered as insulated and independent. Every event is the effect of some cause or combination of causes, and in its turn becomes the cause of many ensuing consequences more or less immediate or remote. The law, however, looks to a practical rule, adapted to the rights and duties of all persons in society in the common and ordinary concerns of actual and real life; and on account of the difficulty of unraveling a combination of causes, and of tracing each result, as a matter of fact, to its true, real, and efficient cause, the law has adopted the rule, before stated, of regarding the proximate and not the remote cause of the occurrence which is the subject of inquiry."

The following, among a multitude of cases, may be referred to as sustaining the general proposition that in cases of tort the determinate pecuniary damages must always be the natural and proximate consequence of the act complained of by the plaintiff: *Ashley* v. *Harrison*, Peake 194, 1 Esp. 48; *Moore* v. *Adam*, 2 Chit. 198; *Donnell* v. *Jones*, 13 Ala. 490; *Anthony* v. *Slaid*, 11 Metc. 290; *Haynes* v. *Sinclair*, 23 Vt. 108; *Brown* v. *Cummings*, 7 Allen 507; *Stone* v. *Codman*, 15 Pick. 297; *Loker* v. *Damon*, 17 Pick. 284.

This rule is, as the authorities show, as applicable to a case of pecuniary loss consequentially sustained as to pecuniary loss directly sustained. It is also applicable to damages for breach of special contract. See *Hadley* v. *Baxendale*, 9 Exch. 341, wherein Alderson, B., says: " When two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally in accordance to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in contemplation of both parties, at the time they made the contract, as the probable result of the breach of it." See, also, *Fox* v. *Harding*, 7 Cush. 516, Biglow, Judge, on pages 522, 523, says:

" The rule has not been uniform or very clearly settled as

to a right of a party to claim a loss of profits as a part of the damages for a breach of a special contract. But we think there is a distinction by which all questions of this sort can be easily tested. If the profits are such as would have accrued and grown out of the contract itself as the direct and immediate result of its fulfillment, they then would from a just and proper item of damages to be recovered against the delinquent party upon a breach of the agreement. These are a part and parcel of the contract itself, and must have been in the contemplation of the parties when the agreement was entered into. But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contracts, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit. To illustrate this by the case at bar: The plaintiffs had a right to recover such sum in damages as they would have realized in profits, if the contract had been fully performed. To ascertain this it would be necessary to estimate the cost and expenses of work and materials in completing the contract on their part, and deduct the sum from the contract price. The balance would be the profit which would have accrued to them out of the contract itself if it had been fulfilled, and which they had a right to recover, in addition to such further sum as would compensate them for the labor and materials supplied towards the completion of the contract. But if the plaintiffs had offered to prove, in addition to this, that, in consequence of the breach of the contract by the defendants, they had lost other contracts, by which they would have realized large profits, and which they had entered into for the purpose of fulfilling their contract with the defendants, the evidence would have been wholly inadmissible, because such collateral undertakings were not necessarily connected with the principal contract, and can not be reasonably supposed to have been taken into consideration when it was entered into. Such profits are too uncertain, remote, and speculative in their nature, and form no basis of damages."

In that case the plaintiff's agreement with the defendant

was to make certain machines, and the defendant agreed with the plaintiff to furnish the materials out of which these machines were to be made, at given times. The plaintiff, having received from the defendant part of these materials, proceeded for some time with his work, but could not complete it because the defendant did not furnish the material, as by this contract he had agreed to do; and in consequence the plaintiff lost time, being unemployed, as well as the profits which he would otherwise have made.

This question of what was the proximate and what was the remote cause of damages was considered by this Court in *Washington* v. *Railroad Co.*, 17 W. Va. 190; and, establishing the principle that the determinate pecuniary damages which can be recovered from any tort of any description must always be the natural and proximate consequence of the act complained of, and not its remote consequence, I may refer to the cases there cited on this subject: *Insurance Co.* v. *Tweed*, 7 Wall. 52; *Carter* v. *Towne*, 103 Mass. 507; *Vicars* v. *Wilcocks*, 8 East 1; *Woolf* v. *Beard*, 8 Car. & P. 373, 34 E. C. L. 787. The conclusion this Court reached in that case is thus expressed in the third point of the syllabus, "The cause of an injury, in contemplation of law, is that which immediately produces it as its natural consequence; and, therefore, if a party be guilty of an act of negligence which would materially produce an injury to another; but, before such injury actually results, a third person does some act which is the immediate cause of the injury, such third person is alone responsible therefor, and the original party is in no degree responsible therefor, though the injury could never have occurred but for his negligence. The casual connection between the first act of negligence and the injury is broken by the intervention of the act of a responsible party, which act is in law regarded as the sole cause of the injury, according to the maxim *in jure non remota causa sed proxima spectatur*."

There was also decided in that case a principle with reference to contributory negligence, which substantially involves the same question. The points decided on this question are thus stated in the fifth and sixth points of the syllabus: "By contributory negligence is meant such negli-

gence on the part of the plaintiff as contributes to the injury ; that is, directly in part causes it." "It is therefore not contributory negligence for the plaintiff to be guilty of a negligent act which might have produced the injury, if, before it actually results, the defendant is guilty of some negligent act which was the immediate cause of the injury, even though no damage could have resulted to the plaintiff had he not been originally negligent." In delivering the opinion of the Court, I discuss these two propositions at length, from page 199 to page 204, inclusive, in which I refer to some thirty-five cases, many of which are in substance stated, and which I believe sustain the position above stated deduced from them. What I have said is equally applicable to all sorts of determinate pecuniary loss, whether it be directly sustained, as by the destruction of property, or by diminution in its value by directly injuring such property, or whether it be consequential pecuniary loss, as for instance, the pecuniary value of time lost from injuries directly inflicted by the defendant on the plaintiff, or expenses incurred by the plaintiff for physicians' bills, pay for attendance and board while disabled by the injuries inflicted by the defendant, or the like.

But there is a marked difference in the manner in which the two sorts of determinate pecuniary loss must be stated by the plaintiff in his declaration. If it be directly sustained, it is called general damages ; but, if it be only consequential pecuniary loss, it is called special damages. All damages must be the result of the injury inflicted. Those which are directly sustained, or general damages, as they are called, always necessarily result from the injury. These may be shown under the general allegation of damages at the end of every declaration ; for the defendant is, by the rules of pleading, presumed to be aware of the necessary consequences of his conduct; and therefore can not be surprised by the proof of them, though they be not specially mentioned in the declaration. But it is different with all consequential losses. The damages thus arising, though the natural consequence of the act complained of, as well as the proximate result of such act, are not the necessary result. The damages resulting from such consequential losses are

the special damages I have spoken of. To prevent a surprise upon the defendant, the rules of pleading require that these should be particularly specified in the declaration; and, if they are not, the plaintiff will not be permitted to produce before the jury any evidence of them at the trial. See 1 Chit. Pl. 328, 346, 347; *Baker* v. *Green*, 2 Bing. 317; *Pindar* v. *Wadsworth*, 2 East 154; *Armstrong* v. *Percy*, 5 Wend. 538, 539, (per Marcy, Judge); *Dickinson* v. *Boyle*, 17 Pick. 78; *Baldwin* v. *Railroad Corp.*, 4 Gray 333.

In actions of tort of every description, damages for the determinate pecuniary loss could always be sustained by the party injured against the wrong-doer at common-law; and with a single exception, to be presently specified, such damages could always be recovered, even where the wrong-doer was an infant or *non compos mentis;* for, when such damages were sought to be recovered, the intention of the wrong-doer was not considered, and the recovery of such damages could be had even when the wrong-doer intended to do no wrong, or even in cases where, because of his mental condition, he was incapable of being actuated by any intention. See Dillon, Judge, in *Behrens* v. *McKenzie*, 23 Iowa 343; *Sutton* v. *Clarke*, 6 Taunt. 44; *Filliter* v. *Phippard*, 11 Ad. & E. (N. S.) 347; *Hartfield* v. *Roper*, 21 Wend. 615; *Morse* v. *Crawford*, 17 Vt. 499.

But a child or person *non compos mentis* might, perhaps, not be regarded as negligently causing an injury under circumstances under which an adult, who was *compos mentis*, might be held responsible as for an injury from his negligence. By the common-law all actions of tort died with the person. After the death of the wrong-doer or the party injured, his representatives were not liable to be sued, and could not sue for such a tort, such as battery, slander, etc. See *Hole* v. *Bradford*, Raym. T. 58; *Little* v. *Conant*, 2 Pick. 527; *Franklin* v. *Low*, 1 Johns. 402; *U. S.* v. *Daniel*, 6 How. 13. This has been, to some extent, almost universally modified by statute, both in England and in the various States of this country. The extent of this statutory modification varies in different States. See Code W. Va. § 20, p. 504.

The exception, or apparent exception, to the otherwise

universal rule at common-law, that in actions of tort the injured party might always recover of the wrong-doer the determinate pecuniary loss which he had sustained, is that the death of a human being was never the ground of an action for damages, though such death was the natural and proximate consequence of the wrongful act of the defendant, and the plaintiff was apparently injured thereby. See *Baker* v. *Bolton*, 1 Camp. 493; *Carey* v. *Railroad Co.*, 1 Cush. 475. This well-established rule of the common-law has been, to a certain extent, in recent times, modified by a statute in England; and a similar modification of the common-law in this respect has been effected by statute in most, if not all, of the States. But of this I will speak more at large hereinafter when I consider wrongful interferences with family relations.

Damages of the second class, which I will designate as indeterminate damages, such as from their nature can not be ascertained either exactly, or with any sort of approximation to exactness; such, for instance, as damages for physical suffering consequent upon the injury inflicted by the defendant, including any temporary, protracted or permanent deformity, disability or disfiguring, as by scars or the like, or damages caused by mental anguish, loss of honor or sense of shame of the plaintiff, caused by the defendant's tort, the sense of wrong or degradation felt by the plaintiff and the like, or damages resulting from the defendant's act in injuring the business reputation, social standing and the like of the plaintiff.

Damages of this sort have, I think, been generally but very inappropriately, called vindictive damages, exemplary damages or punitive damages. This designation does not sufficiently distinguish damages of this class from damages of the first class, which I have called determinate pecuniary damages. For, in a general sense, determinate pecuniary damages, might be called exemplary; that is, determinate pecuniary damages—as, for instance, the value of property destroyed by the defendant—inflicted on the defendant would, of course, serve as a warning to him and others to avoid the inflicting of such injuries on others; or such determinate pecuniary damages might be said to be punitive, as

the inflicting of such damages must operate incidentally as a punishment to the defendant, though its object was only to compensate the plaintiff for his loss; or such damages might, in a loose sense, be called vindictive, as it might gratify a vindictive feeling of the plaintiff. But this seems to me a most inappropriate name to bestow on any sort of damages; for, surely, none of them can be regarded as found against the defendant to gratify a vindictive feeling of the plaintiff, or any one else, towards him.

But the greatest objection to calling this second class of damages, which I designate as indeterminate damages, either vindictive, exemplary or punitive damages, by some one of which they have been very generally called, is that any one of these designations must almost certainly lead to confounding such damages, which are obviously compensatory in their character, with the third class of damages, which many insist exists, but which others deny, and whose appropriate designation, if it has any existence, is properly penal damages, but which is commonly called, by those who claim it has an existence, punitive damages. While determinate pecuniary damages are recoverable in some actions on contracts, and in all actions of tort, indeterminate damages, usually but improperly called exemplary damages, the second class, are not recoverable in actions on contract, and are not usually recoverable in actions of tort. This class of damages can only be recovered in actions of tort, when there is connected with the tort fraud, oppression, malice or negligence so gross as to raise a presumption of intentional breach of duty, or malice, or reckless disregard of the plaintiff's rights; or, in other words, it must be proven, that the defendant in doing the act complained of, was actuated by a vicious intention. But where the action is for a breach of contract, the vicious intention of the defendant can have no effect on the damages. The plaintiff is in such case entitled to determinate pecuniary damages, fixed by the decisions with reference to the different sorts of contracts, as shown by these, among many other, decisions: *Farrand* v. *Bouchell*, Harp. 83; *Tarft* v. *Wildman*, 15 Ohio 123; *Alder* v. *Keighley*, 15 Mees. & W. 117; *Strutt* v. *Farlar*, 16 Mees. & W. 249; *Ellison* v. *Dove*, 8 Blackf. 571; *Bell* v. *Walker*, 5 Jones (N. C.)

43; *Gantz* v. *Clark*, 31 Iowa 254; *Frost* v. *Tarr*, 53 Ind. 390; *Lecroy* v. *Wiggins*, 31 Ala. 13; *Herbert* v. *Stanford*, 12 Ind. 503; *Clelland* v. *Snider*, 18 Ill. 58; *Coffee* v. *Meiggs*, 9 Cal. 363; *Railroad Co.* v. *Hodnett*, 29 Ga. 461; *Addams* v. *Tutton*, 39 Pa. St. 447.

The cases decided show that indeterminate damages, or, as they are generally called, exemplary damages, can only be awarded, as above stated, when the defendant, in doing the act complained of, was actuated by a vicious intention. The following are a few of the many cases from which this principle may be deduced: *Farwell* v. *Warren*, 51 Ill. 467; *Brown* v. *Chadsey*, 39 Barb. 253; *Railroad Co.* v. *Statham*, 42 Miss. 607; *Friedenhiit* v. *Edmundson*, 36 Mo. 226; *Dibble* v. *Morris*, 26 Conn. 416.

It will be observed that there is a very marked distinction, in the respect above named, between cases in which the measure of damages is determinate pecuniary damages, and those in which the measure of damages is indeterminate. The one embraces all sorts of suits for damages, whether on contracts or for torts; and the other is confined to a very limited number of actions for torts only. It has been supposed that, when the suit is one in which indeterminate damages may be recovered, the jury may assess damages which are, in their judgment, the remote consequence of the act complained of, and that they are not confined, as in the cases where the plaintiff can only recover determinate pecuniary damages, to damages resulting as the natural and proximate consequence of the act of the defendant, the subject of the complaint; and these authorities have been referred to by Sedgwick (volume 1, side page 88) to show that, where the conduct of the defendant is illegal and mischievous,—that is, where the plaintiff is entitled to recover indeterminate damages, and not simply determinate pecuniary damages,—the disposition of the court is to make the defendant liable for injurious consequences flowing from his illegal act, although they be very remote. *Powell* v. *Salisbury*, 2 Younge & J. 391; *Gilbertson* v. *Richardson*, 5 Man. G. & S. 502; *Gunter* v. *Astor*, 4 Moore 12, 16 E. C. L. 357; *Martinez* v. *Gerber*, 3 Scott N. R. 386; *Wright* v *Gray*, 2 Bay 464; *Duncan* v. *Railroad Co.*, 2 Rich. Law 613.

Some of these cases justify the inference drawn from them by Sedgwick. · In others it seems to me that the consequences for which the defendant, who had done the malicious act, the subject of the complaint, is sued, were proximate and not remote consequences of his act; and I do not think it is a fair inference from these cases that the courts which decided them intended to hold that, when the act of the defendant was malicious, and one for which indeterminate damages, or, as they are called, exemplary damages, might be recovered, the defendant could be held liable beyond the natural and proximate consequences of his malicious act. At most, in some of these cases, the court may and I think did regard consequences as natural and proximate which ought to have been regarded as remote. To suppose that they meant to lay down a rule that, in this class of cases, damages resulting from an illegal act could be recovered, no matter how many acts may have since occurred which were equally the cause of the damage sustained, and the last of which subsequent acts was obviously the direct cause of the damages sustained by the plaintiff, would be to suppose they intended to overthrow the law as firmly established from the earliest day, and, in lieu of it, to say that there is no law as to the measure of damages applicable to such cases, but that the jury can legitimately assess arbitrarily any damages they choose; for, as we have seen, causes and effects are linked together in an endless chain that, if these remote consequences could be regarded as the result of the defendant's act, he might be made' responsible for damages amounting to thousands of dollars, which ·were produced immediately by the act of some other person, simply because such third person could have had no opportunity of doing such act had not the defendant done some malicious act years before, the natural and proximate results of which might obviously have produced a mere trifling damage to the plaintiff, even after there was included in it every item of the indeterminate damages of which we have spoken, such as wounded feelings and the like.

It seems to me that by far the most of the authorities make no sort of distinction in the rule which is to govern juries in ascertaining the measure of damages in any sort of

tort, whether it be malicious or not, so far as the conse-
quences of the defendant's act, of which complaint is made,
is concerned, which the jury may legitimately consider. In
all cases they can take into consideration only the natural
and proximate consequences of the defendant's act, and never
its remote consequences. The law is so laid down by Green-
leaf on Evidence, (volume 2, § 256;) and he not only lays
·down the law thus broadly, to use his language : "The dam-
ages to be recovered must always be the natural and proxi-
mate consequence of the act complained of," but he does not
suggest either in the text or in his notes that there is any
dispute about the correctness of the law, as thus stated, and
its application to all cases, whether the act of the defendant
was or was not malicious; and it does seem to me that he
was entirely justified in thus laying down the law both by
reason and by the immense number of cases in which it had,
without any controversy, been regarded as law applicable
to all sorts of cases.

There has been much controversy in applying this ad-
mitted principle of law to the facts appearing in particular
cases, and in determining whether certain consequences
where the natural and proximate consequences of the de-
fendant's act, or only its remote consequences ; but, this
being determined, there never was any real or serious dis-
pute as to the law as stated by Greenleaf above being the
law which should govern in all cases of torts. There are a
number of cases to be found where the court has assumed
that to be the natural and proximate consequence of the de-
fendant's act, the subject of complaint, which was but the
remote consequence of such act; and the cases where the
act of the defendant was malicious, or controlled by vicious
intent, are more numerous than the cases where the tort was
free from all vicious intent ; and, in the first of these classes
of cases, courts have not inadvertently only, but after delib-
eration, made mistakes, and regarded consequences as
natural and proximate when they were really remote, more
frequently than in the second of these classes of cases.

  These results are, however, it seems, to be explained by
the great difficulty, in many cases, in determining whether
a particular consequence was the natural and proximate re-

sult of an act or the remote result of it, and the difficulty is greater when the act was mixed with a vicious intent than when it was free from all vicious intent on the part of the defendant. I will refer to a few cases in which the courts refuse to permit damages to be recovered for the remote consequences of the defendant's act, the subject of the complaint, though such act was influenced by a vicious intent, and therefore justified the jury in giving the plaintiffs what I have called indeterminate damages, though ordinarilly caled exemplary damages. See *Phillips* v. *Dickerson*, 85 Ill. 11; 60 N. Y. 262; *Cuff* v. *Railroad Co.*, 35 N. J. Law 17; *Hoadley* v. *Transportation Co.*, 115 Mass. 304; *Gilman* v. *Noyes*, 57 N. H. 627; *Sims* v. *Glazener*, 14 Ala. 695; *Terwilliger* v. *Wands*, 17 N. Y. 54; *Fuller* v. *Fenner*, 16 Barb. 333; *Adams* v. *Smith* 58 Ill. 417; *Prime* v. *Eastwood*, 45 Iowa 640; *Wilson* v. *Goit*, 17 N. Y. 442; *Kendall* v. *Stone*, 5 N. Y. 14; *Sturgis* v. *Frost*, 56 Ga. 188; *Fitzsimmons* v. *Chapman*, 37 Mich. 139.

There is, according to many eminent judges and text-writers, a third class of damages, which is called punitive damages generally, though its more appropriate name would be penal damages. These are damages inflicted upon the defendant, not to compensate the plaintiff by giving him all the determinate pecuniary damages, as well as all the indeterminate damages, such as for wounded feelings, bodily pain, and the like, which he has suffered, but going still further, and inflicting damages on the defendant for his intentionally vicious act, that society may be protected by in this manner punishing the wrong-doer, and deterring others from doing like wrongs.

The propriety of allowing damages to be given by way of punishment, under any circumstances, has been strenuously denied in some cases, and the question has given rise in modern times to extensive discussion. The weight of reason is, I think, clearly with those who deny that such punitive damages ought ever to be given. The amount to be paid in order to protect society, and deter others from like offence, is clearly a matter which ought to be left to the criminal courts; and the fine inflicted on the offender in order to·protect society, and deter the commission of like crimes, should

go to the State, and not to the party against whom the wrong is committed. All he can ask is to be fully compensated for the wrong done, and that such compensation should include, not only what we have called determinate pecuniary loss, but also all indeterminate damages, as I have called them, such as for mental suffering, wounded feelings, bodily pain, and the like. When he has recovered this, he has recovered all possible damage sustained by him, according to any meaning which, by the law-books or decisions, has ever been attached to the word "damages;" and it is unjust to give him more by further mulcting the defendant, who may be, at the same time or afterwards, indicted, and again punished for the same offence. This double punishment of a defendant for a felony or misdemeanor is contrary to the constitution and our sense of right, and ought in no case to be permitted.

These punitive damages have, however, certainly been countenanced by many judges, and it has only been recently that either text-writers or judges have vigorously assailed the allowing of such punitive damages; but since the discussion of this question, it seems to me, that the courts would very generally, perhaps universally, hold that such punitive damages ought in no case to be allowed, were they not controlled by the doctrine of *stare decisis*, but many of the courts feel themselves bound to follow the decisions heretofore rendered on this subject. An examination of the authorities would seem to show that the decided weight of authority has been in favor of allowing the awarding of such punitive damages in certain cases. An examination of these cases will show that, where the courts have rendered such decisions, they were almost all rendered without any discussion, and with apparently very little consideration; while in a large number of cases what has been said by some judges, in delivering an opinion, which either expressly or by implication countenanced the propriety, in certain cases, of awarding such punitive damages, was really a mere *obiter dictum*, uttered without much consideration. This question appears never to have been fully discussed, or that consideration given to it which its importance demands, till within the last half century.

The controversy on this subject between Greenleaf, in his work on Evidence, (see his lengthy note to section 253, vol. 2, p. 235, 13th ed.,) and Sedgwick, in his work on the Measure of Damages, (see volume 2, 7th ed., 323, and the voluminous notes) has called the attention of the profession to the importance of the question. Greenleaf in his text (section 253) thus states the law: "Damages are given as a compensation or satisfaction to the plaintiff for an injury actually received by him from the defendant. They should be precisely commensurate with the injury,—neither more nor less; and this, whether it be to his person or estate." If this be law, it of, course, excludes the idea that, in addition to the full compensatory damages, the plaintiff could in any case legally recover more of the defendant, in order that it might operate on him as a punishment, for the protection of society generally, and to deter others from doing like wrongs with vicious intents.

Sedgwick, in his work on the Measure of Damages, takes direct issue with Greenleaf on this question. See volume 1, top page 53, side page 38, (7th ed.) Under the heading of "Exemplary Damages," he says: "Thus far we have been speaking of the great class of cases where no question of fraud, malice, gross negligence, or oppression intervenes. When either of these elements mingle in the controversy, the law, instead of adhering to the system or even the language of compensation, adopts a wholly different rule. It permits the jury to give what it terms punitory, vindictive, or exemplary damages; in other words, blend together the interests of society and of the aggrieved individual, and give damages, not only to recompense the sufferer, but to punish the offender. This rule, we shall see hereafter more at large, seems settled in England, and in the general jurisprudence of this country." And in volume 2, top page 323, side page 456, of the same edition, under the heading, "In Some Cases Punishment of the Defendant is Added or Substituted for Compensation to the Plaintiff," he says: "It might be said, however, that the malicious or insolent intention does in fact increase the injury, and the doctrine of exemplary damages might thus be reconciled with the strict notion of compensation; but it will appear from the cases we now proceed to examine, that

the idea of compensation is abandoned, and that of punishment introduced."

He then proceeds in the text to examine the following cases : *Huckle* v. *Money*, 2 Wils. 205 ; *Tullidge* v. *Wade*, 3 Wils. 18; *Merest* v. *Harvey*, 5 Taunt. 442 ; *Sears* v. *Lyons*, 2 Stark. N. P. 317 ; *Doe* v. *Filliter*, 13 Mees. & W. 47 ; *Rogers* v. *Spence*, Id. 571 ; *Walker* v. *Smith*, 1 Wash. C. C. 152 ; *Tillotson* v. *Cheetham*, 3 Johns. 65 ; *Wort* v. *Jenkins*, 14 Johns. 352 ; *Manufacturing Co.* v. *Fiske*, 2 Mason, 120 ; *Whipple* v. *Walpole*, 10 N. H. 130 ; *Linsley* v. *Bushnell*, 15 Conn. 225 ; *Pastorious* v. *Fisher*, 1 Rawle, 27 ; *Tracy* v. *Swartwout*, 10 Pet. 81 ; Story, Judge, in *The Amiable Nancy*, 3 Wheat. 546 ; *Merrills* v. *Manufacturing Co.*, 10 Conn. 384 ; *Phillips* v. *Lawrence*, 6 Watts & S. 150 ; *Nelson* v. *Morgan*, 2 Mart. (La.) 257 ; *King* v. *Root*, 4 Wend. 113–119 ; *Cook* v. *Ellis*, 6 Hill, 466 ; *Burr* v. *Burr*, 7 Hill 207, 217 ; *McBride* v. *McLaughlin*, 5 Watts 375 ; *Amer* v. *Longstreth*, 10 Pa. St. 145 ; *Grable* v. *Margrave*, 3 Scam. 373 ; *McNamara* v. *King*, 2 Gilman 432 –436 ; *Smith* v. *Sherwood*, 2 Tex. 460 ; *Mitchell* v. *Bellingsly*, 17 Ala. 391 ; *Spikes* v. *English*, 4 Strob. 34 ; *Johnson* v. *Hannahan*, 3 Strob. 425 ; *Rippey* v. *Miller*, 11 Ired. 247.

Greenleaf, in a note to section 253 of the 13th edition, after quoting what I have heretofore quoted from Sedgwick, says, speaking of the view of Sedgwick, that in certain cases a jury may give damages, not only to recompense the sufferer, but to punish the offender. "However this view may appear to be justified by the general language of some judges, and by remarks gratuitously made in delivering judgment on other questions, it does not seem supported to that extent by any express decision on the point and is deemed at variance, not only with adjudged cases, but with settled principles of law. This will appear from an examination of authorities on which the learned author relies." He then takes up such of the above cases as had then been cited by Sedgwick in his text; omitting, however, some inserted in the text in subsequent editions, and reviews them severally, stating generally the exact character of the case in detail, when Sedgwick had failed to do more than quote from the opinion of the judge in the case. His conclusion from the first two old English cases reported in Wilson is that they decided only what is

laid down by Greenleaf, (volume 2, § 272,) which is: "Where an evil intent has manifested itself in acts and circumstances accompanying the principal transaction, they constitute a part of the injury, and, if properly alleged, may be proved like any other facts material to the issue."

The only other English case there cited by Sedgwick (*Doe* v. *Filliter*, 13 Mees. & W. 47) was an action of trespass for profits; and the inference drawn by Sedgwick was that the jury could give damages beyond what was compensatory, as a punishment to the defendant, from the remark of Pollock, C. B.: " In actions for malicious injuries, juries have been allowed to give what are called vindictive damages, and take all the circumstances into consideration." The only question before the court was whether the plaintiff should be confined to estimating his damages to the legal costs of the ejectment suit, or could recover, also, the fees he had paid his attorney. Greenleaf properly concludes that, in determining this question, the judge meant simply to say that, as the taking of the profits was malicious, the jury would consider all the circumstances, and include in their verdict for damages either the legal costs or the actual costs of the ejectment suit, as they thought proper. There was nothing here intimating that damages could be given in addition to the plaintiff's actual loss, in order to punish the defendant though, for want of a better word, the judge did use the word "vindictive." Language was used by Washington, Judge, in *Walker* v. *Smith*, 1 Wash. C. C. 152, in which occur the words "vindictive" damages. He is shown to have had no idea of damages given to punish the defendant beyond what would compensate the plaintiff, as the question for consideration for the jury, with reference to which they were charged by the judge as quoted by Sedgwick, was really whether they were bound to give the plaintiff the full amount of his actual loss, or could give him less, because of mitigating circumstances which accompanied the act of the defendant, the subject of the complaint, the judge, meaning Greenleaf, concludes, that in actions sounding in damages the court had no control over the jury, but, as this was an action not sounding in damages, they should obey the instruction of the court. The remarks quoted from Sedgwick were merely thrown in by the

judge, and were not pertinent to the case before him, and did not mean what they have been assumed to mean.

What was said by Kent, C. J., in *Tillotson* v. *Cheetham*, 3 Johns. 54, 56, in refusing to grant a new trial in a libel suit, is, Greenleaf insists, in perfect accordance with his views. The instruction given the jury was perfectly right. It was "that the charge contained in the libel was calculated, not only to injure the feelings of the plaintiff, but also to destroy all confidence in him as a public officer, and in his opinion, demanded from the jury exemplary damages." It is true, he added, that he did not accede to the doctrine that the jury ought not to punish the defendant, in a civil suit, for the pernicious effects which a publication of the kind was calculated to produce in society. "Here the grounds of damages, positively stated to the jury, were expressly limited to the degree of injury to the plaintiff, either in his feelings or character as a public officer. The 'did not accede' is mere negative." And he further, in his comment, says : "All damages in actions *ex delicto* may be said to be exemplary, as having a tendency to deter others from committing like injuries" He thinks that Chief Justice Kent, in saying what is quoted by Sedgwick from him : "The actual pecuniary damages in actions for defamation, as well as in other actions for tort, can easily be computed, and are never the sole rule of assessment,"—probably meant no more than this : that the jury were at liberty to consider all the damages accruing to the plaintiff from the wrong done, without being confined to those which were susceptible of arthmetical calculation. If Greenleaf had used the terms I suggested, he would have said that the plaintiff, in such a suit, was entitled to recover, not only his determinate pecuniary damages, but also indeterminate damages, which is entirely in accord with my views. Greenleaf says the remarks of Spencer, Judge, in the case quoted by Sedgwick, were beyond this extrajudicial.

In reference to the case of *Wort* v. *Jenkins*, 14 Johns. 352, Greenleaf says : "It was trespass for beating the plaintiff's horse to death, with circumstances of great barbarity. The jury were told they had a right to give 'smart-money,' by which nothing more seems to have been meant than that they might take into consideration the circumstances of the

cruel act as enhancing the injury of the plaintiff by the laceration of his feelings." In *Manufacturing Co.* v. *Fiske*, 2 Mason 120, the only matter relied upon is that Story speaks in it of exemplary damages. The only question in the case was whether, in a case for infringing a patent, the plaintiff might recover, as a part of his actual damages, the fees paid to his counsel for vindicating his rights in that action. I need not say anything in reference to the New Hampshire case, as it was received afterwards fully by the New Hampshire Court of Appeals, as will be hereinafter shown. Greenleaf reviews the case of *Linsley* v. *Bushnell* pretty fully, and reaches the conclusion that, in the quotation of Sedgwick from Church, J., by the language used in it, "vindictive damages" and "smart money" he had reference only to the jury's making an allowance, in such a case, for the trouble and expense that the plaintiff incurred in the suit. This inference is drawn from the connection in which this language is found, and the authorities referred to by the judge. He reviews the case of *Tracy* v. *Swartwout*, 10 Pet. 80, and concludes that the question whether, in any case, damages could be given by way of punishment alone never seems to have crossed the minds of the judges or the counsel in the case, though Sedgwick regarded this case as fully adopting his views. What was said in *The Amiable Nancy Case*, supposed to bear on the question under discussion, Greenleaf regards as amounting to very little, and even that little was foreign to the matter before the court. "The decision in the case of *Grable* v. *Margrave*, 3 Scam. 373," Greenleaf says, " was in perfect accord with his views; and when the judge said: 'In vindictive damages the jury are always permitted to give damages for the double purpose of setting an example and punishing the wrong-doer,'—it was uncalled for by the case before the court, and therefore can not be imputed to the court."

These were all the cases which were originally cited by Sedgwick in his text to support his views. After reviewing them all in detail, Greenleaf says: " It is manifest that his position has no countenance from any express decision upon the point, though it has the apparent support of several *obiter dicta*, and may seem justified by the terms 'exemplary damages,' 'vindictive damages,' 'smart-money,' and

the like, not unfrequently used by judges, but seldom defined. But, taken in the connection in which these terms have been used, they seem to be intended to designate, in general, those damages only which were in measurement incapable of any fixed rule, and lie in the discretion of the jury, —such as damages for mental anguish or personal indignity, and disgrace, bodily pain, etc.,—and there so far only as the sufferer is himself affected. If more than this is intended, how is the party to be protected from a double punishment? For, after the jury shall have considered the injury to the public, in assessing damages for an aggravated assault or for obtaining goods by false pretences or the like, the wrongdoers are still liable to indictment for the same offence. See *Austin* v. *Wilson*, 4 Cush. 273." Greenleaf then reviews and cites the following cases as sustaining his views: Smith, Judge, in *Churchhill* v. *Watson*, 5 Day 144; *Treat* v. *Barber*, 7 Conn. 274; *Edwards* v. *Beach*, 3 Day 447; *Dennison* v. *Hyde*, 6 Conn. 508; *Merrills* v. *Manufacturing, Co.*, 10 Conn. 384; Lord Abinger, C. B., in *Brewer* v. *Dew*, 11 Mees. & W. 625. In this last case Lord Abinger says : " Might not the jury, then, give vindictive damages for such an injury, beyond the mere value of the goods ?" This phrase shows clearly, that by vindictive damages, the judge intended only damages which the plaintiff had sustained beyond the value of his goods, and not those for any supposed injury to the public at large. What Justice Story says in *Whittemore* v. *Cutter*, 1 Gall. 478, shows that he used the term " exemplary damages" to mean "mental anxiety, public degradation, and wounded sensibilities, which honorable men feel at violation of the sacredness of their persons and characters."

Greenleaf also refers to Williams, C. J., in *Bateman* v. *Goodyear*, 12 Conn. 580; *Bracegirdle* v. *Orford*, 2 Maule & S. 77; *Coppin* v. *Braithwaite*, 8 Jur. 875; *Hall* v. *Steamboat Co.*, 13 Conn. 320; *Southard* v. *Rexford*, 6 Cow. 254; *Major* v. *Pulliam*, 3 Dana 582; *Rockwood* v. *Allen*, 7 Mass. 254; and says : " In all these cases there were circumstances of misconduct and gross demerit, richly deserving punishment in the shape of a pecuniary mulct, and fairly affording a case for damages on that ground alone ; and yet in none of them does the court intimate to the jury that they may

assess damages for the plaintiff to any amount more than commensurate with the injury he sustained." He refers also to *Matthews* v. *Bliss*, 22 Pick. 48, and then proceeds to show that his views on the subject have met the approval of the most approved text-writers, and refers, as sustaining his views, to 2 Bl. Comm. 438 ; Ham. W. P. 43–48 ; 3 Com. Dig. tit. " Damages," 3 ; Ruth. Inst. (Phila. Ed. 1799,) bk. 1, ch. 17, § 1, p. 385 ; and Id., bk. 1, ch. 18, § 4, p. 434 ; Gro. de. J. B., bk. 2, ch. 17, § *ii.* (Lord Denham was of the same opinion ;) *Filliter* v. *Phippard*, 12 Jur. 202, 204. · He undertakes to show in *Merest* v. *Harvey*, 5 Taunt. 442, that Lord Kenyon has been misrepresented, and that he entertained Green-leaf 's views on this subject. As showing this, he refers to 2 Ersk. Speech 9. The same views were entertained by Lord Chief Justice Dallas. See *Guntor* v. *Astor*, 4 Moore 12. To same effect, see *Williams* v. *Currie*, 1 Man. G. & S. 841. This was the same in the Roman civil law. 1 Dom. Civil Law, pp. 426, 427, bk. 3, tit. 5, § 2, No. 8, and notes ; Wood Civil Law, bk. 3, ch. 7, pp. 258-264.

Greenleaf then says : " The broad doctrine stated by Mr. Sedgwick finds more countenance from the bench of Penn-sylvania than in any other quarter, and yet even there it can hardly be said to have been adjudged to be the law, as may be seen by the cases decided." He then cites, as the strong-est cases sustaining or tending to sustain Sedgwick's views, *Sommer* v. *Wilt*, 4 Serg. & R. 18 ; *Stimpson* v. *Railroads*, 1 Wall. Jr. 164, 170 ; and comments on them, insisting that what is principally relied on as sustaining the views of Sedg-wick was extrajudicial. The strongest case that he has found sustaining these views of Sedgwick is *McBride* v. *McLaugh-lin*, 5 Watts 375, which he criticises at length. He asserts that the grounds of the action for seduction were recently examined in England in *Grinnell* v. *Wells*, 7 Man. & G. 1033, and damages explicitly admitted to be given as com-pensatory ; and he further asserts that the case of · *Benson* v. *Frederick*, 3 Burrows 1845, cited in this Pennsylvania case, was not a case of damages given for the sake of ex-ample. He also comments on the case of *Wynn* v. *Allard*, 5 Watts & S. 524, and *Rose* v. *Story*, 1 Pa. St. 190-197. Green-leaf then relies on, as sustaining his views, when properly

understood, the doctrine in *Taylor* v. *Carpenter*, 2 Woodb. & M, 1-21 ; *Rodgers* v. *Nowill*, 11 Jur. 1039 ; *Clark* v. *Newsam*, 1 Exch. 131 ; *Whitney* v. *Hitchcock*, 4 Denio. 461 ; Cushing, Judge, in *Meads* v. *Cushing*, in the Court of Common Pleas of Boston, 10 Law Rep. 238. In *Austin* v. *Wilson*, 4 Cush. 273, the court expressly declines to express any opinion on this point. It is decided in this case that, if such punitive damages are ever recoverable, they are clearly not recoverable in an action for an injury which is also punishable by indictment, as libel and assault and battery. " If they could be, the defendant could be punished twice for the same act. We decide the present case on this single ground. See *Thorley* v. *Lord Kerry*, 4 Taunt. 355 ; *Whitney* v. *Hitchcock*, 4 Denio. 461 ; *Taylor* v. *Carpenter*, 3 Woodb. & M. 22."

Greenleaf then says : " The obscurity in which this subject has become involved, has arisen chiefly from the want of accuracy and care in the use of terms, and from a reliance on casual expressions and *obiter dicta* of judges as deliberate expositions of the law, instead of looking only to the point in judgment. In most of the cases in which the terms ' vindictive damages,' ' exemplary damages,' and ' smart-money' have been employed, they will be found to refer to the circumstances which actually accompanied the wrongful act, and were part of the *res gestæ*, and which, therefore, though not of themselves alone constituting a substantive ground of action, were proper subjects for the consideration of the jury because injurious to the plaintiff. When the language used by judges in this connection is laid out of the case, as it ought to be, the position, that criminal punishment may be inflicted in a civil action by giving the plaintiff a compensation for an injury he never received, and which he does not ask for, will prove to have little countenance from any judicial decision. The contrary is better supported both by the principle of many decisions and the analogies of the law." *Chubb* v. *Gsell*, 34 Pa. St. 114, is referred to by Greenleaf. It is admitted by him that a majority of the Court held and decided that the views of Sedgwick were correct in *Taylor* v. *Church*, 8 N. Y. 460. And this decision was approved in *Hunt* v. *Bennett*, 19 N. Y. 174, the court considering that the point

was finally settled in unreported cases, the last of which, *Keezler* v. *Thompson*, was decided in December, 1857. In *Fay* v. *Parker*, 53 N. H. 352, the whole subject of exemplary damages, and especially the question in controversy between Greenleaf and Sedgwick, is very ably and elaborately discussed by Foster, Judge, who approved of the views of Greenleaf. The court decided that punitive damages cannot be recovered for a tort which may be punished criminally.

This is briefly the substance of Greenleaf's argument, and the language of the edition of his book published since his death. The argument of Sedgwick, in reply, found in his note at foot of 2 Sedg. Dam. (17th ed.), marg. p. 466, top p. 345, is in substance as follows: "Greenleaf says (volume 2, p. 209,) that 'damages should be precisely commensurate with the injury—neither more nor less.' This language is certainly in direct conflict with the whole system of damages in cases of contract, and I apprehend the denial of the right o, vindictive damages is equally untenable. In addition to the authorities I have cited "(which have heretofore been named)," how is it possible to be reconciled with the uniform language of the courts on motions for new trials, that they will not interfere, unless the verdict be evidently the result of corruption, prejudice or passion? The bench has uniformly refused to limit the damages to their own idea of compensation. There is a crowd of cases going to show conclusively, though the courts are entirely satisfied that the damages are excessive, and altogether beyond a compensation for the actual loss sustained, they will not on motion for a new trial interfere with the finding, unless the verdict is so extravagant as to bear evident marks of prejudice, passion or corruption. *Sharpe* v. *Brice*, 2 W. Bl. 942; *Benson* v. *Frederick*, 3 Burrows 1845; *Duberley* v. *Gunning*, 4 Term R. 651; *Sargent* v. *Denniston*, 5 Cow. 106; 1 Grah. New Trials, 410, 509; Bull. N. P. 327. In *Thruston* v. *Martin*, 5 Mason, 497, on the Rhode Island circuit, when a motion was made for a new trial on the ground of excessive damages, Story, Judge, said: "The damages are certainly higher than what had I, sitting on the jury, been disposed to give, and I should now be better satisfied if the amount had been less; but, on the ground that nothing appeared inconsistent with an hon-

est exercise of judgment,' the motion was denied. See *Wiggin* v. *Coffin*, 3 Story 11, and *Fisher* v. *Patterson*, 14 Ohio 418."

Again, Mr. Greenleaf admits (page 224) "that, when an evil intent has manifested itself in acts and circumstances accompanying the principal transaction, they constitute a part of the injury, and (page 221) 'that the defendant's wealth may be given in evidence.' To admit testimony of this kind, to deny the power of the court to adjust the verdict according to the principles of compensation, and still to insist that the jury were bound to give a verdict strictly commensurate with the injury, seems to me practically incompatible and inconsistent propositions. Nor, I confess, do I understand the wisdom of the proposed rule. In cases of tort the suit at law appears to have public as well as private ends in view. I can see no reason why the defendant should not, in a civil suit, be punished for his act of fraud, malice or oppression, nor why the pecuniary mulct which constitutes the punishment should not go into the pockets of the plaintiff, instead of the coffers of the State. A strong analogy will be found in *qui tam* actions. Any attempt to limit the inquiry of the jury, in cases of this description, to a strict measure of compensation, will be, I think, to institute an investigation of a character distressingly metaphysical and utterly impracticable. Mr. Chancellor Kent, in his Commentaries (7th ed. 1851, vol. 1, pt. 4, p. 618, § 24), thus reviews and decides this controversy : 'In the Law Reporter 1847, there is an elaborate review of the cases, in matters of tort, on the subject of exemplary damages, endeavoring to show that the decisions do not, on a strict examination and construction of the language of them, amount to authorities for going beyond compensatory damages. On this subject it appears to me that the conclusions in Mr. Sedgwick's treatise are well warranted by the decisions, and that the attempt to exclude all consideration of the malice and wickedness and wantonness of the tort, in estimating a proper compensation to the victim, is impracticable, visionary and repugnant to just feelings of social sympathy.' I take pleasure in recording the approbation of an eminent man." This note then concludes with a just eulogy of Mr. Kent.

It strikes me that these arguments of Sedgwick all admit of easy refutation. He says, first, that Greenleaf errs when he says "that the damages should be precisely commensurate with the injury—neither more nor less." " This language," Sedgwick says, "is in direct conflict with the whole system of damages in cases of contract." I confess my inability to see such direct conflict. Thus, Sedgwick himself, in his work on the Measure of Damages, volume 1, marg. p. 210, top p. 430, (17th ed.), to which all my references will be made, says: "On the contrary, it has been held in many cases that, in actions for breach of contract, the measure of damages is not the price stipulated to be paid in full performance, but the actual injury sustained in consequence of the defendant's fault; for the rule that the contract furnishes the measure of damages is subject to the other rule already stated, that compensation is only to be given for actual loss."

I see no direct, or indeed any, conflict. It is true that in the efforts of courts in breaches of contract to lay down rules, whereby the damages allowed shall be made commensurate with the loss, they have necessarily laid down general rules, which, when applied, may not in certain cases make the damages allowed commensurate with the loss sustained. This it would be impossible to do. And it may be that the rules thus laid down, having this object in view, may, with reference to particular sorts of contracts, fail to effect justice. But this only shows that it is impossible, by any law, to prevent a failure of justice in many cases. This furnishes, however, no reason why the law should not endeavor, by general rule, to do justice. To lay down no rules, but to leave the whole matter in dispute, and the measure of damages to the arbitrary discretion of a jury, would obviously result in far more injustice to parties than to prescribe general rules with reference to the measure of damages, though such rules may necessarily be imperfect. With reference to this subject (p. 434, side page 201), Sedgwick says:

"It is, in truth, but slowly, and in a comparatively recent period, that a jury has relinquished its control over actions even of contract, and that any approach has been made to a fixed and legal measure of damages. But by degrees the salutary principle has been recognized, and is now well set-

tled, that in all actions of contract, subject to exceptions already noticed, and in all cases of tort, where no evil motive is charged, the amount of compensation is to be regulated by the direction of the court, and the jury cannot substitute their vague and arbitrary discretion for the rules which the law lays down."

This salutary principle is applicable, as I understand the law, in all cases, whether of contracts or torts, and whether the torts are accompanied with evil motives or not. It is true, when the tort is a malicious one, the direction of the court will from the necessity of the case, be more general and indefinite than in matters of contracts or ordinary torts; and because, from the nature of the case, this must be so, it does not follow that we should fall back on the old exploded rule that the jury could, by its arbitrary discretion, fix damages in any case, entirely unaided by any direction from the court. The direction from the court, in very many cases of actions on contract, as well as ordinary torts unaccompanied by malice, necessarily leaves a very large discretion to the jury in fixing the amount of damages; and, doubtless, a much larger discretion must necessarily be allowed them in fixing damages for a malicious tort. But this seems to me no reason for retrograding to semi-barbarous times, and abandoning the effort on the part of the courts, by directions in all cases, to aid and assist the jury in reaching just and legal conclusions as to the amount of damages to be given in any and all cases.

Sedgwick asks: "How is the position of Greenleaf, that damages should be commensurate with the injury sustained by the plaintiff, to be reconciled with the uniform language of the courts on motions for new trials, that they will not interfere, unless the verdict be evidently the result of prejudice, corruption or passion? The bench has uniformly refused to limit the damages to its own idea of compensation." And to prove this he cites a number of cases. This is unquestionably the law, and it is universally admitted. Greenleaf, and no one else, controverts this to be the law.

I can see no sort of difficulty in reconciling this action of the courts, in refusing to grant new trials in such cases, with the law as it is contended to be by Greenleaf; for, while he

does say that "damages are given as a compensation, recompense or satisfaction to the plaintiff for an injury actually received by him from the defendant," he also says: "they should be precisely commensurate with the injury—neither more nor less; and this, whether it be to his person or estate." 2 Greenl. Ev. (13 ed.), § 253, top page 235. But, as he is careful to explain, the injury resulting to a person from an accidental blow in the face, producing no serious hurt, and a like malicious blow in the face, designed to insult and degrade, are very different. In the one case, the actual injury sustained being very trifling, if the jury gave heavy damages, a court would grant a new trial, because the damages given were obviously not commensurate with the injury, which, in such case, the court, or any one else, could clearly see, without undertaking to weigh nicely the evidence, or in any way usurp the power of the jury. But in the other case, the jury, as it is insisted by Greenleaf and admitted by Sedgwick, should, in estimating the injury inflicted on the plaintiff by his spitting in his face, with the view of insulting and degrading him, have a clear right to consider the injury the plaintiff had thus sustained by the wounding of his feelings and by degradation ; and as there can be no accurate pecuniary measurement of this sort of injuries, but they must depend on all the circumstances of time, place, and persons, it is obvious that the court could not set aside a verdict, simply, as Judge Story says, because the damages were certainly larger than what he, if sitting on the jury, would have been disposed to give. To do so would be an obvious usurpation by the court of the province of the jury; for, in the contemplation of the law, the jurors were regarded as more competent to assess the correct amount of damages for the injury by the wounding of his feelings and by the disgrace which the plaintiff had sustained than the judge. It was a question of fact, and not of law ; and if there " appeared nothing on the part of the jury inconsistent with an honest exercise of judgment," as Judge Story said, their verdict ought not to be set aside. But why such a refusal to set aside such a verdict should, as Sedgwick argues, show that the jury had a right, not only to fully compensate the plaintiff for all injury he had sustained

in person or in the wounding of his feelings, but also, in addition, add to the plaintiff's damages a further sum as a punishment to the defendant, I confess I can not see. The jury's verdict could not, on well known legal principles, be set aside in either case merely because it was deemed very exorbitant. The failure or refusal of the court, therefore, to set aside such verdicts does not even help to prove that the jury had a right to inflict damages on the defendant as a punishment for his offence.

Mr. Sedgwick, in his note, says: " Again, Mr. Greenleaf admits (page 224) 'that, when an evil intent had manifested itself in acts and circumstances accompanying the principal transaction. they constitute a part of the injury;' and (page 221) 'that the defendant's wealth may be given in evidence.' To admit evidence of this kind, to deny the power of the courts to adjust the verdict according to the principle of compensation, and still to insist that the jury are bound to give a verdict strictly commensurate with the injury, seems to me practically incompatible and inconsistent propositions."

I have been unable to find the last of the passages above quoted from Greenleaf, because Mr. Sedgwick, while he states they are on page 224 and page 221, fails to state what edition of Greenleaf he was using when he referred to these passages of Greenleaf. As it must have been top paging, as no side paging has been preserved in Greenleaf's work, and as these top pages change with each edition, this designation of the pages without stating what edition of Greenleaf he was using, serve as no guide. The edition of Greenleaf before me is the thirteenth, and I have been unable to find these quotations either in the text or in the long note from which I have heretofore copied so largely. I have sought specially for the quotation, " the defendant's wealth may be given in evidence," quoted from page 221, and therefore unconnected with the previous quotation from page 224, which I have found, being in section 272, p. 285. I have sought for this quotation, because, from the manner it is inserted by Sedgwick, I supposed it was qualified by what preceded or followed. But I have been unable to find it.

I have succeeded, however, in finding, in the edition be-

fore me, what Greenleaf does say about the defendant's wealth being given in evidence, and I find nothing but this on the subject in the edition of Greenleaf before me. What he does say constitutes the whole of section 269, vol. 2, p. 263. It is as follows:

" Sec. 269. The character of the parties is immaterial, except in actions for slander or seduction or the like, when it is necessarily involved in the nature of the action. It is no matter how bad a man the defendant is, if the plaintiff's injury is not on that account the greater; nor how good he is, if that circumstance enhanced the wrong. Nor are damages to be assessed merely because of the defendant's ability to pay; for whether the payment of the amount due to the plaintiff as compensation for the injury will or will not be convenient to the defendant does not at all affect the question as to the extent of the injury done, which is the only question to be determined. The jury are to inquire, not what the defendant can pay, but what the plaintiff ought to receive. See Lord Mansfield's allusion to *Wilford* v. *Berkeley*, Lofft 772. See, also, *Stout* v. *Prall*, 1 N. J. Eq. 80; *Coryeil* v. *Colbaugh*, Id. 77, 78; *Treat* v. *Barber*, 6 Conn. 274. And the plaintiff's rank and condition in life are also admissible on the question of damages. *Kulmph* v. *Dunn*, 66 Pa. St. 141; *Gandy* v. *Humphries*, 35 Ala. 617. So are his earnings and expenses, and his surroundings generally. *Welch* v. *Ware*, 32 Mich. 77. But so far as the defendant's rank and influence in society, and therefore the extent of the injury are increased by his wealth, evidence of the fact is pertinent to the issue. See *Bennett* v. *Hyde*, 6 Conn. 24; *Shute* v. *Barrett*, 7 Pick. 86, (per Parker, chief justice;) *Grable* v. *Margrave*, 3 Scam. 372; *Reed* v. *Davis*, 4 Pick. 216; *McNamara* v. *King*, 2 Gilman, 432; *McAlmont* v. *McClelland*, 14 Serg. & R. 359; *Larned* v. *Buffinton*, 3 Mass. 546; *Stanwood* v. *Whitmore*, 63 Me. 209."

To admit this sort of testimony seems to me perfectly compatible and consistent with holding that the plaintiff can recover only damages commensurate with his injury; meaning thereby, not only his determinate pecuniary damages, but also his damages resulting from physical suffering, permanent deformity or disability or disfiguring, for mental

anguish, loss of honor, and sense of shame, and degradation, and injury to himself, reputation, social standing, and the like, if claimed in the declaration.

Mr. Sedgwick, in his note on which I am commenting, says: " I can see no reason why the defendant should not, in a civil suit, be punished for his act of fraud, malice, or oppression, nor why the pecuniary mulct, which constitutes that punishment, should not go into the pockets of the defendant, instead of the coffers of the State. A strong analogy will be found in *qui tam* actions. An attempt to limit the inquiry of the jury, in cases of this description, to a strict measure of compensation, will be, I think, to institute an investigation of a character distressingly metaphysical and utterly impracticable."

It seems to me, on the contrary, that of the reasons why the defendant, in such civil suit, should not be punished for his public offence or misdemeanor, and why the jury should not, in such civil suits, be permitted to impose on him a fine, in addition to all kinds of damages, either of a determinate pecuniary character, or for mental anguish, degradation, and the like, for his public misdemeanor, which should also go into the pockets of the plaintiff, the first and most obvious of reasons is that the infliction of such fine by a jury in a civil suit would be in most obvious violation of the fundamental principles of all free governments. One of these principles is that no person shall be punished twice for same misdemeanor; and as no one has ever asserted that such a civil suit, where the offence of the defendant was a misdemeanor, would bar a public prosecution of the defendant for such misdemeanor, though he had been mulcted for it by a jury in such a civil suit, it is obvious that this would be a punishment of the defendant twice for the same misde meanor, if the jury were allowed to punish him for such misdemeanor in a civil suit by including what they regarded as a proper fine for his public offence with the damages of the plaintiff.

But what is still worse, though for many such misdemeanors our statutes, as well as the statutes, I suppose, of all the States, limit the amount for which a party may be mulcted or fined for such offences, yet, if the recovery of such fine

could be had in a civil suit, there is absolutely no limit to its amount. Thus, in this State, a rioter, unless he pull down or destroy a dwelling-house in whole or in part, can not be fined exceeding $100.00. Warth's Amend. Code W. Va., ch. 148, § 6, p. 805. If a person throw in my well or spring, maliciously, any offensive water, it is a misdemeanor, but his fine can not exceed $100.00. Id., ch. 145, § 24, p. 796. If he poison my horse, worth less than $20.00, it is a misdemeanor, but he can not be fined more than $50.00. Id., ch. 145, § 25   If he maliciously deface my property, it is a misdemeanor, but he can not be fined over $100.00. Yet Sedgwick can see no reason why, if a civil suit be brought for commission of these and a multitude of other offences, where the fine is limited, the jury may not mulct the offender any amount by adding to the plaintiff's damages, as a punishment of the offence, whatever they deem proper.

Then, for most misdemeanors, the statute law, except in a few specified cases, bars any proceeding to enforce the fine after a very short time. In this State, with two exceptions, as far as now remembered, it is one year. Code., ch. 152, § 10, p. 830. But for a vast number of misdemeanors personal actions of trespass or trespass on the case may be brought within five years by the party specially injured. And in those made in violation of law, the defendant may be punished, after the plaintiff has been allowed damages for every species of injuries he has suffered, by adding thereto a fine for the offence against the public, in direct opposition to such statute law! Again, the fine for a misdemeanor, when not fixed by statute law, is fixed by the court, unless otherwise provided, Id., ch. 152, § 22, p. 832; but this law is disregarded when it is held that the punishment for most misdemeanors may be fixed by a jury whenever a civil suit is brought by the person specially injured, as can be done in most cases. And then, again, if the fine for a misdemeanor exceed two dollars, the accused must be presented by a grand jury in this State. Id., ch. 157, § 7, p. 843. Of what value to a person charged with an offence are all these and many other provisions if the offender may be punished for such offence, in disregard of all the safeguards, when the party injured brings against him a civil suit for the damages he has sustained?

These and other provisions of our statute law were passed as safeguards for persons accused of misdemeanors. There are doubtless similar safeguards thrown around the accused by statute-law in every State. They lie at the very foundation of every free government. And yet Mr. Sedgwick sees no reason why the accused may not properly be deprived of them all!

There is also another objection to this doctrine. The plaintiff, when he has received damages for all the injuries of every sort which he has received,—not only all his determinate damages for his physical suffering, but also damages for his mental anguish, loss of honor, sense of shame, for injury to his business reputation, social standing and all other damages he has sustained,—has certainly received all he is entitled to recover; and he can have no right, in addition to all this, to receive a further amount, falsely called damages, to be inflicted on the defendant as a punishment for his public offence, even if the public did not have also a right to inflict a fine on the defendant for his public offence. But Sedgwick says: "A strong analogy to this will be found in *qui tam* actions." I am unable to see this strong analogy. Some States have thought proper, in a few cases of misdemeanors, to give the whole or a part of the fine inflicted for the offence to the prosecutor, as a mode of detecting and punishing offences, which from their nature it was supposed, would be apt to escape punishment, if this inducement was not held out by the State to get witnesses to appear against an offender and aid the public in his prosecution. There never were many sorts of misdemeanors which could be thus prosecuted, and none except those which the Legislature thought proper to permit to be so prosecuted. The number has constantly diminished as civilization has advanced. And, so far as I know, there is no misdemeanor which can be prosecuted *qui tam* in this State; it being very generally regarded to be better that such misdemeanors should occasionally go unpunished, than that the public morals should be lowered by inducing witnesses, who themselves had engaged in committing the offences with the accused, for a compensation to break good faith with him and appear as his prosecutors.

But, while such a policy would now be generally con-

demned, there never was a time when it could have been adopted by the courts, unless it was expressly authorized in particular cases by the Legislature. But I confess I am not able to see, even if it had been a policy adopted by the courts in particular cases, why it should be regarded as analogous to permitting a defendant in a civil action, without being in any way called upon by the State to assist in a prosecution, to recover a fine, in all cases of misdemeanors, where he suffered a special wrong for which he was allowed to bring a suit. In the one case, for the supposed public good, and to induce him to appear as a witness, the State has thought proper to offer him a reward to be paid, in effect, out of the public treasury, if the accused be found guilty and fined. But how does this justify the courts in permitting him, in cases where the State has no sort of difficulty in procuring witnesses and prosecuting successfully the defendant for a misdemeanor, to instruct a jury that the fine they may think proper to award as a punishment may be added to the plaintiff's damages, and thus go into the plaintiff's pocket, instead of in to the public treasury? This supposed analogy is further destroyed by the fact that after this is done, the State may again fine him for the same offence, and put this second fine into the treasury, or, if a *qui tam* prosecution, into the plaintiff's pocket.

But Sedgwick, in his note above quoted, says he thinks an attempt to separate the fine imposed for the public offence from the damages awarded the plaintiff for his individual injury, and to limit the jury to compensatory damages for the plaintiff's injury, would, if law, "institute an investigation of a character distressingly metaphysical and utterly impracticable." There may be some difficulty in making this separation, just as there is difficulty in fixing a proper fine for most misdemeanors, and just as there is difficulty in assessing the damages the plaintiff has sustained from physical pain, mental anguish, loss of honor, degradation, and the like. But I can not see how the difficulty of ascertaining damages of this character is in any degree lessened by instructing the jury, after they have found them, to add to them what they think should be the fine for the public offence. I can only say that, as far as I know, no civilized

nation, ancient or modern, except some of the States of this Union, has regarded it as impracticable and distressingly metaphysical to exclude from the tribunal which was to assess a plaintiff's damages any consideration of the punishment or fine which should be imposed on the defendant for his crime, and to confine itself to what damages the plaintiff had sustained physically or mentally. Sedgwick himself, in this very note, in a part of it which I have quoted, admits that the Roman law excluded all consideration of punishment for the crime against the public when the plaintiff was claiming damages for the injuries sustained by him by the wrongful act of the defendant. He also admits that this is the law of Scotland. To show this, I quote the language of Lord Chief Commissioner Adams, one of the most eminent judges of this century, as I find it in this note of Sedgwick. He says : " In all cases of damages, a fair, unprejudiced discussion (avoiding in civil cases the converting compensation for a civil injury into a matter of punishment) will lead to a rational, conscientious, and fair compromise of your different opinions, and bring you to fix one sum." And to this the reporter adds : " In all cases of this sort, his lordship has been in the habit of repeating this doctrine. *Hyslop* v. *Staig*, 1 Murr. 15." And as we have seen, this was the law as laid down by Rutherford and by Domat.

If this is the law, as generally administered in the civilized world, I do not see why it should be regarded as too metaphysical or impracticable to be administered by us. The justice and propriety of it appear self-evident, and I do not perceive that the difficulty of administering will be at all enhanced by following the obvious dictates of justice and right. On the contrary, it does seem to me that a much nearer approximation to what is just will be reached by keeping before the eyes of the jury that it is the plaintiff's damages they are to assess, taking care to explain to them all that may be properly considered in estimating his damages, and that with the punishment of the defendant for his public offence they have nothing whatever to do.

Sedgwick concludes his note, upon which I have been commenting, by quoting a passage from Kent's Commentaries, (ed. 1851,) which he regards as a decision of this con-

troversy with Greenleaf in his favor. But, as I understand the passage, Kent expresses an opinion which rather countenances the views of Greenleaf than those of Sedgwick. This opinion, to use his own language, is " that the attempt to exclude all consideration of the malice and wickedness and wantonness of the tort is impracticable," and this must be considered by a jury in estimating a proper compensation to the plaintiff for damages he has sustained through mental anguish, loss of honor, and sense of shame, the sense of wrong inflicted and degradation felt. And yet all these things, it is insisted by Greenleaf as well as Sedgwick, are sources of *damages*, which the jury must consider in estimating the *damages* the plaintiff may receive. The difference between them is that, after the jury have estimated the plaintiff's *damages*, both determinate pecuniary and indeterminate, such as mental anguish, loss of honor, etc., Sedgwick insists they may still increase the *damages*, by adding to this proper compensation of the plaintiff a further sum as punishment for the defendant's public offence or misdemeanor. Kent does not intimate that in this he concurs with Sedgwick. On the contrary, his saying that the malice of the defendant should be considered by the jury in estimating a proper compensation to the plaintiff, without adding thereto, "and for the further purpose of punishing the defendant," seems to me to indicate that he concurred with Greenleaf in this matter of controversy. He only concurs with Sedgwick, so far as I have shown he concurred with Greenleaf, and he concurred with him, in opposition to some writer in the Law Reporter, April, 1847, who insisted that they could not go beyond compensatory damages. To make this first part of what Kent says agree with the conclusion he reaches, we must suppose, by compensatory damages, a proper compensation to the plaintiff for wounded feelings and the like. The deduction I draw from this passage from Kent is that it is very important to use more clear and definite terms by which to designate different sorts of damages. Kent seems in this passage to consider compensatory damages as something different from proper compensative damages. To my mind they meant the same thing; and in neither case, if the meaning of the words is such as any dictionary gives

them can they include a sum added by the jury as a punishment for the public offence which the defendant had committed. Whether Kent supposed that proper compensative damages did include this fine for the defendant's public offence, but compensatory damages did not, all that I can say from this paragraph, taken from his Commentaries, is that, if this was his meaning, he has expressed himself very obscurely.

I will now review all the authorities, either in the text or note of Sedgwick, cited to support his first position, that " the idea of compensation is abandoned, and that of punishment introduced," on marginal page 456 and top page 323 of the second volume of his treatise on the Measure of Damages (7th edition).

The decision of the Supreme Court of the United States referred to by him is the case of *Railroad Co.* v. *Arms*, 91 U. S. 492, and he quotes as follows from Justice Davis's opinion : " It is undoubtedly true that the allowance of anything more than an adequate pecuniary indemnity for the wrong suffered is a great departure from the principle on which damages in civil suits are awarded. But though, as a general rule, the plaintiff recovers merely such indemnity, yet the doctrine is too well settled to be shaken that exemplary damages may be assessed. As the question of intention is always material in actions of tort, and as the circumstances which characterize the transaction are therefore proper to be weighed by the jury in fixing the compensation of the injured party, it may well be considered whether the doctrine of exemplary damages can not be reconciled with the idea that compensation alone is the true measure of redress. But courts have chosen to place this doctrine on the ground, not that the sufferer is to be reimbursed, but that the offender is to be punished ; and, although some text-writers and courts have questioned its soundness, it has been accepted as the general rule in England and in most of the States of this country. 1 Redf. R. R. 576 ; Sedg. Dam. (4th ed.) ch. 18, and note,—where the cases are collected and reviewed. It has also received the sanction of this Court. Discussed and recognized in *Day* v. *Woodworth*, 13 How. 371, it was more accurately stated in *Railroad Co.* v. *Quigley*, 21

How. 213." But, as the Court in that case held it was clearly one in which exemplary damages would not be given, the above remarks I have quoted ought rather to be regarded as the views of Justice Davis, and not necessarily the views of the Court. These remarks seem to be an *obiter dictum.*

We will therefore examine the two cases to which he refers, and which are also relied on by Mr. Sedgwick to sustain his views in his note before referred to. The case of *Day* v. *Woodworth*, 13 How. 363, was an action *quare clausum fregit.* The question of controversy was whether if the jury found for the plaintiff, and their verdict was based on the ground that the defendant had committed the trespass under circumstances that in law would make the trespass malicious, the jury ought or ought not to include in their verdict for damages, not only the costs of restoring the dam pulled down by the defendant, and compensation for the necessary delay of the plaintiff's mill, but also, if they thought proper, a sum sufficient to pay the fees of counsel, and other costs he might incur in the prosecution of this suit. The court below instructed the jury that they might include the necessary counsels' fees and costs, if the act was done, in the view of the law, maliciously; otherwise they could not. The jury by their verdict found that the act was not done in a manner that rendered it malicious, and, excluding the counsel fees and costs, rendered a verdict for the plaintiff for $200.00. The Supreme Court affirmed this judgment.

This was clearly right; and that, too, whether the jury could or could not, when the defendant's tort was malicious, add to this verdict any sum as a punishment to the defendant beyond the sum necessary to compensate the plaintiff. So that the remarks of Judge Grier, that, when the tort was malicious, the jury might render their verdict for damages beyond what was necessary to compensate the plaintiff in order to punish the defendant, was an *obiter dictum*, as the verdict of the jury was in effect, as the court held, that the act was not done maliciously. These remarks should therefore be regarded merely as the views of Judge Grier,—views which his opinion shows were expressed without much consideration of the subject, as he refers to no authority to support them, but seems to think there would be no dispute

upon this question. He says: "It is a well established principle of the common-law that, in actions of trespass and all actions on the case for torts, a jury may inflict what are called exemplary, punitive, or vindictive damages upon a defendant, having in view the enormity of his offence, rather than the measure of compensation to the plaintiff." He cites no authority for this position. The opinion was delivered in 1851, before there had been much discussion of the point involved. He simply says: "We are aware that the propriety of the doctrine has been questioned by some writers, but, if repeated judicial decisions for more than a century are to be received as the best exposition of what the law is, the question will not admit of argument." But he cites none of these judicial decisions.

The case of *Railroad Co.* v. *Quigley*, 21 How. 202, was a suit for libel, but the only libel for which the defendant could have been held responsible was for a publication which took place after the suit was brought. The court instructed the jury that "the defendant might be responsible for this libel;" and, in a second instruction, told them that "they were not restricted, in giving damages, to the actual positive injury sustained by the plaintiff, but might give exemplary damages, if any, as in their opinion were called for as justified, in view of all the circumstances in this case, to render reparation to plaintiff, and not as an adequate punishment to the defendant." The jury rendered a verdict for the plaintiff, on which judgment was rendered; but this judgment was reversed because both these instructions were wrong—*First*, because the publication was made after the suit was brought; and, *secondly*, even if it had been before the suit was brought, there was no proof of such malice as would justify the giving of exemplary damages. Justice Campbell, in giving the opinion of the court, does say, on page 214: "Whenever the injury complained of has been inflicted maliciously or wantonly, and with circumstances of contumely or indignity, the jury are not limited to an ascertainment of a simple compensation for the wrong committed against the aggrieved person." But this was obviously an *obiter dictum*. It seems to me, therefore, that these three decisions do not decide the question we are discussing, and that the Supreme

Court of the United States, without violating the doctrine of *stare decisis*, may adopt the view, which it is evident Justice Davis inclined to consider as the sounder in principle, that the measure of damages in all actions of tort is a just compensation to the plaintiff for the wrong to the plaintiff, in estimating which the evil intent of the defendant, and all the circumstances characterizing the act, the subject of complaint, may be properly considered by the jury, but they can not add to the plaintiff's just compensation a sum given to punish the defendant for his malicious conduct. Justice Davis thought that this had been adjudicated by the Supreme Court of the United States; but we have seen no such adjudication had been made by that court, and the question was and is now an open question before that court.

It will be impossible to review in detail the numerous decisions rendered by the supreme appellate tribunal in the various States of the Union, cited by Sedgwick in his text or notes to sustain his position, or the numerous cases cited by Greenleaf in his text and note to refute the position of Sedgwick. I have, however, examined nearly all these decisions, and also a large number of other decisions, some of which have already been referred to. I will arrange these cases I have examined, below, so as to put the cases decided in each State together, and will give my views of their character generally, and as to what amount of weight we should attach to them as authorities, and will select from this great body of cases the comparatively few in which this question has really been discussed, and state in detail the views of the judges in these selected cases, using their own language.

The following are the cases which bear in some measure on the question in discussion, and which I have examined: *Mitchell* v. *Billingsley*, 17 Ala. 394; *Ivey* v. *McQueen*, Id. 410; *Parker* v. *Mise*, 27 Ala. 483; *Donnell* v. *Jones*, 13 Ala. 490; *Devaughn* v. *Heath*, 37 Ala. 595; *Clark* v. *Bales*, 15 Ark. 452–458; *Walker* v. *Fuller*, 29 Ark. 459; *Wilson* v. *Middleton*, 2 Cal. 56; *Dorsey* v. *Manlove*, 14 Cal. 553; *Wade* v. *Thayer*, 40 Cal. 578; *Merrills* v. *Manufacturing Co.*, 10 Conn. 388; *Linsley* v. *Bushnell*, 15 Conn. 236; *Huntley* v. *Bacon*, Id. 273; *Dibble* v. *Morris*, 26 Conn. 421; *Bartram* v. *Stone*, 31 Conn. 162; *Steamboat Co.* v. *Whilldin*, 4 Har.

(Del.) 228; *Jefferson* v. *Adams*, Id. 321; *Cummins* v. *Spruance*, Id. 315; *Robinson* v. *Burton*, 5 Har. (Del.) 340; *Bonsall* v. *McKay*, 1 Houst. 520; *Smith* v. *Overby*, 30 Ga. 248; *Johnson* v. *Weedman*, 4 Scam. 495; *Grable* v. *Margrave*, 3 Scam. 373; *Hawk* v. *Ridgway*, 33 Ill. 473; *Reeder* v..*Purdy*, 48 Ill. 261; *Reno* v. *Wilson*, 49 Ill. 95; *Roth* v. *Smith*, 54 Ill. 431; *Farwell* v. *Warren*, 70 Ill. 28; *Becker* v. *Dupree*, 75 Ill. 167; *Drohn* v. *Brewer*, 77 Ill. 280; *Foote* v. *Nichols*, 28 Ill. 486; *Railroad Co.* v. *Fears*, 53 Ill. 115; *Freese* v. *Tripp*, 70 Ill. 496; *Meidel* v. *Anthis*, 71 Ill. 241; *Smalley* v. *Smalley*, 81 Ill. 70; *Clevenger* v. *Dunaway*, 84 Ill. 367; *Kolb* v. *O'Brien*, 86 Ill. 210; *McNamara* v. *King*, 2 Gilman 432; *Anthony* v. *Gilbert*, 4 Blackf. 348; *Taber* v. *Hutson*, 5 Ind. 322; *Guard* v. *Risk*, 11 Ind. 156; *Butler* v. *Mercer*, 14 Ind. 479; *Millison* v. *Hoch*, 17 Ind. 227; *Little* v. *Tingle*, 26 Ind. 168; *Stewart* v. *Maddox*, 63 Ind. 51; *Stevenson* v. *Belknap*, 6 Clarke 98; *Plummer* v. *Harbut*, 5 Iowa 308; *Cochran* v. *Miller*, 13 Iowa 128; *Denslow* v. *Van Horn*, 16 Iowa 476; *Williamson* v. *Stage Co.*, 24 Iowa 171; *Hendrickson* v. *Kingsbury*, 21 Iowa 379; *Garland* v. *Wholeham*, 26 Iowa 185; *Slater* v. *Sherman*, 5 Bush. 206; *Railroad Co.* v. *Smith*, 2 Duv. 557; *Bronson* v. *Green*, Id. 234; *Chiles* v. *Drake*, 2 Metc. (Ky.) 146; *Jennings* v. *Maddox*, 8 B. Mon. 430; *Wiley* v. *Keokuk*, 6 Kan. 107; *Wiley* v. *Mon-a-to-wah*, Id. 111; *Nelson* v. *Morgan*, 2 Mart. (La.) 256; *Gaulden* v. *McPhaul*, 4 La. Ann. 79; *Young* v. *Mertens*, 27 Md. 115; *Railroad Co.* v. *Blocher*, Id. 277; *Railroad Co.* v. *Breinig*, 25 Md. 378; *Turnpike Road* v. *Boone*, 45 Md. 353; *Railroad Co* v. *Larkin*, 47 Md. 161; *Austin* v. *Wilson*, 4 Cush. 273; *Richards* v. *Farnham*, 13 Pick. 457; *Barnard* v. *Poor*,. 21 Pick. 378; *Stows* v. *Heywood*, 7 Allen 123; *Weld* v. *Bartlett*, 10 Mass. 470; *Smith* v. *Holcomb*, 99 Mass. 554; *Hawes* v. *Knowles*, 114 Mass. 518; *Fox* v. *Stevens*, 13 Minn. 276 (Gil. 252); *Jones* v. *Rahilly*, 16 Minn. 320 (Gil. 283); *Milburn* v. *Beach*, 14 Mo. 104; *Stoneseifer* v. *Sheble*, 31 Mo. 243; *McKeon* v. *Railway Co.*, 42 Mo. 87; *Green* v. *Craig*, 47 Mo. 90; *Buckley* v. *Knapp*, 48 Mo. 162; *Klingman* v. *Holmes*, 54 Mo. 304; *Graham* v. *Railroad Co.*, 66 Mo. 541; *Railroad Co.* v. *Allbritton*, 38 Miss. 242; *Whitfield* v. *Whitfield*, 40 Miss. 352; *Briscoe* v. *McElween*, 43 Miss. 569; *Jamison* v. *Moon*, Id.

602; *Storm* v. *Green*, 51 Miss. 103; *Sinclair* v. *Tarbox*, 2 N.
H. 135; *Whipple* v. *Walpole*, 10 N. H. 130 ; *Perkins* v. *Towle*,
43 N. H. 220; *Fay* v. *Parker*, 53 N. H. 342; *Bixby* v. *Dun-
lap*, 56 N. H. 456; *Magee* v. *Holland*, 27 N. J. Law 86 ;
*Ackerson* v. *Railway Co.*, 32 N. J. Law 254; *Tillotson* v.
*Cheetham*, 3 Johns. 56; *Wort* v. *Jenkins*, 14 Johns. 352;
*Morse* v. *Railroad Co.*, 10 Barb. 621 ; *Cook* v. *Ellis*, 6 Hill
466; *Tifft* v. *Culver*, 3 Hill 180; *Hamilton* v. *Railroad Co.*,
53 N. Y. 25; *Voltz* v. *Blackmar*, 64 N. Y. 440; *Hunt* v. *Ben-
nett*, 19 N. Y. 173; *Taylor* v. *Church*, 8 N. Y. 460 ; *Brizsee*
v. *Maybee*, 21 Wend. 144 ; *King* v. *Root*, 4 Wend. 113 ; *Ken-
dall* v. *Stone*, 5 N. Y. 14; *Walker* v. *Wilson*, 8 Bosw. 586 ;
*Wylie* v. *Smitherman*, 8 Ired. 236 ; *Gilreath* v. *Allen*, 10
Ired. 67 ; *Roberts* v. *Mason*, 10 Ohio St. 277 ; *Railway Co.*
v. *Dunn*, 19 Ohio St. 162; *Sommer* v. *Wilt*, 4 Serg. & R. 19 ;
*Kuhn* v. *North*, 10 Serg. & R. 411; *Mc Bride* v. *McLaughlin*,
5 Watts 375 ; *Phillips* v. *Lawrence*, 6 Watts & S. 154; *Amer*
v. *Longstreth*, 10 Pa. St. 148; *Nagle* v. *Mullison*, 34 Pa. St.
48; *Hodgson* v. *Millward*, 3 Grant Cas. 406; *Johnson* v.
*Hannahan*, 3 Strob. 425 ; *Spikes* v. *English*, 4 Strob. 34; *Rail-
road Co.* v. *Partlow*, 14 Rich. Law 237; *Byram* v. *McGuire*,
3 Head 530 ; *Jones* v. *Turpin*, 6 Heisk. 181; *Smith* v. *Sher-
wood*, 2 Tex. 460; *Cook* v. *Garza*, 9 Tex. 358; *Gordon* v.
*Jones*, 27 Tex. 620; *Bradshaw* v. *Buchanan*, 50 Tex. 492;
*Nye* v. *Merriam*, 35 Vt. 438; *Earl* v. *Tupper*, 45 Vt. 275;
*Hoadley* v. *Watson*, Id. 289; *Pickett* v. *Crook*, 20 Wis. 358;
*Klewin* v. *Bauman*, 53 Wis. 244, 10 N. W. Rep. 398; *Lavery*
v. *Crooke*, 52 Wis. 612, 9 N. W. Rep. 599.

These authorities have all been referred to by text-writers
or by judges as sustaining or as denying the proposition that
in actions of tort, accompanied by insult, oppression, malice,
etc., the jury may properly give damages sufficient to com-
pensate plaintiff for any loss, including that resulting from
wounded feelings, sense of degradation, and the like, and
may add thereto a further sum as a punishment of the de-
fendant for his misconduct, and as an example to deter
others from committing like offences. With but compara-
tively a few exceptions, something may be found in all these
cases which, if they be not critically examined, apparently
supports the position that, in certain cases of tort, dam-

ages may be given by the jury as a punishment of the defendant for his malicious tort, and not simply as compensation to the plaintiff for the injuries he has received, whether in estate or person, and whether physically or mentally; but upon a careful examination, it will be found that by far the greater part of what has been said on this subject by judges in delivering their opinions in these cases was *obiter dictum*, and some of these expressions of views on this subject were quite uncalled for by any thing in the case before them for decision; and, even as *obiter dicta*, they are many of them entitled to less than usual weight given to *obiter*, because, from an examination of the case in which they appear, it will be seen they are qualified and explained by other expressions used in the same opinion, or are greatly restrained in their meaning by the facts of the case. In almost every case, too, where the tort was accompanied by such malice and oppression as would cause the jury to give exemplary or punitive damages as punishment of the defendant, there was some insult to the plaintiff's feelings, so that damages ought to be given, not only for the determinate pecuniary loss of the plaintiff, but for the plaintiff's loss resulting from wounded feelings and a sense of degradation. And damages for losses of this kind can not, of course, be assessed by any definite rule, but are necessarily indeterminate in their character; and in particular cases it is therefore often difficult to show whether the damages the jury actually allowed did in fact include any sum beyond the amount of the pecuniary loss sustained by plaintiff, including what would compensate him for injuries to his person and to his feelings. So that, in comparatively few of these cases, can it be said that any damages have been awarded against the defendant as a punishment to him for his offence, and not as a compensation simply of the plaintiff. This, however, does appear to have been done in some of these cases, by observing that the jury was instructed that they might award such damages as a punishment of the defendant. Even in the comparatively few of those cases where it is claimed that, under the direction of the court, damages have been awarded against the defendant, not to compensate the plaintiff, but to punish the defendant, it can not be truly said, with any sort of certainty,

that the court gave any such instruction to the jury, or expressed really any such opinion. In most of these cases the court has simply said that the plaintiff, in the suit for the vicious tort of the defendant, might be awarded by the jury vindictive damages or exemplary damages or punitive damages, or that the jury could in such a case give smart-money. All these decisions in which such language was used have been claimed as decisions that in actions of tort, when the tort committed by the defendant was accompanied by actual malice or vicious intent, the jury could, in addition to what would compensate the plaintiff for every loss of estate, and every loss both physical and mental, add, at their discretion, a further sum as a punishment of the defendant for his malicious tort. Unless the court has added something to its instruction or explained what it meant by these phrases, "punitive damages," " exemplary damages," " vindictive damages," " smart-money," we are not justified in concluding that it means to hold more than that, in cases of such malicious tort, the jury were not confined in assessing damages to the determinate pecuniary loss of the plaintiff, but might add thereto a further sum for the loss resulting to the plaintiff from his mental suffering, which being indefinite and indeterminate, and having had no legal designation especially appropriate to it, has been called exemplary damages, vindictive damages, punitive damages, and smart-money.

But these phrases do not necessarily, as has been frequently thought, carry with them the idea that damages can be given for the purpose of making an example of the defendant so as to deter others from committing like torts, or as a punishment of the defendant for his malicious wrong, or as damages to satisfy the vindictive feelings of the plaintiff produced by the defendant's malicious tort, or as such a mulcting of the defendant as would make him smart for his malicious tort. On the contrary, as has been shown in many of these and other cases, these phrases may properly be interpreted as meaning simply indeterminate damages, governed by no definite rule for mental anguish and the like, and therefore, because of being so indefinite, likely to deter from the commission of malicious torts. Such damages, though not given as a punishment for the malicious tort, would,

while they compensate the plaintiff, operate incidentally as a punishment of the defendant for his malicious tort, and so it might happen, and has for this reason happened, that such damages have been called punitive and vindictive damages, as they incidentally tended to gratify any vindictive feelings entertained by the defendant towards the plaintiff from his malicious tort. But it would be unfair to the court who has simply, in deciding a case, used these phrases, saying the jury could award vindictive, exemplary, or punitive damages, or give smart-money, to infer that damages could be given for the purpose of punishing the defendant, or for the purpose of gratifying the plaintiff's vindictive feelings, or for the purpose of making an example of the defendant so as to deter others from like offences. These results must follow the awarding of indeterminate damages for mental anguish inflicted on the plaintiff; but, if these phrases are unexplained, they do not mean damages awarded for the purpose of punishment of the defendant. Every tariff, though it were laid strictly to raise revenue, and with no purpose of protecting or aiding home manufactures, would nevertheless operate incidentally to afford such protection, and it might be thus tersely called a protective tariff. And in just this sense can indeterminate damages awarded the plaintiff, because of his mental suffering, be called punitive damages, exemplary damages, vindictive damages, and smart-money. Nothing definite can now be learned from the simple use of these phrases, unexplained by the context, in any other way. But some few of these cases may be regarded as positive adjudication that the law, in certain cases of malicious torts, permits the awarding of damages beyond what would compensate the plaintiff for all losses of every sort, on the ground that such additional damages may be given for the purpose of punishing the defendant for his malicious torts. But, in my judgment, the decided weight of reason, as deduced from these decisions, is opposed to the allowance to the plaintiff, in any case, of any but compensatory damages, and that in no case should any damages be awarded the plaintiff, not as compensation to him, but as punishment of the defendant. In most of the cases above cited the courts have not reasoned at all on the subject, but they have simply announced views

of the law; and the language used by them has very generally been so indefinite as really to furnish no safe conclusion as to what was thought by the court of the question we are discussing.

I have selected all of the cases where there has been anything like elaborate reason by the court on this question, and I give below the reasoning very much in the language of the judge announcing the views of the court; so that we may fairly judge of the weight of reason on each side of this mooted question. At the same time we will thereby be better able to judge how much of weight should be attached to the above cited cases as mere authority. Many of these are rendered obviously with very little consideration.

The first of these cases to which I would especially refer is *Smith* v. *Overby*, 30 Ga. 248. In that case, decided in 1860, the point we are considering was not so involved as to render it necessary to decide it; but the opposing views of Sedgwick and of Greenleaf were brought to the special attention of the court, and discussed; and Lumpkin, Judge, in delivering the opinion of the court, considered them carefully, and thus expressed himself on the subject, (page 248) : " We apprehend that in most of the cases, when carefully examined, it will be found that, whether the injury be done to person or estate, the measure of damages is, after all, the actual injury inflicted,—neither more nor less. An assault and battery is committed on the person by pulling the plaintiff's nose, or spitting in his face; the object being to degrade him. What I ask is the actual injury? The mere bodily suffering? That is nothing. Men have a moral as well as a physical nature. Here the injury is done to his feelings,—his honor, his pride, his social position. Suffer these to go unprotected, unredressed, and life is no longer tolerable. Hence the jury, in such a case, should render large damages, not as punishment, but to compensate the actual injury. They must put a price upon this manhood of a freeman, and mulct the defendant accordingly. Let this illustration suffice. Analyze the cases, and the same solution applies to all   Courts and text-writers have not clearly comprehended this doctrine, and the philosophy of it; otherwise there would be harmony, instead of confusion

and apparent contradiction, on the subject." As the court held, this was not a case for exemplary damages, and damages would not be given in it for injury to the plaintiff's feelings. What we have quoted as Judge Lumpkin's opinion must be regarded as *obiter dictum;* but it is entitled to greatly more weight, as a deliberate opinion of Judge Lumpkin's after due consideration, than are the large number of casual expressions of opinion on this subject, without consideration, in many cases I have cited.

The next case to which I would especially refer is *Hendrickson* v. *Kingsbury*, 21 Iowa 379. In this case, Judge Cole, on page 385, uses this language :

" The counsel for the appellant also insists that there was further error in the instruction as given by the court, and especially as far as it directed the jury to give such a verdict as would inflict some punishment upon the defendant for his unlawful act. The question has been discussed by counsel only to a limited extent; and that, too, in connection with the instruction that was refused, in which the court was asked to instruct the jury. that, since the assault and battery was punishable by criminal prosecution, they could not give a verdict against the defendant, in this case for the purpose of punishing him, we propose to examine the question separately. And, *first*, as to the right of the jury to give damages by way of punishment.

" Without now stopping to review at any length the numerous cases in which this question has been discussed or decided by the courts of England and this country, we may state we have carefully examined over one hundred different cases, and find a majority of them decide (the necessity or propriety of the decision being involved in the determination of the case) that vindictive damages may be given when the element of fraud or oppression is shown ; and the balance, with the exception of the cases hereinafter specified, and possibly three or four others, contain *dicta* recognizing the doctrine of vindictive or punitory damages; but the question was not necessarily involved in the case or not controverted by counsel.

" He would be a bold jurist who, in view of these authorities, should hold the doctrine of exemplary, vindictive, or

punitory damages had no foundation in law. Since the time of the controversy between Prof. Greenleaf and Mr. Sedgwick (1847) on this subject, a large majority of the appellate courts of this country have followed the doctrine advocated by Mr. Sedgwick in that controversy; and our Supreme Court has expressly denied, on the authorities, the correctness of Prof. Greenleaf's views, (*Frink* v. *Coe*, 4 G. Greene, 555;) and in the same case expressed the opinion that, under certain circumstances, exemplary damages should be given. In a case against a physician for malpractice, it was held by our court that the plaintiff was not restricted to actual damages, (*Cochran* v. *Miller*, 13 Iowa 128;) and in other cases our court has indirectly recognized the same doctrine, (*Thomas* v. *Isett*, 1 G. Greene, 470; *Denslow* v. *Van Horn*, 16 Iowa 476; *Kinyou* v. *Palmer*, 18 Iowa 377.) See, also, Revision 1860, §§ 3,112, 3,113, 3,183.

" It seems that the terms ' exemplary,' ' vindictive,' ' punitive,' ' speculative,' and ' smart money ' are used in law as synonymous; and the first of these were expressly held in *Chiles* v. *Drake*, 2 Metc. (Ky.) 146, to be synonymous terms. While these words certainly have a critical or technical difference of signification, as defined by lexicographers, yet they have been too long used as synonymous by legal writers to now justify the making of any distinction in their meaning in construing the decisions or opinions of judges or other law writers in which they are used.

" The controversy on this subject between Prof. Greenleaf and Mr. Sedgwick may, perhaps, after all the attention and discussion it has excited, be found to be a controversy as to the terminology of the law, rather than as to the extent of the right of recovery or the real measure of damages. Prof. Greenleaf holds that, while the plaintiff can only recover compensation, he is not confined to the proof of actual pecuniary loss, but the jury may take into consideration every circumstance of the act which injuriously affected the plaintiff, not only in his property, but in his person, his peace of mind, his quiet and sense of security in the enjoyment of his rights; in short, his happiness. But it must affect his happiness, but not his neighbor's; and therefore to this question alone the jury should be restricted. While Mr.

Sedgwick holds that whenever the elements of fraud, malice, gross negligence, or oppression mingle in the controversy, the law, instead of adhering to the system or even the language of compensation, adopts a wholly different rule. It permits the jury to give what it terms punitory, vindictive, or exemplary damages; in other words, blends together the interest of society and the aggrieved individual, and gives damages, not only to recompense the sufferer, but to punish the offender. Sedg. Dam. 623.

" The difference arises, not in the statement of the proposition, but in the restatement or construction which is put upon the rule stated. ' In short,' says Prof. Greenleaf, ' his happiness,' while Mr. Sedgwick says, ' in other words, blends together the interest of society and the aggrieved individual,' etc. But some of the courts which follow the rule as stated by Mr. Sedgwick place a construction upon it not all in antagonism to the rule as stated by Mr Greenleaf. In *Chiles* v. *Drake*, 2 Metc. (Ky.) 246, the court says : ' Every recovery for personal injury, with or without vindictive damges, operates, in some degree, as a punishment, but it is a punishment which results from a private wrong, and does not, therefore, violate either the meaning or spirit of the constitution prohibiting more than one punishment for the same offence.' The damages are allowed for the loss sustained, but the jury are permitted to give exemplary damages on account of the nature of the injury. It is therefore the increase of the damages resulting from the character of the defendant's conduct that is denominated punitive or vindictive.

" Under the rule as stated by Mr. Greenleaf, this increase of damages resulting from the character of the defendant's conduct, showing fraud, malice, or opposition, is given to the plaintiff as compensation for the invasion of his ' peace of mind, his quiet and sense of security in the enjoyment of his rights ; ' while under the rule as stated by Mr. Sedgwick, this increase is given as ' punitory, vindictive, or exemplary damages.' In either case or under either rule, the amount given by the jury is imaginary, presumptive, or speculative with them ; that is, the jury have not, and in the nature of things can not have, in either case, any pecuniary standard

by which to measure the amount of compensation or damage to which the plaintiff is entitled.

"It is, perhaps, true that the broad and general language of the rule, as stated by Mr. Sedgwick, tends more to convey to the .jury the idea of their unlimited and unrestrained power, jurisdiction, or control over their verdict than the rule as stated by Mr. Greenleaf; and that, under that rule, jurors would more frequently return verdicts based more or less on their passions and prejudices ·than under the other rule. For instance, the instructions as given in this case would tend very strongly to convey to the jury the idea of complete control over the amount of their verdict, unrestrained by any legal rule whatever. But suppose they had been instructed that, in estimating the amount of the plaintiff's damages, they would ascertain and give—*first*, the actual pecuniary loss sustained, as the value of the clothing destroyed ; *second*, the consequential pecuniary loss, as the value of the time lost by the plaintiff, the expense, if any, incurred for medicine, physicians' bills, compensation to the attendant, and board while sick, and the like ; *third*, the physical suffering consequent upon the injury, including any temporary, protracted, or permanent deformity, disability, or disfiguring, as by scars and the like ; *fourth*, the mental anguish, loss of honor, sense of shame, caused by the act of the defendant, as by the exposure of her naked person to the public, the sense of wrong inflicted, insult effected, the degradation felt, and the like ; *fifth*, the injury to the business, reputation, social standing, and the like. It is not unreasonable to suppose that such an instruction would more certainly exclude passion and prejudice, and the jury would feel themselves more constrained to limit their verdict to the compensation to the plaintiff for the injuries inflicted by the defendant, and at the same time would render a verdict which would amply compensate for the injury in every phrase and manner wherein it could operate. And, indeed, it seems to us, under such an instruction, the verdict would be far more likely to approximate to justice, and to exclude passion and prejudice, than under the loose and general instruction as given by the court in this case, and justified by the rule laid down

by Mr. Sedgwick, and sustained by the general amount of authorities.

"It must be remembered that the doctrine of giving damages for the malicious or oppressive act, if construed as punishment, must be limited to cases where the act done is not punishable by the penal or criminal laws of the State; for it is a principle of the common law, and one which is embodied in many of the State Constitutions, that no person shall be twice punished for the same cause,—*nemo bis vexati pro eodem causa*. And, if the rule of giving damages as a punishment can not be applied in cases where the act is punishable by the criminal laws of the State, then it can not be a general rule, and would operate unequally.

"Take this case for illustration. If the petition contains a true statement of the acts of the defendant, the verdict is certainly little enough. But the statute limits the penalty for the crimes those acts constitute to $100.00 and 30 days imprisonment. Now, if no damages by way of punishment can be given when the act is punishable by the criminal laws of the State, the penalty in this case would amount to a positive benefit to the criminal. The term 'punitive damages,' as contained in Mr. Sedgwick's rule, is construed in some States as punishment for the act; and the rule is therefore held in Massachusetts and Indiana, and perhaps other States, not to apply in cases where the act is punishable by the criminal laws of the State. *Austin* v. *Wilson*, 4 Cush. 273; *Taberr* v. *Hutson*, 5 Ind. 322; *Butler* v. *Mercer*, 14 Ind. 479; *Nossaman* v. *Rickert*, 18 Ind. 350. While in Kentucky the term 'punitive damages' is held and construed not to mean that damages were given as punishment, but to remunerate for the loss sustained; and therefore, in that State the rule would apply to all cases.

"In New York it has been held that punitive damages are given as a punishment, and may be given when the act is criminally punishable also; and that in such cases the remedy for the defendant is to procure a suspension of the judgment in the criminal case until the civil case is tried, and then avail himself of the verdict in the civil action by way of mitigation of the penalty in the criminal case. *Cook* v. *Ellis*, 6 Hill 466. See, also, *Cole* v. *Tucker*, 6 Tex. 266; *Wilson* v.

*Middleton,* 2 Cal. 54; *Corwin* v. *Walton,* 18 Mo. 71. But the clear weight of authority is with the rule laid down in *Chiles* v. *Drake,* 2 Metc. (Ky.) 146,—in substance that the damages allowed in civil cases by way of punishment have no necessary relation to the penalty incurred for the wrong done the public, but are called punitive damages by way of distinction from pecuniary damages, and to characterize them as punishment for the wrong done the individual. In this view, the awarding of punitive damages can in no just sense be said to be in conflict with the constitutional or common law inhibition against inflicting two punishments for the same offence. The instruction, as given in this case, being fully sustained by the authorities, was not erroneous; nor was it error to refuse to give the second instruction (copied above) as asked by the defendant."

The inference I draw from this case is that Cole, Judge, representing the Supreme Court of Iowa when it rendered this decision, felt himself bound, by previous decisions of the Supreme Court of Iowa in which this subject had been but very slightly considered, to sustain the court below when it instructed the jury that "they might inflict some punishment upon the defendant for his wrongful act," and in its refusal to instruct that, as the assault and battery was punishable as a criminal offence, they could not "give a verdict against the defendant in this case for the purpose of punishing." For the court had, in its action, followed previous rather hasty decisions of the Supreme Court of Iowa. But, after a thorough examination of the subject, the court was satisfied that, though its previous decisions were erroneous, they would have to be followed; it being in Iowa, so far as this point was concerned, too firmly settled by a number of decisions to be again reopened. Judge Cole, on behalf of the court, while really by his argument, though not formally, admitting that in reason and justice this action of the court below could not be defended, and that Greenleaf's position throughout was unanswerable, in a very ingenious argument strove to show that the position of Sedgwick on the point in controversy was defencible, and that it was sustained by the overwhelming weight of authority outside of the State of Iowa.

But learned and ingenious as Judge Cole certainly showed himself to be, it was really more than he or any one·else could do to reconcile the views of Sedgwick on the point in controversy either with reason or with perfectly well-settled principles of law. This I propose now briefly to show.

In the first place, the court below, following Sedwick, held that the jury might inflict damages as a punishment on the defendant for an assault and battery on the plaintiff, though, this being a criminal offence, the defendant might be again punished for the same assault and battery by being indicted for it by a grand jury; and this, too, in the face of the fact that the Constitution, as well as the common law, forbids a person to be twice punished for the same offence. How can these two obviously inconsistent propositions be reconciled? Judge Cole, for the court, endeavors to do so in this manner: He states that, while "punitive damages" given in a civil suit are construed as a punishment for the defendant's act, the subject of complaint, as in New York, for instance, elsewhere, as in Kentucky, the term "punitive damages" is held and construed not to mean that damages were given as a punishment, but to remunerate for the loss sustained; and he shows that this was held in *Chiles* v. *Drake*, 2 Metc. (Ky.) 146. He says: "The clear weight of authority is with the rule as laid down in *Chiles* v. *Drake*."

Of course, the conclusion from such premises is that a court, in a proper case, may instruct a jury that it may give "punitive damages," it being understood that punitive damages does not mean punishment for the act committed by the defendant,—in this case assault and battery,—but only means "compensatory damages," that is, damages to compensate the plaintiff for every sort of loss, physical or mental. For, of course, the giving of such punitive damages, when so understood, would not be punishing the defendant for his assault and battery, but merely ·compensating the plaintiff for his loss which he had sustained. But the trouble is that the court below did not instruct the jury that they might give "punitive damages." Had it done so, his action might have been sustained; as by "punitive damages," according to the clear weight of authority, according to Judge Cole, is not meant "damages given for the purpose of punishing the

defendant," but merely compensatory damages for any sort of loss of the plaintiff, physical or mental. But this was not the language of the court below. He did not instruct the jury they might give "punitive damages" against the defendant; but he instructed them they might "inflict some punishment on the defendant for his wrongful act," and he refused to instruct them that they could not "give a verdict against the defendant for the purpose of punishing," according to the reasoning of the Supreme Court in its opinion rendered by Judge Cole.

This action of the court was clearly prejudicial to the defendant; yet the court held it was not erroneous. But they wisely closed their opinion on this point by saying that the instruction was sustained because it was sustained by the authorities. It was sustained, though contrary to sound reason, by previous Iowa decisions. The court may have felt, as it doubtless did feel, that it was bound to let these decisions stand, however erroneous on the principle of *stare decisis.*

But this is not the only inconsistency into which the Supreme Court of Iowa, through Judge Cole, puts itself in this opinion. In one part of the opinion, Judge Cole very properly says " that the terms ' exemplary,' ' vindictive,' ' punitive,' ' imaginary,' ' presumptive,' ' speculative,' and ' smartmoney,' are used in law as synonymous," and therefore they all mean the same as punitive; that is, to use Judge Cole's language elsewhere: " They must be construed not to mean that such damages were given as a punishment, but to remunerate for the loss sustained." If this were so, of course every decision in which the court simply held, in general terms, without any explanation of its meaning, that the jury " might give vindictive, exemplary, or punitive damages in cases where the element of fraud or oppression is shown, would be a decision that in no case could damages be given as a punishment for the public offence done by committing the act complained of, but the jury were in all cases confined to remunerative damages sufficient to cover all the losses of the plaintiff, physical and mental.

I must say I do not think it would be right so to construe decisions of this sort; but they ought to be regarded simply as holding that the plaintiff, in such cases, was not confined

to a recovery of his actual pecuniary loss, but he was entitled to additional damages, the court wholly failing to define what was to constitute these additional damages,— whether the wounding of the feelings of the plaintiff, his degradation, and the like, or whether they supposed that included in these additional damages was a mulct to punish the defendant. They, in such cases, generally had no defined idea of what should be included in the additional damages in such cases; their attention not having been called to that question, but only to the question when additional damages were called indifferently exemplary damages, vindictive damages, punitive damages, imaginary damages, speculative damages, and smart-money.

I have examined more than 100 cases, and in almost all of them there were either decisions or *dicta* to the effect that exemplary, vindictive, or punitive damages might be given in cases where malice, fraud, or oppression were shown, and in which the court deciding this proposition, or the judge expressing such a view, gave not the slightest intimation of what he regarded as the meaning of the phrase used, whether exemplary damages, vindictive damages, punitive damages, or smart-money. We know that such text writers as Greenleaf use the phrase " exemplary damages," and Rutherford in his Institutes, the words " smart-money," without intending to indicate that they thereby intended to include damages given for the purpose of punishing the defendant; for they elsewhere express themselves emphatically that in no case can this be done.

Now, Judge Cole, in the beginning of the above quotation from his opinion, says: " We have carefully examined over one hundred different cases, and find that a majority of them decide that vindictive or pecuniary damages may be given in cases where the element of fraud or oppression is shown; and the balance, with the exception of the cases hereinafter specified, and possibly three or four others, contain *dicta* recognizing the doctrine of vindictive or punitory damages." And, again: " Since the time of the controversy between Mr. Greenleaf and Mr. Sedgwick (1847) on this subject, a large majority of the appellate courts in this country have followed the doctrine advocated by Mr. Sedgwick in that con-

troversy." Now, while this first quotation, no doubt, states the facts correctly, taken in connection with what follows, it is almost certain to mislead. I have examined probably nearly all of the 100 cases which Judge Cole has examined; and while, as he states, they almost universally say that in certain cases exemplary, punitive, or vindictive damages may be recovered, yet there is a very small number of cases to be found where the courts have, in any sort of way, intimated what they meant by these phrases, or that, by so deciding or saying, they had any idea of deciding or suggesting that any damages could ever be given for the purpose of punishing the defendant for the act complained of. And excluding such cases, which really decide nothing, I do not find that Sedgwick's views, as opposed to Greenleaf's, are supported by a large majority of the appellate courts by their decisions either before or since 1847.

Judge Cole does not refer us to any of the hundred cases he has examined. In this, I have not followed his example, but I have referred to those I have examined, or will do so in this opinion. And an examination of them will, I think, show that what I have above said is correct. I have not found the weight of authority in favor of Sedgwick's views, in opposition to those of Prof. Greenleaf. It is true that the mere number of cases which have held his views exceed those which have held Greenleaf's; but it is obvious that a large majority of the cases which show a careful examination of the point in controversy hold the views of Prof. Greenleaf. In this very Iowa case, which decides the exact point according to the views of Sedgwick, all the reasoning in the case shows, I think, that the court is of opinion that it would have been better to adopt the views of Greenleaf rather than Sedgwick; and they would have done this, but for the fact that they were bound by previous decisions of their court which had been rather hastily rendered.

In a very large number of the cases which I have cited as relied upon by authors and by judges as authority upon this mooted point, there was really nothing actually decided on this point, or the decision was a mere general decision by the court that, in certain sorts of tort, the jury might give punitive, exemplary, or vindictive damages, or

give smart-money. But it would be impossible, from the facts of the case, or from anything said in it by the court, or by anything said in any other part of the opinion, to ascertain what was meant by the decision that exemplary damages, vindictive damages, punitive damages, or smart-money might be properly awarded the plaintiff by the jury. For anything which appears in the particular case as reported, the court may well have meant nothing more, in such cases, than that the jury, in such cases of malicious tort, might give more damages than the actual pecuniary value of the property destroyed, or than the actual loss of the plaintiff capable of accurate ascertainment. Of this character are the cases I have cited from Alabama, Connecticut, Illinois, Pennsylvania, and South Carolina, with a few exceptions only. The question in controversy does not appear to have been discussed or considered with any elaborateness in these as well as in many cases in other States; and, the decisions in them being indefinite and vague, they, it seems to me, are entitled to but little weight. But it is just such decisions of this mooted question,—and such decisions constitute a majority of the cases,—which he has examined, and in which he thinks that courts have held that damages in certain actions of tort might not only be given to remunerate and compensate the plaintiff, but also be increased for the purpose of inflicting punishment on the defendant.

I would refer specially to the large number of Illinois cases which have been cited. These remarks are applicable to nearly all of them, though in three or four of them the court does go further, and holds that, in actions for certain torts, the jury may increase the damages as a punishment for the public offence, and to deter others from committing such offences; but in none of the cases are any authorities cited to sustain such position. And this question does not seem to have been much discussed or considered in any Illinois case. In the most recent cases in Illinois, above cited, this is nevertheless held to be settled law in that State; but it is obvious that it would not be held to be law in that State, except that the courts hold themselves bound by their preceding decisions to so hold. And, rather inconsistently with such holdings, in an action similar to the one we are now

reviewing, based on an Illinois statute similar to our statute, though the law expressly authorizes, as ours does, the awarding of exemplary damages in a proper case, these recent Illinois cases hold that in no case can damages in such a suit be awarded the plaintiff beyond what is compensatory, as a punishment of the defendant, and that the words " exemplary damages " in this statute do not mean damages awarded for the purpose of punishing the defendant for his illegal sale of intoxicating liquors to the plaintiff's husband, because the same statute makes provisions for punishing such illegal sale as a misdemeanor.   It is admitted in the most recent Illinois cases that exemplary damages, punitive damages, and vindictive damages, are all synonymous ; and these decisions seem to me to be based on correct principles, to coincide with the views expressed by Greenleaf, and to be antagonistic to the views of Sedgwick, and are really irreconcilable with the previous decisions in Illinois, that the jury could in any case add to the damages allowed the plaintiff, to compensate for all kinds of injury, a still further sum, as a punishment to the defendant for the offence he had committed.

I would likewise note what seems to me to be in conflict in the Indiana decisions before cited, which I can not in principle reconcile.   These Indiana cases show that, when the tort of the defendant is mingled with the elements of fraud, malice, or gross negligence, if the tort was not punishable by the criminal law of the land, the jury might add to the damages awarded the plaintiff as compensation a sum as a punishment of the defendant; but, when the malicious tort is a criminal offence, no damages can be added as a punishment of the defendant in such civil suit.   To allow this would be to punish twice for the same offence.   But it seems to me that this attempted distinction between cases where the tort is a criminal offence and where it is not is entirely untenable.   It strikes me, indeed, as a more dangerous infringement on the defendant's right to let a jury first arbitrarily make his conduct a criminal offence when the law had not made it a public offence, and, having thus added a new offence to the penal law, to arbitrarily attach to it whatever fine they pleased, and then give this

fine, for an imaginary public offence, to the plaintiff in a civil suit, to whom they had, as it were, awarded all the damages necesssary to fully compensate for every wrong he had sustained.

The Massachusetts decisions we have cited show that the rule adopted in Massachusetts has been to allow for any tort only compensatory damages including damages for mental suffering and the like. And the same is the rule for the measure of damages in Minnesota in actions for all torts, according to the decisions we have cited from Minnesota. The reverse, however, is apparently the law as laid down by the Missouri and Mississippi courts, where it seems to be deliberately held that, in actions for certain sorts of torts, the jury may add to the plaintiff's damages for the purpose of punishing the defendant. These views seem to have been adopted without discussion, and with but little consideration. And in Wisconsin and Kansas the cases we have cited show that in these States, with the conflicting views of Sedgwick and Greenleaf before their courts, they after consideration adopted the views of Sedgwick.

The Wisconsin case in which these views are adopted, as Judge Crawford says, " after the question was fully considered," refers, in support of these views, only to certain English and New York cases; and he concludes by saying " that, since the publication of Mr. Sedgwick's work, the rule as laid down by him is recognized in *Smith* v. *Sherwood*, 2 Tex. 450; in *Rippey* v. *Miller*, 11 Ired. 247; in *Morse* v. *Railroad Co.*, 10 Barb. 624; and in *Wilson* v. *Middleton*, 2 Cal. 54." It would be naturally inferred from this that in those cases cited that the controversy between Sedgwick and Greenleaf had been specially called to the attention of the court, and that each of these courts, after consideration of this point in controversy specially, had adopted the views of Sedgwick; but an examination of these cases will show that this was not the case, but, on the contrary, there was no discussion of the point in controversy, and no reference to the controversy between Sedgwick and Greenleaf, and what was said was so vague and general as to be of little value as an authority.

The Kansas cases adopting Sedgwick's views were based

entirely on the United States Supreme Court decisions which we have cited, and which are assumed to be decisions directly on the point in controversy, which was an error, as we have seen. What was said in these Supreme Court decisions were merely *obiter dicta* entitled really to but little consideration as authority.

On the contrary, in New Hampshire the cases we have cited will show that, after a most exhaustive consideration of the whole subject, the New Hampshire courts have reached the conclusion that in no action for any sort of tort can the plaintiff recover anything but compensatory damages in its large sense, including, in a proper case, damages for wounded feelings and the like; but that in no case can to these be added, after this full compensation of the plaintiff, a further sum as a punishment for the defendant for his malicious tort. In the case of *Fay* v. *Parker*, 53 N. H. 342, all the previous New Hampshire decisions on this subject. as well as many decisions elswhere, are reviewed at length. There were 20 of these previous New Hampshire cases. *Whipple* v. *Walpole*, 10 N. H. 130, is spoken of as an exploded case. It was overruled in *Woodman* v. *Nottingham*, 49 N. H. 387. It is shown that *Perkins* v. *Towle*, 43 N. H. 220, simply decided that exemplary damages might be given in actions of *quare clausum fregit;* but what might be properly included in and regarded as exemplary damages was not considered in that case. The case shows that this whole subject has been very fully discussed in that State, and that there was considerable conflict of authority on the subject, though the weight of the New Hampshire authorities has generally been rather in favor of compensatory damages as the correct rule in all cases.

As the opinion of the court, delivered by Foster, Judge, is one of great ability, and shows a very thorough investigation of the whole subject, I propose to give a brief summary of it. He admits that probably a majority of the cases indicate the views of courts to be opposed to his views, but he finds no case which treats of elements of damages, such as are called vindictive, punitory, or exemplary, which might not properly be treated, in estimating the compensatory damages which, under like circumstances, everybody concedes

the injured party might justly receive.   None of them go so far as to hold that the same elements of damages might be twice considered, and damages twice awarded; much less three times,—once to the plaintiff, as compensation for the damages actually sustained by him, a second time to the plaintiff as a punishment of the defendant, and a third time to the State by way of fine under the criminal law.  He then shows, that the definition of damages by Grotius and all others, is inconsistent with the allowing of anything but compensatory damages, and that these were the views of Grotius, Puffendorf, Domat, and Rutherford.   He sets out at length the character of the controversy between Greenleaf and Sedgwick.   He shows that, what I surmised with reference to the citations from a late edition of Kent's Commentaries, (the 11th,) Kent had no idea of deciding, as Sedgwick seemed to think, this controversy in his favor, and that he only commends Sedgwick's views so far as they conflicted with that of the writer in the Law Reporter, which was that all considerations of the malice, wickedness, and wantonness of the tort should be ignored in estimating the plaintiff's proper damages; and with this view Greenleaf dissents, and in fact none could do otherwise than condemn the misrepresentations of the true rule of damages which characterize this article in the Law Reporter.   Kent indignantly repudiated them, but he did not condemn those of Prof. Greenleaf, or commend those of Sedgwick where they differed from Greenleaf's, but rather the reverse.   He says, undoubtedly, many of the cases relied on by Sedgwick to support his views do sustain them, but many of them fall far short of it, and proceeds to show that they are not sustained by these cases:   *Tullidge* v.  *Wade,* 3 Wils.  18 (decided in 1769); *Huckle* v.  *Money,* 2 Wils. 205 (decided in 1763); *Merest* v. *Harvey,* 5 Taunt. 442 (decided in 1814); *Sears* v.  *Lyons,* 2 Stark. N. P. 317.   He well says that the full explanation of all that was said in any of these cases is that "In ancient days, if not in the present, a jury would perhaps regard only the former" (physical damages) "unless their attention was directly called to the question, whether the plaintiff's feelings were injured by  *  *  *  the insult of the defendant's act."   The cases *Leith* v.  *Pope,* 2 W. Bl.

37

1,326, and *Bennett* v. *Allcott*, 2 Term R. 166 (decided in 1787), indicate that the value of the injury done was the proper measure of damages in any sort of a case. The cases of *Pleydell* v. *Earl of Dorchester*, 7 Term R. 529 (decided in 1798); *Duberley* v. *Gunning*, 4 Term R. 651 (decided in 1792); *Wilford* v. *Berkeley*, 1 Burrows 609 (decided in 1758); *James* v. *Biddington*, 6 Car. & P. 589 (decided in 1834); *Forde* v. *Skinner*, 4 Car. & P. 239—all show that the judges who decided these cases never imagined that the plaintiff's damages could be increased by the jury adding to them something as a punishment for the defendant's offence; and most of them show affirmatively that the judges deemed the proper damages in any case was compensation for all his injuries. He shows that in *Pearson* v. *Lemaitre*, 5 Man. & G. 700 (decided 1843), always cited to sustain Sedgwick's views, Lindal, C. J., said: " Upon principle, we think that the spirit and intention of a party publishing a libel are to be considered by a jury in estimating the injury done to the plaintiff;" and that the case, properly understood, favors the views of Prof. Greenleaf, and shows that the injury done to the plaintiff was what the jury was to estimate, and not how much the defendant should be punished by their verdict. His punishment, resulting from their verdict, was merely incidental, and not the object of the verdict.

He then shows, from examination of the case, that in *Emblen* v. *Myers*, 6 Hurl. & N. 54 (decided in 1860), though the judges speak of the injury the "plaintiff had sustained" and "exemplary damages," they really meant only, by "the injury sustained," the injury to his property; and, by " exemplary damages," the injury to his feelings caused by the insult offered. In this tort-case, Pollock, C. B., said: "If you choose to call compensation for injuries done to the plaintiff's feelings by the defendant's manner of committing an act 'exemplary damages,' no harm results from the misnomer, provided juries and courts understand that 'exemplary damages' means compensation for injury to the plaintiff's feelings. The trouble is that such language is persistently misunderstood." That case furnishes a number of examples of the use of careless language; for instance, Bramwell, B. said: "Damages might be given for the insult, as well as

the actual injury,"—just as if injury to the feelings was not an actual injury. Foster, Judge, well says : "But of what consequence is it whether damages given for insults and oppression are called compensatory or exemplary, liberal or sparing? Of none whatever, till fundamental constitutional rights are imperiled and overthrown by a misconception of the meaning of words. Then it becomes high time to express ideas in language which can not be misunderstood." The following modern cases, relied on by Mr. Sedgwick, Foster, Judge, in his opinion, thinks, not only fail to sustain, but, when properly understood, condemn his views: *Janess* v. *Campbell,* 5 Car. & P. 372 (decided in 1832); *Rogers* v. *Spence,* 13 Mees. & W. 571 (decided in 1844); *Doe* v. *Filliter,* Id. 47 (decided in 1846).

As showing that the English courts hold that compensatory damages are all that can be allowed in any case when it is understood to include wounded feelings and the like, he refers to *Andrews* v. *Askey,* 8 Car. & P. 7 (decided in 1837); *Edgell* v. *Francis,* 1 Man. & G. 222 (decided in 1840); *Williams* v. *Currie,* 1 Man., G. & S. 841 (though this case is strangely relied on by Mr. Sedgwick); *Clissold* v. *Machell,* 26 U. C. Q. B. 422 (decided *anno* 30 Vict). Richards, C. J., in that case said : "Though the defendant may deserve punishment, that is no reason why the plaintiff should reap a reward beyond a fair indemnity in consequence of the bad conduct of the former." Judge Foster says: "This case manifests the sound sense of the administration of justice in the dominion."

Having reviewed all these English cases, Judge Foster reviews the prominent American cases. And, first, he shows that the courts of Massachusetts have steadily adhered to the doctrine of compensation as affording the only true measure of damages. As showing this, he cites *Weld* v. *Bartlett,* 10 Mass. 470 (decided 1813); *Richards* v. *Farnham,* 13 Pick. 451 (decided 1833); *Barnard* v. *Poor,* 21 Pick. 378 (decided 1838); *Austin* v. *Wilson,* 4 Cush. 273 (decided in 1849). Yet Sedgwick seems to so far misunderstand these cases, plain as they are, as to suppose that some of them sustain his views. He then criticises the case of *Linsley* v. *Bushnell,* 15 Conn. 242. He shows that the case was correctly decided, but the appellate court seems to

be unable to conceive of compensation otherwise than as a market value applied to material things; and proceeds to enlarge and explain, and, in so doing, speaks of "vindictive damages" and "smart-money" in such a manner as might well confuse. In the case of *Huntley* v. *Bacon*, 15 Conn. 267, the charge of the court below was perfectly correct, and so held by the court above, who by the use of careless and inaccurate language, have bred confusion. The same judge who delivered this confused opinion delivered also the opinion in *Linsley* v. *Bushnell.* But there is more senseless confusion and inaccuracy of language found in a single sentence in the opinion delivered in *Dennison* v. *Hyde*, 6 Conn. 508, from which it would seem that wanton vexation was spoken of as if it was not direct damages, and therefore not compensatory. The sentence ends thus: "But the probable and inevitable 'damages, and those which result from the aggravating circumstances attending the act, are proper to be estimated by the jury." Foster, J., commenting on this, says: "The author of the present discourse finds such lucubrations as these both aggravating and vexatious, and not remote, but consequently direct, demanding compensation for the trouble of their consideration." In *Seger* v. *Barkhamsted*, 22 Conn. 290, (decided 1853,) correct views, expressed in accurate language, is shown by the opinion. But in 1857 the case of *Dibble* v. *Morris*, 26 Conn. 416, was decided; and in the case of *Platt* v. *Brown*, 30 Conn. 336, (decided in 1862,) the court uses again such confused and contradictory language as to render it impossible to tell what were their views of the law.

Foster, J., then says the doctrine of exemplary damages, as understood by Sedgwick, is undoubtedly recognized in Illinois; but in *Yundt* v. *Hartrunft*, 41 Ill. 10, *Reeder* v. *Purdy*, 48 Ill. 261, and *Farwell* v. *Warren*, 51 Ill. 467, the term "exemplary damages" is unquestionably used for no other purpose or intention than to express damages beyond the mere pecuniary loss actually sustained; while in the case of *Railway Co.* v. *Williams*, 55 Ill. 185, the idea of exemplary damages is expressed as something "in addition to the actual damages, for the indignity, vexation, and disgrace to which the party has been subjected." This is an-

other illustration of the careless and indefinite use of language. The case of *Slater* v. *Sherman*, 5 Bush 206, and *Chiles* v. *Drake*, 2 Metc. (Ky.) 146, are referred to, and explain the conclusion that they both regard damages as always compensatory, though there is some confusion of language in the first case. But the case was correctly decided and on correct grounds. The case of *Ellsworth* v. *Potter*, 41 Vt. 688, furnishes an illustration of the application of the terms "exemplary," "vindictive," and "punitive" damages to such as belong in fact to compensation merely. Such is also the case in *Bonsall* v. *McKay*, 1 Houst. 520, though the doctrines of exemplary damages, as understood by Sedgwick, is insisted upon. *Barnett* v. *Reed*, 51 Pa. St. 190 is another instance of the confusion which seems inseparable from the consideration of this matter, and like confusion in the language used, is pointed out in *Carey* v. *Bright*, 58 Pa. St. 70; *Canal Co.* v. *Graham*, 63 Pa. St. 290. *Fox* v. *Stevens*, 13 Minn. 272, (Gil. 252,) is shown to have been decided on the ground that the plaintiff was in no case entitled to anything but compensatory damages; but the language used by the court shows that they thought that mental suffering and dishonor could not be actual damages, properly speaking.

In *Bussy* v. *Donaldson*, 4 Dall. 207, a case of gross negligence, it is said : "As to the assessment of damages, it is a rational and legal principle that the compensation should be equivalent to the injury. There may be some occasional departure from this principle, but I think it will be found safest to adhere to it in all cases proper for a legal indemnification in the shape of damages." In *Freidenheit* v. *Edmundson*, 36 Mo. 226, Holmes waived expressing any opinion on this part of the controversy; but in *McKeon* v. *Railway Co.*, 42 Mo. 79, he said his opinion was that damages for punishment could not be given in any civil case. *Green* v. *Craig*, 47 Mo. 90, indorses the doctrine of damages in certain cases given as punishment of the defendant ; but in that case, as in most cases of this sort, all the damages called exemplary might have been just as well awarded for compensation only. *Cook* v. *Ellis*, 6 Hill 466, which sustains Sedgwick's views, is based on *Jacks* v. *Bell*, 3 Car. & P. 316, which does not

sustain it. In *Smithwick* v. *Ward*, 7 Jones (N. C.) 64, the views of Sedgwick on this question were adopted, though they were deemed wrong; and the only reason given for so doing, was that the Circuit Court had long acted on this wrong principle, and the Court of Appeals thought best not to disturb it. The case of *Hendrickson* v. *Kingsbury*, 21 Iowa 379, is criticised. The last American case reviewed is *Post* v. *McArthur*, 16 Mich. 447. The parts of the syllabus bearing on the subject of our discussion are these : " While those damages which depend on the sound discretion of a jury are not susceptible of any accurate regulation by the court, yet the jury should be prevented, by proper caution, from acting upon improper theories as to the legitimate elements to be considered in estimating them. The term ' exemplary ' or ' vindictive damages ' should not be used without such explanation as may prevent a jury from being misled by it. For voluntary wrongs, additional damages are allowed for injured feelings, which must be naturally aggravated or mitigated by the degree of malice actually existing; but nothing beyond individual grievances should be taken into account in estimating them." Mr. Justice Campbell, in delivering the opinion of the court, says : " While the term ' exemplary ' or ' vindictive damages ' has become so fixed in the law that it may be difficult to get rid of, yet it should not be allowed to be used so as to mislead ; and we think the only proper application of damages beyond those to persons, property, or reputation is to make reparation for the injury to the feelings of the person injured. This is often the greatest wrong that can be inflicted, and injured pride or affection may, under some circumstances, justify very heavy damages."

After this review, the conclusion drawn is that expressed in this opinion : " That the modern erroneous idea of exemplary damages originated in and is in fact the same thing as damages for wounded feelings, as distinguished from damages for an injury to a person or property. Damages for lacerated sensibilities, insulted honor, tyrannical oppression, and so forth, being much emphasized, and often being the principal damages suffered by the plaintiff, the language being loosely used, and not preserving the true distinction,

carelessly or intemperately used in the heat of indignation which judges often felt, and could not repress, while contemplating an enormous outrage, it finally came to be understood that damages might be given in a civil suit as a punishment for an offence against the public,—an idea which is plainly not disclosed in the early cases. I venture to say that no case will be found, in ancient or indeed in modern reports, in which a judge explicitly told a jury that they might, in an action for assault and battery, give the plaintiff four damages : (1) For loss of property, as for injury to his apparel, loss of labor and time, expenses of surgical assistance, nursing, etc. ; (2) for bodily pain ; (3) for mental suffering ; and (4) for punishment of the defendant's crime. But a critical examination of the cases will show, as I believe, that this fourth item is comprehended in the third, and has grown to become an additional item by inconsiderate, if not intemperate and angry, instructions given to the juries, when the court was too much incensed by the exhibition of wanton malice, revenge, insult, and oppression to weigh with coolness and deliberation the meaning of language previously used by other judges. * * * Thus the doctrine of compensation for the plaintiff has become the doctrine of punishment for the defendant, imparting into civil suits that punishment which still remains in criminal procedure, and so unfairly, as well as unconstitutionally and illegally, punishing an offender twice for the same crime."

He then proceeds to show that the frame of our writs in such suits show clearly that the compensation for damages suffered by the plaintiff is all that he demands. " What is a civil remedy but reparation for a wrong,—compensation for damages sustained by the plaintiff? How could the idea of punishment be deliberately and designedly installed as a doctrine of civil remedies? Is not punishment out of place, anomalous, exceptional, unjust, unscientific, not to say absurd and ridiculous, when classed among the civil remedies ? What kind of a civil remedy for the plaintiff is the punishment of the defendant? The idea is wrong. It is a monstrous heresy. It is an unsightly excrescence, deforming the symmetry of the body. It germinates in misconceptions and inadvertencies which were born of righteous indigna-

tion, and zealous eagerness to visit justice and punishment for wrong upon a convicted offender by means of the first judicial process which might happen to bring his sin to light. * * * The truth is this method of compensation is a modern and American invention, resulting from a misunderstanding of the use of the loose and inaccurate forms of expression in the old English cases. * * * If compensation were now understood, as it formerly was, to be made for injuries to material substances only, and exemplary damages were now understood, as they were formerly, to refer to injuries to the spiritual or mental part of the human nature, there would be no trouble or difficulty; but in the progress of time these definitions have changed. Compensatory damages now include injuries to the mental and spiritual part of mankind; and this change of definition, leaving nothing for 'exemplary damages,' as formerly understood, to operate upon and be applied to, by a very natural mistake the term 'exemplary' has been supposed to refer to criminal punishment for the sake of public example,—an idea which was not included in 'exemplary damages' as formerly understood."

Judge Foster then proceeds to point out how this doctrine violates fundamental and constitutional law, first by punishing twice for the same offence. He cites *Fox* v. *Ohio*, 5 How. 435, in which McLean, Judge, says: "There is no principle better established by the common-law, none more fully recognized in the Federal and State Constitutions, than that an individual shall not be put in jeopardy twice for the same offence." He ridicules the decision in *Pendleton* v. *Davis*, 1 Jones (N. C.) 98, and the reason given for this absurd conclusion, that a plaintiff should be so punished twice, though they deemed it wrong; that reason being that the Circuit Court of North Carolina had generally acted upon this false principle. He then says: "Almost innumerable practical difficulties must be encountered, involving absurdities disgraceful to the administration of the science of law, destructive of the established rules of pleading, and in utter contempt of constitutional rights and time-honored principles of justice, in the attempt to evade, conceal or harmonize the incongruities resulting from an effort to recover dam-

ages in a civil action of tort beyond and distinct from compensation to the full extent of all the injury which a plaintiff has sustained."

He then points out these absurdities and incongruities: (1) The plaintiff is awarded what he does not ask for in his writ or declaration; (2) the defendant is forbidden to plead or prove that he has paid or been absolved from the payment of his fine, which, though this be the case, the plaintiff gets without asking for it; (3) the defendant is punished criminally in a civil suit, and thus deprived of his fundamental right of not being punished till he has been indicted by a grand jury ; (4) the defendant may be compelled in the civil suit to testify against himself, though the law ·declares he shall never criminate himself; (5) he may have depositions read against him in the civil suit in which he may be fined, and he is thus deprived of his constitutional right, whenever charged with a crime, to meet the witnesses against' him face to face; (6) he may thus be punished and convicted for a crime in the civil suit through the mere balance of the weight of evidence against him, though by the law he can not be found guilty of a crime so long as the jury entertains a reasonable doubt of his guilt; (7) he entirely loses his right, given by the Constitution, to be relieved from the fine for an offence, if the governor should think proper to pardon him.

He concludes this portion of his views with these remarks : " Where shall be the limit of the confusion and absurdity involved in the attempt to reconcile the doctrine of vindictive and punitive damages in a civil suit with the reason, the logic, the symmetry of the sense of jurisprudence ? And what power can avail to stay the utter demolition of the constitutional safeguards from the arbitrary despotism which would impose upon them cruel, unjust, and oppressively accumulated punishments?" Again, he says : " When it is asserted, as it has been, that the ' true principle is that judgments in both the civil and criminal courts should operate as mental checks upon each other, thereby increasing or diminishing the punishment in this suit,' it is said much too hastily ; and, if only a little more reflection and consideration had been given the matter, it would not have been said at all.   See 7 Amer. Law Rev. Jan. 1873, pp. 366–368.   Such

a theory is altogether too fanciful, visionary, and impracticable." The difficulties of this attempt he then shows from the case of *Wells* v. *Abrahams*, L. R. 7 Q. B. 554.

He then adds: "Now, why all this unnecessary trouble, confusion, and perplexity, when the course of procedure should be plain, straight, and uninterrupted? The true rule, simple and just, is to keep the criminal process and practice distinct and separate. Let the criminal law deal with the criminal and administer punishment for the legitimate purpose and end of punishment, namely, the reformation of the offender, and the safety of the people. Let the individual, whose rights are infringed, and who has suffered unjustly, go to the civil courts, and there obtain full and ample reparation and compensation; and let him not thus appropriate the funds to which he is not entitled, and which belongs to others. Why longer tolerate a false doctrine, which, in its practical exemplification, deprives a defendant of his constitutional rights of indictment or complaint on oath before being called into court, deprives him of the right of meeting the witness face to face, deprives him of the right of not being compelled to testify against himself, deprives him of the right of being acquitted unless the proof of his offence is established beyond all reasonable doubt, deprives him of the right of not being punished twice for the same offence? Punitive damages destroy every constitutional safeguard within their reach. And what is to be gained by this annihilation and obliteration of fundamental law? The sole object, in its practical results, seems to be to give a plaintiff something which he does not claim in his declaration. If justice to the plaintiff required the destruction of the Constitution, there would be some pretext for wishing the Constitution to be destroyed. But why demolish the plainest guaranties of that instrument, and explode the very foundation upon which constitutional guaranties are based, for no other purpose than to perpetuate false theories, and develop unwholesome fruits? Undoubtedly, the pernicious doctrine has become so fixed in the law, to repeat the language of Mr. Justice Campbell of Michigan, 'that it may be difficult to get rid of it; but it is the business of the courts to deal with difficulties, and this heresy should be taken in hand

without favor, firmly and fearlessly.' It was once said: 'If thy right eye offend thee, pluck it out; and if thy right hand offend thee, cut it off.' Wherefore not reluctantly should we apply the knife to this deformity, concerning which every true member of the sound and healthy body of the law may well exclaim, 'I have no need of thee.' As to so much of the verdict as relates to exemplary or vindictive damages, it must be set aside."

The whole subject we are considering has been so fully and ably discussed by Judge Foster in this elaborate opinion that I deem it unnecessary to refer to others reasoning on this subject. I fully concur in these views of Judge Foster, and they should be adopted by our Court, unless we are so hedged in by the authorities that, contrary to our judgment, we are compelled to reject his views. We have said enough to show that there has not been such a current of authorities elsewhere as compels us to reject these views of Judge Foster, for we have seen that they have been and are sustained by eminent jurists after careful consideration. In fact, it does seem to me that, while the mere number of decided cases are in accordance with the views of Sedgwick, yet most of the cases in which this subject has been carefully examined have adopted the views of Greenleaf; and, unless we are bound by our own decisions to reject them, there is nothing in the decisions elsewhere which should compel us, against our judgment, to reject these sound views.

It will be observed that from a number of States we have cited no cases on this subject. In most of the States from which we have cited no cases on this subject, very little has been said on the subject, and what has been said has been generally so vague and indefinite as really to be entitled to very little consideration; and in these States, generally, the question we are considering may be very properly considered as an open question. In Virginia, for instance, prior to the formation of this State, I find no decisions on the point under discussion, and scarcely a mention of the subject, since the formation of this State. There have been some *dicta* on this point by judges, which may have some influence on the ultimate decision of the point in controversy in Virginia, but they can have no controlling influence with our Court. So

that we may regard the question under consideration as an open question in this State, unless an examination of the decisions of our own Court should show, that we have so decided the question as to no longer permit us to regard it as open to review or reconsideration.

In this State the question, what is the true measure of damages, where a defendant has committed on the plaintiff a tort accompanied by fraud, malice, gross negligence, or a willful disregard of the plaintiff's right, has been several times presented to this Court, and our decisions on the subject have not been uniform. The first case in which this question was called to the attention of this Court was *Sweeney* v. *Baker*, 13 W. Va. 158. This was an action on the case, brought by the plaintiff for a libel of the defendant, published in a newspaper of the defendant. Upon the subject we are considering, on pages 217, 218, in delivering the opinion of the Court, I say : " It is earnestly insisted by the appellant's counsel that the true and only measure of damages in a suit of this character, as in all other suits for torts, is the actual pecuniary loss which the plaintiff has sustained by reason of the wrong done; and though the courts have often said that, in cases of this character, the jury may properly give vindictive damages as a punishment to the defendant,—that is, punitive damages, damages beyond the injury actually sustained,—for the sake of the example, that such is not the law. We are earnestly invoked to disregard these often-expressed views of the ablest jurists, as contrary to fundamental principles, and as confounding the broad line, always to be kept in view, which divides civil and criminal proceedings. While no authorities are referred to by the appellant's counsel, and none can be found to maintain his extreme views, that the plaintiff in such an action is only entitled to nominal damages, unless there be evidence of actual pecuniary injury, coupled with proof of malicious intent, yet highly-respectable jurists have insisted that what is strictly called punitive damages ought in no civil case to be given, and damages awarded the plaintiff should be only the damages sustained by him through the defendant's wrong. But those who entertain these views are careful to say that, by the damages sustained by the plaintiff, they do not mean

the amount to which his estate has been diminished by the wrong, that is, the pecuniary loss, as the phrase is generally understood, but there is to be included in the damages sustained by the plaintiff full compensation for his mental and bodily suffering directly consequent on the wrong. And while the loss to his estate, his pecuniary loss, may be a mere trifle, the loss resulting from bodily suffering or mental agony may be very great. As the court gave no instruction to the jury in this case, I do not deem it necessary to express any opinion as to which of these views expresses more correctly the measure of damages in such a case, as the verdict of the jury ought not, in my judgment, to be set aside and a new trial awarded by this Court because the damages allowed by the jury were excessive, whether we regard the one or the other as the proper rule for measuring the damages."

But in *Vinal* v. *Core*, 18 W. Va. 49 *et seq.*, an action on the case for malicious prosecution, I, in delivering the opinion of the Court, did express my views on this question, though there was no more necessity for my so doing than there was in the case of *Sweeney* v. *Baker*, 13 W. Va. 158; for, though there were in the case many instructions given by the court below, not one of them, either given or refused, had any reference to the measure of damages in the case. And the verdict of the jury could not in this case, any more than in the first case, have been set aside and a new trial awarded by this Court " because the damages awarded by the jury were excessive, whether we regard the one or the other as the proper rule for measuring measure of damages." I ought, therefore, to have declined to express any opinion on the question; but I did state my views, and they were approved by the other members of the Court, and were in subtance inserted in the seventeenth point of the syllabus, (page 3). These views were expressed thus, (page 49) : " But if the defendant has been actuated by actual malice, or a design to injure the plaintiff, or fraud or oppression has entered into his conduct, the decided weight of authority, both English and American, holds that the jury may inflict on him exemplary damages as a punishment for his misconduct, and to hold up an example to the community. There have

been a few very respectable courts and writers who have held that in no case can a jury inflict on a defendant punitive damages; but the overwhelming weight of authority, both English and American, is that in certain cases such punitive damages may be inflicted. I will only refer to a few cases in actions for malicious prosecution, and those which most resemble this action in the nature of the wrong inflicted, such as libel and slander, in which it has been held that in certain cases of this character punitive damages may be inflicted by the jury. See *Barnett* v. *Reed*, 51 Pa. St. 191; *Cooper* v. *Utterbach*, 37 Md. 284; *Fry* v. *Bennett*, 4 Duer. 247; *Gilreath* v. *Allen*, 10 Ired. 67; *Hosley* v. *Brooks*, 20 Ill. 116." I then state the substance of the first two of these cases, and the holding of the courts in those which I approve.

It will be observed that this opinion is based upon the authority of decisions in other States solely, but I do not pretend to assign the reasons of the principles laid down in them; nor do I undertake to reconcile them with the fundamental principles of our government. If my attention had been called to this, I presume I would have looked into the matter more carefully. As I gave it so inadequate an examination, and as it really was unnecessary to express any opinion on the subject, as our judgment in the case would have been the same whatever had been our views on this point, I do not think we should hesitate to overrule the latter part of the seventeenth point in the syllabus in that case, which adopts these views, if we are, as I am, for the reasons I have assigned, satisfied that they are fundamentally wrong in principle, though they be, as we have seen they are, sustained by the decided weight of the decided cases in England and America, though that weight of mere authority is by no means so overwhelming as the examination made in that case led me then to suppose. The truth is, I fell into the error, into which a great many other courts have on this subject fallen, of following decisions elsewhere rendered without examining the reasons on which they were based, and without noticing then that these cases I followed were based on other decisions merely, and not on reasoning.

It seems to me we should have less difficulty in not following the views I then expressed, though they were then

approved by our Court, because, two or three years after, this Court, in *Riddle* v. *McGinnis*, 22 W. Va. 253, without referring to this case, adopted principles in the later cases not in accord with those I have stated as adopted in the former case. And the principles, so adopted, are in entire accord with the views I have hereinbefore expressed. The case was an action brought by a father for the seduction of his daughter under circumstances of great aggravation. The fourth point in the syllabus (page 253) is : " On the trial of an action brought by a father for the seduction of his daughter, evidence of the pecuniary condition of the defendant is admissible to show the extent of the injury caused to the plaintiff by the wrongful act of the defendant." And the eighth point of the syllabus is : " In such an action the jury, in estimating the damages sustained by the plaintiff, may take into consideration the mental anguish, the dishonor and shame, endured by the plaintiff, as well as the actual expense incurred by him by reason of the wrongful act of the defendant." It will be seen that the ground on which the pecuniary condition of the defendant (the seducer) is permitted to be proven in such an action is that it affects the extent of the injury the plaintiff (the father) has sustained.

Judge Woods, in delivering the opinion of this Court, on page 278, says : " The real measure of damages was the shame, mortification, disgrace, dishonor, and mental suffering inflicted upon the parent by the wrongful act of the seducer. *Fox* v. *Stevens*, 13 Minn. 272, (Gil. 252;) 2 Greenl. §§ 269, 579; *Lipe* v. *Eisenlerd*, 32 N. Y. 229; *Knight* v. *Wilcox*, 18 Barb. 212; *Lavery* v. *Crooke*, 52 Wis. 612, 9 N. W. Rep. 599, and numerous cases there cited. Upon this subject all the authorities agree ; but whether the testimony showing the pecuniary circumstances of the defendant ought to be given to the jury has been questioned by very respectable authorities, who have been disposed to limit the inquiry to the amount the injured is entitled to receive, and not what the wrong-doer is able to pay. All the authorities, however, admit that the jury ought to consider, not only the circumstances attending the commission of the wrong, but also the siuation of the parties in life, (*Andrews* v. *Askey*, 8 Car. &

P. 7; *Bennett* v. *Allcott*, 2 Term R. 166;) and also the defendant's rank and influence in society, and therefore the extent of the injury, as the same is increased by his wealth. And testimony tending to show his pecuniary condition is pertinent to the issue. 2 ·Greenl. Ev. §§ 90, 269 ; *White* v. *Murtland*, 71 Ill. 250. The logical deductions from these principles, as well as the weight of modern authorities, warrant the conclusion that, in the action of seduction of a daughter, the pecuniary condition of the plaintiff and defendant are proper subjects for the consideration of a jury in making up their verdict. 5 Wait, Act. & Def. 666–668." He then cites, to sustain this view, *Lavery* v. *Crooke*, 52 Wis. 612, 9 N. W. Rep. 599 ; *Applegate* v. *Ruble*, 2 A. K. Marsh 12 ; *Hewitt* v. *Prime*, 21 Wend. 79 ; *Clem* v. *Holmes*, 33 Gratt. 726,—quoting portions of opinions delivered in these cases.

It will be observed that in this opinion, as in the syllabus, the ground on which it is held that the wealth or poverty of the defendant, as well as of the plaintiff, may be admitted as evidence in such a suit, is not that if the defendant is wealthy a larger recovery should be had of him than if he were poor, but because the wealth of both the plaintiff and the seducer of his daughter tend to show their relative rank and influence in society, and this affects the extent of the injury the plaintiff has sustained. But that the damages in such a case, no matter how outrageous the conduct of the defendant may have been, should be compensatory and not punitive in the view of our Court in this case, is more clearly shown in the eighth point of the syllabus, (page 254,) above quoted, and in the opinion of Judge Woods on the measure of damages, (page 281). Judge Woods says :

" The alleged wrong was wanton, willful, deliberate. The daughter was young; was employed in the defendant's house. She was under his protection. Her father, who had known him for more than thirty years, was a near neighbor. He believed the defendant to be a gentleman, and trusted his infant daughter to his care. He felt assured of her safety, for she slept in the chamber of his aged mother. That sanctuary might have been deemed a safe retreat. In this, the unfortunate father was mistaken. The defendant had corrupted her; his toils were about her feet; she fell from her

high estate; and society cast her out, and nothing is left but shame and unavailing grief. The facts in this record show that this illicit intercourse commenced about March 1, 1881, and continued for a long time. When the plaintiff discovered his daughter's shame, he was overwhelmed with grief, anger, and mortification. He wrote to the defendant, but received no answer. He went to see him. His propositions of compromise were rejected. The defendant admitted he was the father of her child. Confident in his belief that the father was helpless, with a degree of heartlessness almost surpassing belief, he told the plaintiff he had ' violated no bastardy law; that, if he sued him, no jury of twelve men could be found some of whom were not in the same condition; . that, if the plaintiff did not want his daughter, he could turn her out; she was a good walker, and could find some place to lie in; she had money and could pay her board.' What could be more cruel, more heartless ? His daughter had fallen; his heart was wrung with anguish; his home was blighted; his other two daughters and his sons were abashed and disgraced by their sister's shame. Who can describe the father's anguish ? His daughter is brought home with blighted hopes, to be nursed and cared for by her father, ' even if it cost him his last piece of bread.' "

This was the case as stated by Judge Woods. Surely this was a case calling for punitive damages if they could ever be given; yet Judge Woods says not a word about the legality of allowing punitive damages as a punishment to the defendant for his outrageous offence. What he says on the measurement of damages is on pages 277, 278 : " It has long been well settled that in actions for seduction, and also in other actions for willful and wanton injuries done to the person and reputation, as for assault and battery, malicious prosecution, and the like, the plaintiff is entitled to recover damages, not only for expenses incurred by him, but for loss of time, his bodily suffering, and, if the injury was willful, for his mental anguish also." Not a word or intimation that damages could be increased, beyond what would fully compensate in all respects the plaintiff, in order to punish the defendant for his offence, and prevent others from committing like offences.

39

It is true that, in a subsequent case, ( *Ogg* v. *Murdock*, 25 W. Va. 139,) this Court, in the third point of the syllabus, lays down the law thus : " The rule for the measure of damages, in cases where the malice necessary to sustain the action is such only as results from a groundless act, and there is no actual design to injure or oppress, is to allow compensatory damages,—that is, damages to indemnify the plaintiff, including injury to property, loss of time, and necessary expenses, counsel fees and other actual loss,—but not to allow vindictive or punitive damages to punish the defendant." And in *Downey* v. *Railway Co.*, 28 W. Va. 733, point 7 of the syllabus is : " Where the evidence does not tend to prove that the injury complained of was caused by the willful, wanton, or oppressive conduct of the agents of a railway company, and that such conduct was expressly or impliedly authorized or ratified by the company, it is error to refuse to instruct the jury that they can not give punitive or exemplary damages." These propositions are indisputably right. But it may be said they imply that punitive damages may be given ; but they really imply only that there are cases in which the measure of damages is not confined to mere compensatory damages, when by this is meant, as defined in the first of these cases, " damages to indemnify the plaintiff, including injury to property, loss of time and necessary expenses, counsel fees and other actual loss." In other words, when compensatory damages are defined to mean what I have called " determinate pecuniary damages." And, of course, this is true. All that can be said from these two cases is that the words " vindictive and punitive damages " are used in an improper sense, as they have often been, as I have shown, in many other cases, as meaning something beyond determinate pecuniary damages, as, for instance, mental anguish and the like, often called exemplary damages or punitive damages and the like, merely as in opposition to determinate pecuniary damages. And compensatory damages are improperly used as meaning only determinate pecuniary damages, and excluding damages for mental anguish and the like.

These being all that appear in our decisions, I see nothing in them, nor in the decisions elsewhere, to prevent our adop-

tion of the views I have expressed with reference to the measure of damages in actions of tort, if we are satisfied that, in reason and justice, these views are clearly correct.

The meaning, then, of "exemplary damages," used in the statute under which this action was brought, was a sum allowed as damages by a jury, in addition to what was allowed in every species of tort when the act complained of was accompanied by fraud, malice, oppression, gross negligence, or a reckless disregard of the plaintiff's rights, which sum, usually called "exemplary damages," was the damages to the plaintiff, occasioned by the defendant's act, and sustained by the plaintiff, by his mental anguish, loss of honor, and sense of shame, sense of wrong from defendant's insult, degradation felt, loss of social position, and the like, but excluding any sum given as a punishment for the public offence of the defendant, or as an example to deter others from committing such offences or wrongs. And by the phrase used in this statute, "such damages as he or she (the plaintiff) has sustained," is meant such damages as are the natural and proximate consequence of the act of the defendant complained of, modified only to the extent which will be hereafter explained, by the act itself, and by the uniform decisions which have defined, in a certain case, what are injuries which the plaintiff has sustained where the subject of complaint was the tortious interference with family relations.

We propose now to consider what at common-law, prior to the passage of the statute under which this suit was brought, were the cases for which a suit lies for tortious interference with family relations, and the extent of the damages which by the common-law, could be recovered in such suits. And as the family relation is one of the social relations, I will consider, in connection therewith, the like suits and measure of damages for interference with one of the social relations which bears, by the common-law, a very close resemblance, in many respects, to the family relations, I mean the relation between master and servant. In considering this subject, it will be necessary to trace the progress of the common-law doctrine; for in this, as in some other matters, the common-law has changed from what it was originally; and it is the common-law as it stood in 1877, when the statute

under which this suit was brought, into which we must inquire in order to interpret properly this statute.

From the earliest time an action of trespass *vi et armis* could be sustained by a master against any one who forcibly carried off his servant,—the loss of the services of the servant being regarded as the necessary result of such trespass; and this action was in those early days based, not on any contract for services, but only upon an existing state of service and the loss of this service by the master for a longer or shorter time by the violent taking away of the servant by the defendant. Bracton, who wrote in the reign of Henry III. (1216–72,) so states the law, and the old Year-Books show this to be law. See cases reported 11 Hen. IV. 1; 21 Hen. VI. 8, 9, 31; 22 Hen. VI. 30, 43. These cases I do not propose to review; but, if they are examined, they will show that the conclusion I have drawn is correct. These old cases are examined, to a considerable extent, by Coleridge, Judge, in *Lumley* v. *Gye*, (decided in 1853,) and reported in 2 El. & Bl. 216, (75 E. C. L. 254). That this was the law appears clearly from the case in Year-Book, Mich. 11, A, (*a*,) pl. 23, A, pl. 46, fully stated and commented on by Coleridge, Judge, in above case. This was the only direct decision to this effect; but it was treated as the law from the earliest times. This continued the common-law, unchanged by any statute, till 1350, when the statute of laborers was enacted, which in effect, provided that when the servant had contracted with his master for a term of services, and during that term a third person enticed him to leave his service, or, the servant having left his service, if such third person employed the servant, that is, harbored him, the master should thereafter have an action against such third person. This statute was confined in its operation simply to laborers and servants in the usual and common meaning of this term. The reason why, independent of this statute, an action would not lie for enticing away a servant, or for harboring him, would seem clear enough. If he was thus enticed away or harbored, the direct cause of the master's losing the service of his servant was the act of the servant in leaving his master, and hiring himself to such third person. The enticement and harboring of the servant by the third person was

not the proximate cause of the damages the master sustained; and therefore till this statute passed he could bring no action, as his damages were not the proximate consequence of the act complained of, the enticing away or harboring of his servant.

But changes were inadvertently made in the common-law. Thus, when a servant was forcibly taken from his master, the original and proper action was an action of trespass *vi et armis;* but as the declaration alleged that by reason thereof he (the master) lost the services of his servant, and in this allegation it resembled an action of trespass on the case, the action gradually came to be regarded as an action on the case; and since 1651 it has been held that an action on the case was the proper form of action, where the servant was forcibly carried off by the defendant. And, where the servant was enticed or harbored, after a while the fact that it was a case which the common-law gave no remedy for, but only the statute of laborers of 1350, seems to have been overlooked or forgotten, and the court treated these actions as actions given to the master by the common-law for enticing away or harboring his servant. The earliest case in which this error seems to have been committed by the court, where the servant was enticed away, was in *Adams* v. *Basealds*, 1 Leon. 240, (decided in 1591,) more than 200 years after the passage of the statute of laborers.

And the earliest case, where it was thus inadvertently held that the common-law gave an action on the case by a master against one who harbored his servant, was *Fawcet* v. *Beavres* 2 Lev. 63, (decided in 1684.) But from that there have been numerous cases in the English courts which fully established the law that, at the common-law, an action on the case could be maintained by a master for forcibly carrying off or for enticing away his servant or for harboring his servant, who had deserted from the service of his master, whereby, in any of these cases, the master had lost the services of his servant. See *Fawcet* v. *Beavres*, 2 Lev. 63; *Bird* v. *Randall*, 3 Burrows 1,345; *Reg.* v. *Daniell*, 6 Mod. 99, 182; *Lumley* v. *Gye*, 2 El. & Bl. 216, (75 E. C. L. 254). It is questionable, however, whether this law can be extended beyond menial servants and laborers. See case last cited, decided in 1853, where this

question is fully discussed. Of course, on these principles, an action on the case lies by the master against a person who committed a trespass on his servant, as by wounding him, whereby he was disabled from serving the master, *per quod servitium amisit.* See *Hodsoll* v. *Stallebrass,* 11 Adol. & E. 301.

Originally, the only action which lies for the injury of a child was when the eldest child was forcibly carried off, (kidnapped); and for this the father or guardian had such a right of action. The only ground on which this action was based, was the plaintiff (in such case the father or guardian) lost the value of the heir's marriage. But for some reason, probably because the ground of the action was lost sight of after some time, the courts began to allow an action for carrying off forcibly any child; and the reason given was that the father thereby lost the services of his child. This was held as early as 1389. If this was allowable, it would follow, of course, that the father ought to have an action for the battery of his child whereby he lost his services. But this was said not to be the law as late as 1587, (see *Gray* v. *Jefferies,* Cro. Eliz. 55 ); but it was settled to be the law in 1651, (see *Norton* v. *Jason,* Style 398) ; and since then it has been everywhere admitted that a father had a right to bring an action on the case for the battery of his child whereby he lost his services.

While an action did not lie for enticing away a servant who had no contract of services with his master, yet, as it was admitted that it did lie where there was a contract for services (see *Lumley* v. *Gye,* 2 El. & Bl. 216, 75 E. C. L. 254), and as the child was under obligation to his father to render services, such obligation was regarded as the equivalent, in such case, of the obligation to render services by express contract in other cases ; and therefore, as it had been established that a father had a right of action, because of loss of services, against one who committed a trespass *vi et armis* against his son,— as a battery, for instance,—it would follow, as a matter of course, upon these principles, the father would be entitled to an action on the case against one who enticed away his son, whereby he (the father) lost his services. See *Evans* v. *Walton,* L. R. 2 C. P. 615. This

case suggests that in no case, though it be a suit brought by a master for the loss of services of his servant by his being enticed away, would it be necessary to show an express contract to serve; but this does not seem to be sustained by the authorities. See article in 21 Amer. Law Rev. 764, by John H. Wigmore, No. 5, September and October number, 1887. This loss of the services of a daughter, which she was bound to render her father, was also the basis, as it still is, of the action of seduction.

In 1619, it was established that a husband could bring a suit alone for the loss of the society of his wife by her being forcibly carried off (see *Guy* v. *Livesey*, Cro. Jac. 501; *Hyde* v. *Scyffor*, Id. 538); and in 1745 an action was allowed a husband when the wife had been enticed away. In an article in the American Law Review, volume 21, p. 769, this is spoken of as a stroke of judicial legislation. It does not so strike me, as a married woman, being unable to consent must be regarded, when enticed away, just as though she had been forcibly abducted, having no will in the matter because of her coverture. The law, as thus finally reached in England with reference to the remedies for interference with family relations by a stranger, has been generally followed in the United States. See *Grinnell* v. *Wells*, 7 Man. & G. 1,033; *Hartfield* v. *Roper*, 21 Wend. 615; *Dennis* v. *Clark*, 2 Cush. 347; *Magee* v. *Holland*, 27 N. J. Law 86; *Drew* v. *Railroad Co.*, 26 N. Y. 49; *Sargent* v. *Mathewson*, 38 N. H. 54; *Hoover* v. *Heim*, 7 Watts 62; *Railroad Co.* v. *Kelly*, 31 Pa. St. 372; *Cowden* v. *Wright*, 24 Wend. 429; *Robinson* v. *Burton*, 5 Har. (Del.) 338.

We may regard it as now established in England and in the United States, by the common-law, that a husband or father has an action on the case against a stranger for the abduction, by force, of his wife or child, or for enticing them away, or for harboring them, if they have willfully left; and also for any battery or tort of any kind, whereby the plaintiff loses services or society of his wife, or the services of his child, as will appear from the above-cited authorities. A father has also such an action for the seduction of his daughter, where he has lost her services; and a husband has a like action, in a few special cases, for

certain exceptional interferences with the family by a stranger, not necessary to be now specified. The mother has not the same extent of protection for interference with the family relation, after her husband's death, as the father had; but the common-law afforded her some protection, as, for instance, she may sometimes bring an action for the seduction of her daughter. But her right to bring such suit will frequently be negatived when, under like circumstances, the father, if living, could bring such action. See *Hornketh* v. *Barr*, 8 Serg. & R. 36; *Logan* v. *Murray*, 6 Serg. & R. 175. The difference results from the fact that a mother, after her husband's death, has no right to the services of her minor children as the father had. *Pray* v. *Gorham*, 31 Me. 240; *Bartley* v. *Richtmyer*, 4 N. Y. 30.

There were many other interferences with the family relation by strangers for which the common-law afforded no remedy; they being regarded as cases of *damnum absque injuria*. And, when it did afford a remedy in such cases, it only afforded it to the head of the family, and never to any other member of the family. The measure of damages for such interference with family relations, when a remedy was given, was not very definitely settled by the common-law; there being conflict among the authorities. Where a husband sued as such, he was generally allowed to recover what has been commonly called exemplary damages; that is, compensation for the injury he has suffered from a disturbance of his peace of mind, loss of honor, or social position, or the like. See *Hutcheson* v. *Peck*, 5 Johns 196; *Hyatt* v. *Adams*, 16 Mich. 180. When a father sued, he was, in some classes of cases, also allowed exemplary damages, so called, for disturbance of peace of mind, loss of social position, and the like, as when the wrong was the seduction of his daughter; but in other cases, as for the battery of his child, or other physical injury inflicted on his child, whether the injury was inflicted maliciously or not, in some States no exemplary damages—that is, damages resulting from the disturbance of the father's peace of mind and wounded feelings and the like—were ever allowed, as, for instance, in New York, (see *Cowden* v. *Wright*, 24 Wend. 429) while exemplary damages, so called, may be

given—that is, the wounded feelings and the like of the father, may be taken into consideration by the jury, when the tort of the defendant was done with vicious intent—in other States. See *Magee* v. *Holland*, 27 N. J. Law 86.

But there is one matter with reference to the measure of damages in tortious interference with family relations, as well as in every other description of cases, which was clearly settled. That is, if death be produced by such tort, whether it was done with malice aforethought or from gross carelessness, and though death followed even necessarily from the defendant's tort, in no case was any damages allowed which were occasioned by such death. Applied to the cases of interference with family relations, if the wife or child be killed by the defendant in any way, maliciously or otherwise, the husband and father can at common-law in no case recover any damages of any kind resulting from the death. If the wife or child be killed instantly, the husband or father has at common·law no action against the wrong-doer. And if the wife or child be disabled for the time being, and, after some time, die from the injury inflicted on her or him, the husband or father may sustain his action on the case against the wrong-doer, but he can in such case only recover for the loss of society or service of the wife or child up to his or her death, for expenses incurred, such as attendance on the injured one, medical bills, and the like, and, perhaps, for funeral expenses. But there can be no damages allowed for the loss of the society of the wife, or the loss of the services of the child, which the plaintiff would have enjoyed but for his or her death caused by the wrongful act of the defendant. Nor can any damages be allowed for the grief and distress of mind of the husband or father, or any other damages which followed the death of the wife or child, and was the necessary result of it. These principles have become elementary principles of the common-law, established and recognized as the settled law by very many decisions, both in England and the United States, which decisions extend over a period of 250 years. The following are some of these decisions: *Smith* v. *Sykes*, Freem. 224; *Higgins* v. *Butcher*, reported in Yelv. 89, 90, and in Brownl. & G. 205, and Noy 18; *Baker* v. *Bolton*, 1 Camp. 493;

*Carey* v. *Railroad Co.*, 1 Cush. 475; *Lucas* v. *Railroad Co.*, 21 Barb. 245; *Hollenbeck* v. *Railroad Co.*, 9 Cush. 480; *Miller* v. *Umbehower*, 10 Serg. & R. 31; *Kearney* v. *Railroad Corp.*, 9 Cush. 109; *Eden* v. *Railroad Co.*, 14 B. Mon. 165; *Quinn* v. *Moore*, 15 N. Y. 435; *Worley* v. *Railroad Co.*, 1 Handy 481; *Safford* v. *Drew*, 3 Duer. 637.

There has been but a single decision, either in England or in the United States, which can be regarded as in conflict with the principles above laid down, which are universally admitted to be principles deeply rooted in the common-law, and that is *Ford* v. *Monroe*, 20 Wend. 210, where the plaintiff was allowed to recover damages for the death of his son, killed by the servant of the defendant. The jury were told by the judge below that they could award damages, if the defendant was guilty of negligence, for the sickness of the mother, the result of the injury which her child, about 10 years old, had received by the running of the defendant's gig over him, and of which he died after a short illness, and all the amount of the services of the child till he was 21 years old, if he had not died of the injury. The real question of controversy was whether the plaintiff was entitled to recover at all for services lost, without some proof being given that the servant who was driving the gig, was acting in the business of the defendant when he ran over the child. There does not appear to have been any controversy in the court below or in the court above as to the measure of damages. This point, that damages might be given for services the child, which would have rendered for some 10 years, had he not died, seems to have been assumed and passed *sub silentia* both in the court below and in the Supreme Court. The character of this case, and its want of value as an authority, was pointed out in the case above quoted, 1 Cush. 479, and it was condemned; and it was also condemned by Judge Bronson, 3 N. Y. 493, in case above cited; and it was directly overruled in *Green* v. *Railroad Co.*, 28 Barb. 21.

The law, as I have stated it, is broadly laid down as the settled law by every text-writer I have seen, who speaks of the subject. This is the language of Judge Cooley in his work on Torts, (page 15) : "No action will lie at common-

law for causing the death of an individual. This was as thoroughly settled by the decisions as it was possible for any point to be, and the concurrence of authority was unanimous. When, therefore, it was concluded that public policy demanded the giving of a right in these cases, a new law was obviously essential. There was no principle which could adapt itself to such a remedy, for the established principle was distinctly adverse to it." On page 262, Judge Cooley further and more fully explains his meaning. He says:

"By what has been said is not meant that the act causing the death might not, under some circumstances, give a right of action, but it must be a right springing from death itself. Thus it has been shown that the master and servant, or any one who is lawfully entitled to command the services of another, may bring action against a wrong-doer who deprives him of those services. Now, the same act which deprives the master of the services of the laborer, or a father of those of a child, may result in the death of the servant or child. In these cases the common-law gave a remedy for the loss, but only for the time intermediate the injury and the death. The master, parent, etc., suing, might, however, recover any incidental damages he might have suffered, such as expenses for medical attendance and nursing up to that time; but the estimate must be confined to the pecuniary loss, and not cover mental suffering. See *Peterson* v. *Knoble*, 35 Wis. 80. * * * But such redress is exceedingly inadequate in any case; and when the death is instantaneous, as well as in very many other cases, the principles which have supported recovery in the cases above mentioned can have no application, and no redress at all was possible at common-law.

"This was a great and admitted defect, and the British Parliament undertook to remedy it in 1846 by an act which is familiarly known as 'Lord Campbell's act,' an act which has formed the model of much of the legislation in this country on the same subject. It was provided, by this important statute, 'that whenever the death of a person shall be caused by the wrongful act, neglect, or default of another, and the act, neglect, or default is such as would, if death had not ensued, have entitled the party injured to maintain an action,

and recover damages in respect thereof, then, and in every such case, the person who would have been liable if death had not ensued, shall be liable for an action of damages, notwithstanding the death of the person injured, and though the death shall have been caused under such circumstances as amount in law to felony; that every such action shall be for the benefit of the wife, husband, parent, and child of the person whose death has been so caused.

" What are called exemplary damages—that is injury to the feelings, and loss of the comfort of the society of the deceased party—could not be recovered under this and like statutes, nor were the pain and suffering of the deceased an element which, under this and like statutes, could be recovered for. The true basis of recovery, under this and like acts, is thus stated by Pollocks, C., B. in *Franklin* v. *Railway Co.*, 3 Hurl. & N. 211. ' It has been held that these damages are not to be given as a *solatium*. This was so decided for the first time in *banc* in *Black* v. *Railway Co.*, 18 Q. B. 93. The case was tried before Parke, B., who told the jury that the Lord Chief Baron had frequently ruled at *nisi prius*, and without objection, that the claim of damages must be founded on pecuniary loss actual or expected, and that mere injury to feelings could not be considered. * * * The damages should be calculated in reference to a reasonable expectation of pecuniary benefit, as of right or otherwise, from the continuance of life.' "

A law similar to Lord Campbell's act was proposed by the revisors of the Code of Virginia of 1849; but it did not pass the Legislature, so that we never had any act of this character in force in this State till after the State was separated from Virginia, when we adopted such an act promptly. See Acts 1863, p. 113. And since then such an act has always been in force in this State. The act now in force may be found in Warth's Amend. Code, ch. 103, §§ 5, 6; and it is in almost the identical language of Lord Campbell's act, but it differs from it in the mode in which the money recovered in such action is to be distributed; our act providing that "it shall be distributed to the parties and in the proportions provided by law in the distribution of personal estate left by persons dying intestate." The amount of the recovery is not

to exceed $10,000.00 and the suit must be brought in two years after the death of the person. This act of Lord Campbell was entitled "An act for compensating the families of persons killed." It made a great change in the common-law, when there was an interference with family relations. In the first place, the action was permitted to be brought for a specified interference with the family relations by a stranger when no action could be brought at all at common-law; that is, when a member of the family was wrongfully killed. And, secondly, it permitted this action to be brought for a child or wife for their own benefit solely, as well as by a husband or father. Though it had been decided that what are called exemplary damages—that is, damages assessed because of the distress of the family produced by the untimely death of one of its members—could never be given under this act, still, when we adopted it, we modified it by fixing a limit to the amount of the damages a jury could award. The limit is, as we have seen, $10,000.00.

The next statute which was passed in this State changing the law with reference to the tortious act of a stranger interfering with family relations was passed April 4, 1873. It resembled, in many respects, the act under which this suit was brought, copied in the beginning of this opinion, though it differed from it in some important respects. It is found in the Acts of 1872–73, ch. 99, § 1, p. 253. I deem it unnecessary to insert it here, as the act under which this suit was brought, passed February 27, Acts 1877, ch. 107, § 16, is set out at length in the beginning of this opinion, and was an amendment of this act. It gave redress, for a certain specified interference with the family relation, to any member of the family, instead of to the head of the family only. And, secondly, it gave redress for an interference with the family relation for which the common-law gave no redress; but this interference, instead of being the death of one of the family wrongfully brought about by an act of the defendant, was for an entirely new matter, never thought of as an interference with the family relations, for which the law should give a redress, till long after the passage of Lord Campbell's act; and that was the sale, by a person engaged in selling intoxicating liquors as a busi-

ness, to a person who had been an habitual drunkard, after some member of the family, other than a brother or sister, had given such liquor dealer written notice not to sell such person intoxicating liquors; such person being, at the time such notice was given, an habitual drunkard. I shall construe the act making these changes in the common-law, only so far as, from the evidence in this case before us, it is probable that, on another trial of this case, which must be had, it will be important to definitely understand the meaning of certain portions of the act; leaving the construction of other portions of it to be made when a case arises requiring such construction.

It is claimed by the appellant's counsel that neither the declaration nor the proof shows, that when the plaintiff alleges she gave the defendant a written notice not to sell or furnish intoxicating liquors to her husband, the defendant was engaged in the sale of intoxicating liquors. The counsel for the appellee (the plaintiff below) insists that, by a true construction of this statute, the proper written notice to any person, whether he be engaged in the sale of intoxicating liquors or not, would, if intoxicating liquors were afterwards furnished such person by the party so notified, and he thereby became intoxicated, and while in that condition did damage to another, render such person, so notified, though never engaged in the sale of intoxicating liquors, liable to be sued under the provisions of this statute.

With due deference to the argument of the learned counsel, it does seem to me that this statute can not possibly be so construed. Its language, as well as its obvious intention, so far as it relates to the person intended to be made subject to suit under certain circumstances, is too clear to admit of any sort of doubt. It says certain persons " may serve, upon any person engaged in the sale of intoxicating liquors, a written notice,' 'etc.; and afterwards it says : "An action may be maintained by the husband, wife," etc., " of the person named in said notice against the person selling or giving such liquors," etc. It is not disputed that this must be the person receiving such written notice; and, by the express words of the statute, such written notice " is to be served on some person engaged in the sale of intoxicating liquors ; " meaning,

of course, engaged in the sale of intoxicating liquors as a business when so notified. The language of the law is too clear to admit of a doubt as to its meaning; and I can not imagine that the Legislature even intended that a person who never had been engaged in the sale of liquor as a business should, by this law, be held to any liability beyond that imposed on him by the common-law for furnishing, it may be at his home and in the spirit of hospitality, intoxicating liquors to any person, or that any increased responsibility could be put upon him for such an act by any written notice from any one. The law obviously allows this increased responsibility to be put on persons "engaged in the sale of intoxicating liquors," and on none others. But, on the other hand, it seems to be equally obvious from the words of this statute that it is totally immaterial whether, when such person received such notice, he was engaged in the sale of intoxicating liquors for himself or for another, and whether it was a legitimate business he was carrying on, having a license to sell such liquors, or whether it was an illegal business, he having no license to sell such liquors; or whether he was, when he received such written notice, selling liquors for another, and when he disregarded it and sold or gave liquor to the person, he was notified not to sell or furnish such liquors to, he was selling liquor for himself and not as the agent of another, as he was when he received the notice.

From the evidence and argument of the counsel, it is obvious that it was a question, in the former trial of this case as to what must be contained in the written notice required by this law. The appellant's counsel contends that by this law mere oral testimony is insufficient to prove that such a written notice was given to the defendant, and that, when such a notice is served, there should be preserved a corresponding copy, or, more properly speaking, the original, on which should be a return of service, whether made by an officer charged with executing process, or served by a private person, and this service sworn to, as our law provides shall be done when notices are served; and, if the original be lost, its loss must be accounted for, and then, and then only, can its contents be proven by parol tes-

timony. This is, it seems to me, a misconstruction of the statute, which provides: " Any husband, wife," etc., " may serve such written notice ;" but not a word is said about how such notice shall be served. If the defendant has received such written notice, he becomes responsible in the manner provided by this act; and that he has received such written notice, as any other fact, is proven by parol testimony, as the law has not provided it shall be proven in the manner in which legal notices are required to be proven. Nor does this law require the plaintiff to keep the original or a copy of this notice. The fact that no original notice was originally kept, or, if kept, not produced, may be a fact which might weigh before a jury on the question whether such written notice was given to the defendant, when, as a witness, he denies on oath that he ever received any such written notice ; and, when this is done, the plaintiff's proof before the jury would be much strengthened—indeed, it would be rendered convincing despite such denial—if there was produced the original notice, showing that it was served as legal notices are required to be served. It would therefore be safer for the person giving such notice in all cases to have it thus served, and keep the original with the proper proof of service endorsed upon it as when legal notices are served; and the failure to do so may prejudice greatly her case before a jury. But it is not required by the law that the service of the notice should be thus proved, and it may therefore be proved by parol testimony.

If the notice is given by a wife, the appellant's counsel insists it should on its face show that the person named in it is the husband of the party giving the notice. It is clearly the law, that she must be his wife, but there is nothing in the statute requiring this to appear on the face of the notice. The statute says: " The written notice is not to sell or furnish such liquor to her husband." But she may, in her written notice, give the name simply of her husband, and thus identify him ; but there is no requirement or necessity, on the face of the notice, to state that he is her husband.

In this case the jury assessed the plaintiff's damages at $1,000.00, on which judgment was rendered for that sum and

costs in favor of the plaintiff against the defendant. The suit was brought on February 27, 1885. The statute of limitations, in actions of this sort, is one year. It was pleaded by the defendant, and barred all damages for torts of defendant committed prior to February 27, 1884. The husband of the plaintiff was drowned March 26, 1884; so that the plaintiff had a right to recover damages only for the torts of defendant occurring between February 27, 1884, and March 26, 1884. And, as his labor was worth only from $1.50 to $2.50 per day, it is obvious that this verdict, assessing the plaintiff's damages at $1,000.00, must have either included damage to her means of support by reason of his drowning, or it must have included what are called exemplary damages. I propose, therefore, as the same questions must arise on a second trial of this case, which must be had, to consider what is the law with reference to the plaintiff, by reason of the death of her husband by drowning when drunk and in consequence of his drunkenness, and also under what circumstances the jury are authorized to give exemplary damages in a suit of this character, under this statute, as well as what is meant by exemplary damages. The statute is as follows :

"If the person so served with such notice shall sell or furnish such liquors to the person named in said notice, and by reason thereof the person to whom such liquor is sold or furnished shall become intoxicated, and while in that condition does damage to another, or shall, by reason of such intoxication, injure any person in his or her means of support, who may have the legal right to look to him therefor, * * an action may be maintained by the husband, wife, child, parent, or guardian of the person mentioned in said notice, or other person injured by him as aforesaid, against the person selling or furnishing such liquors, as well as for all such damages as the plaintiff has sustained by reason of the selling or giving of such liquors, as for exemplary damages."

It is under the clause, "or shall, by reason of such intoxication, injure any person in his or her means of support," that the plaintiff claims that she has a right to recover the damage to her means of support occasioned by the death of her husband, caused by his intoxication. Has she such a

41

right? It seems to me, clearly, that she has no.t Admitting, for argument's sake, that the falling out of the boat was the natural and proximate consequence of his being intoxicated, which it seems to me it was not, still I cannot see how she could recover damages consequent upon the death of her husband. Did he (the husband) injure her in her means of support by his death? We have. seen that it has been for 250 years as thoroughly settled by the decisions as it is possible for any point to be, that the death of a human being, no matter how caused, was, in contemplation of law, no injury. It was unquestionably in many cases a great damage, but it has always been held to be *damnum absque injuria ;* and, therefore, under no conceivable circumstances could a suit be brought for causing the death of a human being, because in contemplation of law it was never an injury. If, for instance, a person maliciously shot down and killed the wife of another, the husband could not at common-law sue him for it, because in contemplation of law he had not been thereby injured, though he had suffered great damages. If her arm was broken by the shooting, her husband could sue for such tort, and recover damages, because the breaking of her arm was an injury to him, depriving him of her society and services; but her death was not regarded as an injury, and therefore he could not sue the person who killed her.

This was changed by Lord Campbell's act, which we have adopted; and, if now a man's wife should be shot down maliciously by any one, the person shooting could be sued, but only by her personal representive, not by her husband. It is obvious that Lord Campbell's act would not give the wife a right in this case to sue the defendant, even if he, instead of making him intoxicated, had directly killed him by giving him poison; and, certainly, by the common-law, she could not have sued the defendant if he had maliciously killed, by poisoning, her husband, because, however much he had damaged her, he had not injured her, in contemplation of law. It was *damnum absque injuria.* It seems to me, therefore, clear that, under the statute we are considering, the plaintiff (the widow) in this case can recover no damages resulting from the death of her husband caused by his intoxication, because

in contemplation of law no injury was sustained by her in her means of support, or in any other way, though she may have suffered much damage by her husband's death; for a death, no matter how great and obvious may be the damage done another member of the family, was never regarded as an injury. She has simply suffered *damnum absque injuria*. This is by no means the only instance in which, though it is obvious one has suffered great damages, yet the law regards him as not injured. There are many other instances found in our law of *damnum absque injuria*. Some of these cases have by statute been declared to be injuries for which suits may be brought, but there are still others where, though one unquestionably suffers damages, neither the common-law nor the statute gives him any redress; the law contemplating that he has suffered no injury.

I propose now to examine the decisions in other States on this point where they have a statute similar to the one under which this suit was brought. In most of the States, statutes have been passed whereby there has been added to the cases where by the common-law a person committing certain torts by interference with family relations could be sued, the case where certain persons specified in the statute are made liable for furnishing liquors under certain circumstances to a party illegally, and thus making him drunk. Most of these statutes are like the statute in New York, so far as it bears on the question we are discussing. These different statutes are compiled by Cooley, in his work on Torts, (page 242, etc.) Thus the statutes of Illinois, Indiana, Iowa, Kansas, Michigan, Ohio, Wisconsin and Arkansas are, in the matters bearing on the question we are discussing, substantially like that of New York; from which they were copied; and there are other States where these provisions are more or less similar; and in Massachusetts the statute-law is now very similar to that of New York. See Pub. St. Mass. 1882, ch. 100, § 21, p. 529, (passed in 1879.) The New York statute is worded as follows, so far as it can bear on the question we are discussing: "Every husband, wife, child, parent, guardian, employer or other person who *shall be injured* in person or property or means of support by an intoxicated person, or in *consequence* of the intoxication, *habitual* or otherwise, of any person,

shall have a right of action in his or her name against any person," etc. I have underscored the words which it is supposed by appellant's counsel make our statute substantially different from this and like statutes in the other States named, including Massachusetts.

In New York, in *Mead* v. *Stratton*, 87 N. Y. 493, (decided in 1882,) after the passage of the act on which the suit before us was brought, the court decided, when "the death of a man is a result necessarily following and attributable to his intoxication, an action is maintainable, under this act, by his widow, if injured in her means of support, against the vendor of the liquor causing the intoxication, in the case specified in the statute." Miller, Judge, in delivering the opinion of the court, says: " The injury to the means of support was one of the main grounds of the action, where the party is deprived of the usual means of maintenance, which he or she was accustomed to enjoy previously, by or in consequence of the intoxication or the acts of the person intoxicated. It is evident that the Legislature intended to go, in such a case, far beyond anything known to the common-law, and to provide a remedy for injuries occasioned by one who was instrumental in producing on caused such intoxication. While a statute of this character should not be enlarged, it should be interpreted, when the language is clear and explicit, according to its true intent and meaning, having in view the evil to be remedied, and the object to be attained. *The evident object was to suppress the sale and use of intoxicating liquors, and to punish those who in any form furnished means of intoxication, by making them liable for damages which might arise, which was caused by the parties who furnished the means.* If the injury which had resulted to the deceased in consequence of his intoxication had disabled him for life, or to such an extent as to incapacitate him for labor, and from earning a support for his family, it would, no doubt, be embraced within the meaning and intent of the statute. That death ensued in consequence thereof furnishes much stronger grounds for a claim for loss of means of support; and a different rule in the latter case would make a provision for the lesser and temporary injury, while that which was greater and more serious would

be without remedy or means of redress. Such could not have been the intention of the law-makers; and the statute was designed to embrace, and most manifestly cover and include, all injuries produced by intoxication, and which legitimately result from the same."

On this decision I would remark that the portion of this opinion, which I have above italicised, as being what the court says was the evident object of the New York statute, was evidently not the object of our statute.

The evident object of our statute was "not to suppress the sale and use of intoxicating liquors, and to punish those who in any form furnished means of intoxication." It is obvious that our Legislature, in passing this act of February 27, 1877, had no idea of suppressing the sale and use of intoxicating liquors, or of punishing those who in any form furnished means of intoxication; for the very act, of which the statute under consideration is but one section, expressly authorized the sale of intoxicating liquors upon the vendor's complying with certain conditions. The evident object of our statute was to recompense members of a family for certain losses sustained by the sale or furnishing of intoxicating liquors to a member of the family in violation of certain specified provisions of the statute; and it was not intended to punish the vendor of such intoxicating liquors.

The argument of the court to sustain its construction of the terms of this statute seems to be very unsound. I do not think I can better expose its unsoundness than by using the language of the New York court, changing it only so far as to apply it to another subject to which this reasoning is equally applicable, and then showing that the New York courts, as well as the courts everywhere else, have decided that such reasoning is unsound. I will apply it, for instance, to the case of a husband, who sues, as he has a right to do by the common-law, for the loss of his wife's society and services produced by the tort of another. This is the reasoning of the New York court:

" If the injury had resulted to the deceased wife in consequence of the tort of the defendant, and had disabled her for life, or to such an extent as to deprive the husband of her society and service, there can be no doubt but that the com-

mon-law furnished him redress. That her death ensued in consequence thereof furnishes much stronger grounds for a claim for a loss of her society and comfort; and a different rule in the latter case would make provision for the lesser and temporary injury, while that which is greater and more serious would be without remedy or redress at the common-law."

Yet there is no question that the common-law, as universally admitted, while it furnished a redress for the lesser injury, as the court calls it, furnished no redress for the greater and more serious injury, the death of the wife. And this has been repeatedly decided by the New York courts. See *Green* v. *Railroad Co.*, 28 Barb. 22; *Quin* v. *Moore*, 15 N. Y. 435; *Safford* v. *Drew*, 3 Duer 637. These decisions are based on the ground that, in legal contemplation, the death of a wife, or of any human being, was under no circumstances an injury to any one; while the disabling of a person for life was, in legal contemplation, a great injury. The New York court, in calling, therefore, the death of the husband in that case the greater and more serious injury, and the disabling for life a lesser injury, really, without any reference to them, held in effect as nullities a whole class of New York decisions, as well as decisions of the courts everywhere, which had held always that the death of any human being was no injury.

It being the established law in New York and elsewhere, that the death of a human being is not regarded in law as an injury to any one, it does seem to me that, if the Legislature meant to change this common-law rule, so well known, they should have done so in clear language; and that under no fair construction of the language used in this act can it be considered that they intended to do so, when they simply gave to the wife the right to sue when she was injured in her means of support; for it had been settled as law that no one could be regarded as legally injured by the death of another. Accordingly, in the New Hampshire statute on this subject it is in express words provided that, "in case of the death or disabling of a person in consequence of such intoxication, an action may be brought," etc. See Cooley Torts, 254. And in Lord Campbell's act like express language is used. I think the New York court did enlarge its

operation, which, as they say, ought to be done in an action of this character; and in so doing they had to explain and limit the decision in *Hayes* v. *Phelan*, 4 Hun 733, and *Brookmire* v. *Monagan*, 15 Hun 16.

On the contrary, it was decided, under a similar act in Massachusetts, (Stat. 1879, ch. 297,) "that a wife can not maintain an action for the death of her husband, caused by intoxication resulting from the use of intoxicating liquors sold or given him by the defendant." The case in which this was held (*Barrett* v. *Dolan*, 130 Mass. 366) was decided in 1881. The declaration states that the plaintiff's husband was injured by certain cars on a railroad track while intoxicated, and in consequence of such intoxication, from which injuries he soon after died, and that his intoxication was produced by liquors sold to him by the defendant, and that the plaintiff was wholly dependent on husband for support, and by his death she was deprived of her means of support. The defendant demurred to this declaration on the ground that it did not state a legal cause of action. The demurrer was sustained by the court below and in the court above. The Massachusetts act, so far as this question is concerned, is substantially the same as our statute. See Pub. Stat. Mass. 1882, § 21, ch. 100, p. 529. Lord, J., in delivering the opinion of the court, says:

" The demurrer in this case was rightly sustained. There are insuperable objections to the maintenance of the action. The cause of action, as stated in each count, is the death of a husband. In this commonwealth there is no right of action by any person for damages occasioned by causing the death of another. *Carey* v. *Railroad Co.*, 1 Cush. 475; *Shaw* v. *Railroad Corp.*, 8 Gray 45, 80; *Kearney* v. *Railroad Corp.*, 9 Cush. 108; *Palfrey* v. *Railroad Co.*, 4 Allen 55. This proposition may certainly be deemed elementary. There is nothing in the statute which gives such right. This fact, that the liability to pay damages for injuries sustained is created by statute, and does not exist at common-law, does not give a claim for damages by reason of death. The liability to an action for damages occasioned by a defective highway is purely a statutory liability, and did not exist under the common-law; but no damages by reason of death have

ever been recovered or claimed, or supposed to be recoverable, under it. So important a change of the law as the right to recover damages for the death of a person would not be left to implication. * * * If the Legislature had intended to include death among the causes of action, is it possible that the right to bring it would not have been confined to some person for the benefit of all? But we need not discuss this. It is · sufficient to say that no such right exists at common-law and none has been given by statute in Massachusetts."

This reasoning seems to me to be entirely sound. In our State, by the adoption of Lord Campbell's act, substantially a right of action for damages in certain cases (but not in such a case as this) is given, when the death of one party has been occasioned by the hand of another. But just what the Massachusetts court says would be done, if such an action was intended to be given, the Legislature did in this Lord Campbell's act. The right to bring the suit was confined to some person (the personal representative of the deceased) for the benefit of all intended to be beneficiaries.

In Illinois, however, in cases just like the Massachusetts case, they held that a wife might recover damages for injury to her means of support, by reason of the death of her husband, caused by intoxication produced by intoxicating liquors sold to him by the defendant under the provisions of a statute similar to the statutes of New York and Massachusetts. This was held in *Emory* v. *Addis*, 71 Ill. 274, and *Schroder* v. *Crawford*, 94 Ill. 361. In the first of these cases the court at some length reviews the evidence, and argues that the intoxication was the proximate cause of his death ; he having been run over, when drunk, by a railroad train. · In reference to this, I will only say that the court seems to me to entertain very different ideas of the natural and proximate cause of an event from those which this Court has expressed in our decisions. I do not say that the conclusion on this question was erroneous, for I have not considered carefully the case in this respect ; but I will say that the court had, according to its reasoning, what seems to me a very vague idea of what is a proximate cause. The court, on this subject, says : "We are not left to mere vague conjecture as to the primary cause of the death of Addis. No one can

read the evidence without being drawn to the conclusion, but for the intoxication, he would in all probability be living to-day." If this were admitted, it certainly would not, according to my views of the natural and proximate sequence of an act, show that his intoxication was the natural and proximate cause of his death. It would show it was a cause; but, so far as this reasoning goes, it might have been the remote cause. I will point out hereafter the strange notions this Illinois court has entertained as to what is a proximate cause of an event. With reference to the point we are considering, all the Illinois court say is on page 277 :

" The statute is broad and sweeping in its provisions, but the wrongs it is intended to prohibit can only be prevented by the rigid enforcement of highly penal laws. He who deliberately sells that which he knows will inflame the passions, deprive the party of the control of his judgment, and render him, for the time being, incapable of exercising proper care for personal safety, or that of his property, must be prepared for the consequences that may follow. One risk incident to the traffic is that, by the statute, he is made responsible for all the injuries such persons may inflict."

This would do very well as a part of a speech made before a popular audience, or even before the Legislature, to induce the passage of highly penal laws against persons selling intoxicating liquors. But I can not see that it has any bearing on the question before the court, which was the same as that I have been discussing. But, while I am unable to see what bearing these remarks had on the question before the court, yet it was all that was said on this point : whether a wife, under this statute similar to ours, could recover damages because of the death of her husband in consequence of his intoxication produced by the defendant's furnishing liquor in violation of this statute.

The second Illinois case, reported in the volume 94, is, on this subject, not much more satisfactory. It was a similar case of a husband, while intoxicated, being run over by a train of cars, and killed. The question whether the husband's intoxication was the proximate or remote cause of his death was discussed at some length, and the conclusion reached that it was the proximate cause. This I do not propose to

42

consider, and have not examined.  The court then says:
" The chief complaint is the refusal to charge that the jury
should find for the defendants, if the death of the deceased
was produced by the carelessness of the railroad company,
or if there was a failure of proof that it was not produced by
the fault of the railroad company.  Without admitting that
neligence on the part of the railroad company would bar a
recovery, it is sufficient to say that there was no proof as to
any negligence of the company, and so no evidence upon which
to base an instruction in that respect.  It is supposed that, as
the declaration alleges that was produced without any fault on
the part of the railroad company, it was necessary to prove
the averment; but, if no fault of the company was shown,
it might be presumed there was none.  The allegation, too,
was not material, and so unnecessary to be proved."  I would
simply say that, if the court had any definite idea of what
constitutes a proximate cause, "negligence on the part
of the railroad company which would have made them re-
sponsible" would certainly have barred this action, as the
negligence of the railroad company would certainly have
been the proximate cause of the death.

As showing, further, the vague ideas of this court as to
what constitutes a proximate cause and what a remote cause,
I will refer to the cases of *Shugart* v. *Egan*, 83 Ill. 56.  In
that case the court, on the first hearing of the case, actually
held that " the seller of intoxicating liquors to a husband
who became intoxicated by it, and in consequence of abusive
language used by him, is assaulted and killed by a third
party, is liable in damages to the wife for the death."  On a
rehearing however the court reached an opposite conclusion.
The wonder is how they ever could have reached the first
conclusion; for to my mind it is most obvious that the man
who assaulted the drunken man, and killed him, was so ob-
viously the primary cause of his death that the wonder is
that any court should ever have thought otherwise.

In Ohio the courts have decided that, under an act similar
to our act, " in an action for injury to the means of support
in consequence of intoxication which caused the death of
the intoxicated person, damages resulting from the death
can not be recovered."  This was first held in *Davis* v. *Jus-*

*tice*, 31 Ohio St. 359. The decision was based upon the same grounds as that in the Massachusetts case from which I have quoted. I will quote, however, some portions of the opinion of the court as delivered by McIlvane, Judge, which present the argument to sustain the position of the court in somewhat different aspects from any other case. He says, on page 362: "By the common-law, it is clearly settled that actions for personal injuries abate by death, and can not be revived or sustained by the executor or heir; and, if the law does not afford a remedy to the creditor or the heir for a pecuniary injury resulting from death, it is difficult to perceive why a remedy should be allowed to one sustaining any other relation to the deceased." He then reviews the authorities, and shows, in the language of Hunt, Judge, in 95 U. S. 754: "The authorities are so numerous and so uniform to the proposition that by the common-law no civil action lies from an injury resulting in death that it is impossible to speak of it as a proposition open to question." He concludes his opinion by saying: "We place our decision upon the ground that, in view of the previous state of the law, and the mischief sought to be remedied, we can find no expression in the statutes that indicates an intention on the part of the Legislature to bring the loss of labor caused by the death of the person intoxicated within the meaning of the term 'means of support,' for an injury to which a right of action is given." He also intimate that it would be paradoxical to say, where injury to be compensated for is the loss of labor, that there would be included in it that labor which could not be performed during the life of the laborer. Again, he refers to the fact that the action is to the means of support of plaintiff as wife, and not for an injury sustained by her as widow. Boyton, Judge, dissented from the rest of the court. His opinion, however, presents no reason to sustain his views other than those given in the New York decision from which I have before quoted. This case was approved in *Kirchner* v. *Myers*, 35 Ohio St. 85; Judge Boyton again dissenting. The court below was reversed because he charged the jury that, if the plaintiff was entitled to a verdict, "the amount must fully compensate her for all she has lost in her means of support,

both present and future." This charge the court said should have been qualified by limiting her damages to what she had lost up to the time of her husband's death.

In Iowa, under a statute similar to ours, in *Rafferty* v. *Buckman*, 46 Iowa 195, it was decided that the statute authorized the recovery of damages for the death of a husband, which had been caused by intoxication produced by intoxicating liquor sold him. In that case, the husband being drunk and exposing himself to the cold died of the exposure. The court held that his intoxication was the proximate cause of his death; and that the plaintiff, his widow, had a right to recover as much as, in a pecuniary point of view, would make her whole; but nothing was said about her being allowed exemplary damages, though the statute, like ours, permits it in much the same language. See Cooley To.ts, 248. No written notice is required to be given to the plaintiff by the defendant not to sell liquor to the person named in the notice. There was nothing in the case to show that exemplary damages could properly be given. The court seemed to think that the fact that she might re-marry, might properly affect the amount of the damages given her, but it would not defeat her right to sue. There was no discussion by the court of the reason why she should be allowed to recover damages caused by the death of her husband. All that the court say on this point is " that the first objection is that the statute does not authorize a recovery for injuries resulting from the death of the husband. But we think it does, if the wife, by her husband's death, is injured in her means of support." The court give no reasons for thinking so, and I can not regard the case, therefore, of much weight as an authority upon this point.

In the case of *Collier* v. *Early*, 54 Ind. 560, the complaint of the wife stated that, while her husband was in a state of insensibility caused by his intoxication, he slept upon a certain railroad track, and was run over by a train and killed, whereby she was entirely deprived of her support. This complaint was demurred to, and the demurrer sustained, and, as the court says, " the defendant could not be made liable for consequences not naturally caused by his acts. What happened was not naturally, necessarily, or even prob-

ably connected with the fact of the unlawfully selling of intoxicating liquors to him by the defendant, whereby he became drunk; and when the death could take place only upon the coincidence of his sleeping on the track and the train passing at the same time, the consequence becomes more remote and more disconnected with the cause alleged. The death need not take place immediately and directly upon the cause; but it must be effected by a chain of natural effects and causes, unchanged by human action, or the party who committed the first act will not be responsible. * * * Her husband was killed by the train of cars, and not by the act of the defendant in unlawfully selling him intoxicating liquors." The court refers, as sustaining these principles, to *Krach* v. *Heilman*, 53 Ind. 517, and *Kelley* v. *State*, Id. 311. And in *Backes* v. *Dant*, 55 Ind. 181, for the same reasons, the widow of a deceased person who came to his death as the result of injuries received by him from a fall while intoxicated, could not maintain an action therefor against a person who had unlawfully sold her deceased husband intoxicating liquor which had caused such intoxication.

The only other case on this subject which I have is *Roose* v. *Perkins*, 9 Neb. 304 (2 N. W. Rep. 715.) Where it was held that, " if the head of a family died from the effects of drunkenness, the persons furnishing the liquor could be held responsible, under the Nebraska act, for the loss of the means of support by his widow and children." The Nebraska statute is very different from ours. See Cooley Torts, 252, 253. There is a provision in it, for instance, " that a person licensed to sell intoxicating liquors shall pay all damages that the community or individuals may sustain in consequence of such traffic. He shall support all paupers, widows, and orphans," etc. The act seems to be very clumsily drawn, and its meaning by no means clear; but, by speaking of the seller of intoxicating liquors being required to support widows and orphans, it does look as if the Legislature designed to hold him responsible when a husband's death was caused by a liquor seller having furnished him with intoxicating liquor which made him drunk and caused his death. The court, however, does not appear to have based its opinion on the wording of the statute, but says, (page 314 :) " The action being for loss

of the means of support, it will lie in any case where the loss is merely temporary, as by disability, or permament, as by death." There is no discussion of the question, and the great difference between our statute and theirs makes the decision one of but little value in construing our statute.

My conclusion is that both reason and the weight of authorities sustain the position that, under our statute, no damages can be recovered by a widow because of the loss of her means of support by reason of her husband's death caused by intoxication produced by liquors furnished him by the defendant, in disregard of the provisions of the statute. In reaching this conclusion, I have regarded our statute as substantially the same as the statute of New York and the other States whose statutes are similar thereto, though the counsel for the appellant insists that it is materially different, and that under our statute the husband must actively do some act from which injury results to the means of support of his wife before she has any right of action ; the language of our statute being, "while intoxicated, do damage to another, or shall, by reason of such intoxication, injure any person in his or her means of support ;" which it is insisted should be interpreted, do some act whereby he inflicts an injury on his wife or others in their means of support. I am strongly inclined to think that there is no substantial difference, in this respect, between the language and meaning of the New York and other similar statutes and that of our State. The supposed difference is that the New York statute and that of other States say, "if certain persons named are injured in their means of support in consequence of the intoxication," etc., and our statute says, or "shall by reason of such intoxication [that is, in consequence of the intoxication,] injure any person in his or her means of support." Now, to my mind, the language, "shall be injured in consequence of the intoxication," should be interpreted to mean the same as, "if he shall, in consequence of the intoxication, injure him or her in her means of support." All that is required by the language in our statute, as in the statute of other States, is that certain persons shall be injured, in consequence of the intoxication, in their means of support.

An ingenious argument is made by the appellant's counsel to show that, by our act, something must be actively done by the intoxicated husband to injure the wife in her means of support, while, under the wording of the other statutes, nothing need be done by the intoxicated husband to injure the wife in her means of support; but it will suffice if her means of support are injured in consequence of his intoxication, though he has actively done nothing to injure her in her means of support. Such a distinction will not bear investigation; for surely, under our statute, if the injury to the wife's means of support is produced simply by incapacitating the husband to do anything in the way of making a living because of the husband's intoxication, this is, in the meaning of our law, "injuring her in the means of her support," though it is effected simply by his doing nothing, being incapacitated from doing any labor by his intoxication. In other words, the language of our statute, "he may injure her in her means of support" as effectually by doing nothing, because of his intoxication, as by actively doing something to injure her in her means of support. There is, therefore, I think, no such difference in the meaning of the statutes of these other States in their meaning and that of our statute as the appellant's counsel has insisted upon in his argument.

I will now apply the law as I have stated to the facts in this case. But, before so doing, we must dispose of the demurrer to the declaration as amended, and to each count thereof. The first count of the declaration was fatally defective, in this : that the only allegation in this first count in the declaration, that the wife (the plaintiff in this suit) was injured in her means of support in consequence of the intoxication of her husband by the unlawful selling of intoxicating liquors to her husband by the defendant, is this : " While so intoxicated, and by reason of such intoxication, he, the said Pegram, on the ———— of March, 1884, at the county aforesaid, fell into the Kanawha river, and was drowned; and so this plaintiff avers that, by reason of the wrongful acts aforesaid of the said defendant, and because of the drowning of her said husband, the said Thomas Pegram as aforesaid, caused by the wrongful acts of the de-

fendant as aforesaid, she, the said plaintiff, hath been greatly injured in her means of support, to the amount of five thousand dollars." This is a simple allegation that she was injured in her means of support, by her husband, when drunk, being killed by falling into the Kanawha river, and being drowned. We have seen that the death of her husband in consequence of his being intoxicated, under our statute, though she be thereby injured in her means of support, gives her no cause of action; and this is the only ground of action alleged in the first count of the amended declaration. The court ought, therefore, to have sustained the demurrer to this count.

Was the second count fatally defective? This statute of 1877 provides that "any wife," etc., "may serve upon any person engaged in the sale of intoxicating liquors a written notice not to sell or furnish such liquors to her husband," etc. This notice to such a person is obviously, under the statute, necessary to give the wife a cause of action. Was there any such allegation in this second count, as there certainly was not in the first? Was there in this second count this necessary allegation that, when the written notice was given, the defendant was engaged in the sale of intoxicating liquor as a business? The allegations in this second count of the amended declaration, on this subject were these: "Plaintiff also avers that, prior to the —— day of ——, 1878, he, said Pegram, had become addicted to drinking to excess, and on the said day and thereafter was in the habit of drinking to intoxication. Plaintiff also avers that, on the day and year last aforesaid, the said defendant was engaged in the sale of intoxicating liquors at his house, in the town of Point Pleasant, in the county of Mason and State of West Virginia, and that he continued to be engaged in the sale of intoxicating liquors during the years subsequent thereto, and was so engaged in the sale thereof on the —— day of March, 1884. Plaintiff also avers that, on the —— day of ——, 1878, at the county aforesaid, she being then and there the wife of the said Thomas Pegram, and as such had the legal right to look to said Pegram for support, and he, the said Thomas Pegram, being then and there in the habit of drinking to intoxication, this plaintiff served a notice in writing

upon the said John G. Stortz not to sell or furnish the said Thomas Pegram any intoxicating liquors; and at sundry times thereafter, with wifely anxiety, entreated the said Stortz not to furnish her said husband such liquors."

Our statute (see chapter 125, § 29, p. 748, Code 1887,) provides that, on a demurrer to a declaration, the court shall not regard any defect or imperfection in the declaration, unless there be omitted something so essential to the action that judgment according to the law, and the very right of the cause, can not be given, though at common-law it would be regarded as mispleading or insufficient pleading. Under this statute, it seems to me these allegations in the second count may be regarded as amounting to this : " That, prior to a certain day in 1878, the plaintiff's husband was a hard drinker, but on and after that day he became an habitual drunkard, and so continued ; that, while he was such an habitual drunkard, she (his wife) served a written notice, such as this statute required, on the defendant, and that the defendant was engaged in the sale of intoxicating liquors from the day her husband became an habitual drunkard till some time in the year 1884." If this be the meaning of these allegations, then there is in this count the essential allegation that the defendant was engaged in the sale of intoxicating liquors when she served the required written notice on him. I admit that a very liberal construction has to be given to this second count in the declaration in order to hold that it means what I have stated as its meaning. I think, however, under this statute about demurrers to declarations, I am justified in so construing these allegations, and in holding that, in this respect, there was no fatal defect in this second count of the declaration.

This second count then alleges, in substance, that, " in disregard of such notice, in March, 1884, and at divers times prior thereto, the defendant did sell to her husband intoxicating liquors, he being then in the habit of drinking to intoxication, whereby he became intoxicated ; and, in consequence thereof did injure the plaintiff (his wife) in her means of support by depriving her of food, clothing, and other necessaries and comforts of life." The plaintiff in error, by his counsel, claims that these averments do not show

43

that any of these sales, prior to this day in March, 1884, were made after the written notice was served. It is true that this necessary fact would under the common-law be held to be insufficiently pleaded. Still, as those sales are stated to have been made in disregard of this written notice and according to the liberal construction put on the manner of alleging facts in a declaration under the statute I have cited, when there is a demurrer to the declaration, I think we are justified in holding that these sales, in disregard of this written notice, are sufficiently alleged to have been made subsequent to the giving of this written notice. While these essential allegations to sustain this action are so insufficiently pleaded, according to well known common-law rules of pleading, and can only be held not fatally defective by a liberal construction of our statute, there are other allegations which violate the well-known rules of common law pleading. One, for instance, is that, when her husband was not intoxicated he was kind and loving. This, however, must be regarded as not vitiating this count, but as simply surplusage; it being totally immaterial whether, when he was sober, he was kind and loving, or unkind and brutal, or whether, when drunk, he was kind and loving, or whether he was then unkind and brutal.

It is well settled that, whenever a statute gives the wife an action for injury to her means of support, but not for anguish, distress of mind, or painful feelings suffered by her by reason of her husband's intoxication, these are not elements of damages in a suit brought by her under such statute. See *Freese* v. *Tripp*, 70 Ill. 496; *Meidel* v. *Anthis*, 71 Ill. 241; *Fentz* v. *Meadows*, 72 Ill. 540; *Koenor* v. *Oberly*, 56 Ind. 284. In fact, it seems to me on the very face of this statute of ours, it can not be construed to give to a wife an action for anything but for damages done for injuring her means of support. The fact that, because of his intoxication, the husband is made harsh and quarrelsome with his wife, is clearly no ground for action under our statute; nor can it be taken into consideration in fixing her damages when she shows an injury to her means of support, which is a good ground for such action. But allegations of this character in a declaration do not vitiate it, but are mere sur-

plusage; and, of course, no proof ought to be received at the trial to prove such allegations.

In the second count of the declaration there is another like allegation, which must be regarded as mere surplusage. That is the allegation, at the close of the count, that her husband lost his life in the Kanawha river in consequence of his intoxication, whereby she suffered injury to her means of support. There is another objection to this count in the declaration; but, while it is not a fatal objection, it would have the effect of confining the plaintiff very much in the proof she might be allowed to produce before a jury on a plea of not guilty to such a declaration. These allegations in this second count, excluding the portions which I have shown are surplusage, are, in general terms, that the plain-tiff's husband, at divers times prior to a certain time named, became intoxicated, and by reason thereof did injure the plaintiff in her means of support, depriving her of food, clothing, and other necessaries and comforts of life. Under a general allegation of this character, only general damages, as they may be called,—that is, such damages as necessarily result from his being drunk,—such as helplessness and in-capacity for labor can be proven, as this would tend, in some cases, to injure the wife in her means of support, as being the result of his incapacity to labor. But, on gen-eral principles of pleading, damages, though the natural consequence of the drunkenness of the husband, if they are not necessarily the result of such drunkenness, but are what is called "special damages,"—such as, for in-stance, the spending of his means while drunk, breaking up or destroying property, and the like,—can not be proven unless especially alleged in the declaration. No acts of this sort can be proven under such a declaration as was filed in this case. If the plaintiff wished to rely on any such grounds, she should have specified them particularly, so as to give the defendant notice, and prevent a surprise. What are the necessary results of drunkenness, such as helplessness, and inability to labor, the defendant is pre-sumed to know, and they need not be specified in the declaration; but he is not presumed to know what are not the necessary consequences of drunkenness, though

they may be the natural consequences. These differ very widely. Some are made very close and miserly by becoming drunk; others very prodigal. Some are made quarrelsome and destructive of all property around them; others unusually good-natured. So it is obvious that, if damages are claimed for acts which are not the necessary results of the husband's drunkenness, but only the natural results, they must be specified in the declaration, as well as that the plaintiff was thereby injured in her means of support; and how she was injured by the specified acts must be stated in the declaration. For the general principles of pleading which lead to these conclusions, see 1 Chit. Pl. (4th Ed.) 328, 346, 347; 2 Greenl. Ev. § 254, p. 246; *Baker* v. *Green*, 2 Bing. 317; *Pindar* v. *Wadsworth*, 2 East 154; *Armstrong* v. *Percy*, 5 Wend. 538, 539; *Dickinson* v. *Boyle*, 17 Pick. 78. And for application of these general principles to cases like the one before us, see *Hackett* v. *Smelsley*, 77 Ill. 109; *Barnaby* v. *Wood*, 50 Ind. 405. But, though in particular cases it may be very desirable for the declaration to specify the particular acts, whereby the wife was injured in her means of support, yet the failure to do so will not vitiate the declaration, and a general declaration that in consequence of the drunkenness she was injured in her means of support, though under such a declaration she will be much restricted in the proofs she may wish to bring before the jury. For these reasons, the demurrer to the second count in the declaration was properly overruled.

The only remaining question to be considered is: Did the court below err in refusing to award the defendant a new trial on his motion, and in entering up, on February 10, 1886, a judgment for the plaintiff for $1,-000.00, the damages assessed by the jury as sustained by her, and for her costs? The issue joined and tried by the jury were on the pleas of the statute of limitations and not guilty. In determining the question, we should apply to a case of this description exactly the same rules that are applied in all other cases. Where the evidence, when it is most favorably viewed for the plaintiff, could reasonably be regarded as proving the plaintiff's case, though the evidence is contradictory, and the court may be-

lieve that the decided weight of the evidence would show that the plaintiff had no cause of action, still, as the weight to be given the evidence belongs peculiarly to the jury, who are triers of the facts, the court can not hold that the plaintiff has failed to prove that he had a cause of action, if the evidence could satisfy any reasonable mind that a cause of action existed, though the court might differ with the jury in their conclusion that the plaintiff had established a cause of action. This well recognized law in all other cases has not always been observed in cases like the one before us; for in quite a number of cases new trials have been granted when the judges of the appellate court differed very much in their opinions as to whether the plaintiff had proven that she had sustained any injury to her means of support by the drunkenness of her husband, and, according to the established rule, the inference would seem to be that reasonable men could, on the evidence have reached the conclusion that the plaintiff had proven she had a right to recover. In these cases, too, the judges of the appellate court have differed much more as to what were the facts proven in the trial of the case before the jury than on the law applicable to the case. As instances of this character, I would refer to a few cases : See *Meidel* v. *Anthis*, 71 Ill. 241 ; *Kellerman*, v. *Arnold*, Id. 635 ; *Keedy* v. *Howe*, 72 Ill. 137. According to the rule above laid down, the jury, by their verdict for the plaintiff, must have found that she had given a proper written notice to the defendant, engaged at the time in selling intoxicating liquors as a business, not to sell or furnish such liquors to her husband, who was then an habitual drunkard, and that she was thereby injured in her means of support, though there was certainly considerable evidence on which the jury might reasonably conclude that some of these requisites to entitle the wife or widow to recover in this action had not been satisfactorily shown to exist. The court below, whatever was its own judgment as to the weight of this evidence, ought not to set aside this verdict because these facts were held to be established by the jury; nor ought the court below to set aside the verdict if the jury had found a verdict for the defendant, because these facts were not established, in their judgment,

The next question is whether the court below in this case ought to have set aside the verdict because the amount of damages found, $1,000.00, was excessive. The action of the court, in acting on such a question, must depend very largely upon the question whether, regarding the evidence most favorably for the plaintiff, it was a case in which the jury, under the law, had a right to award exemplary damages, as they are called; that is, damages to compensate her not only because she had been injured in her support, but because, by the manner in which the defendant, in committing the tort complained of, had spoken to her, or had acted in any way to her, which showed that he had designedly or recklessly wounded her feelings, thereby mortifying and humiliating her. Where the circumstances attending the sale of intoxicating liquors to a husband are such as justify the jury in giving the plaintiff exemplary damages, understood in this sense, the court ought not to set aside the verdict, unless the damages awarded the plaintiff by the jury are so enormous as to furnish evidence of partiality, passion, corruption, or prejudice on the part of the jury. *Riddle* v. *McGinnis*, 22 W. Va. 280; *Sweeney* v. *Baker*, 13 W. Va. 158. But if the evidence was such that, under the law, no reasonable man could conclude that it made out a case in which the jury were justified in giving the plaintiff exemplary damages, then if it appears that the verdict is so large that the jury must have allowed the plaintiff exemplary damages, the court ought to set it aside on being asked to award a new trial, though it was not a verdict so large as to furnish any evidence that the jury had acted with prejudice, partiality, passion, or corruption. See *Ogg* v. *Murdock*, 25 W. Va. 147; *Railroad Co.* v. *Patterson*, 63 Ill. 304; *Kolb* v. *O'Brien*, 86 Ill. 210. In the case before us, admitting that every fact which the plaintiff's evidence tended to prove as though it had been fully proven, it is clear that the jury, in fixing her damages at $1,000.00, must have included in it the damages caused by the drowning of her husband, or exemplary damages. That, under the law, they had no right to include the injury to her in her means of support resulting from the death of her husband, I have shown.

Had the jury in this case, under the proofs before them, a

right to include exemplary damages in the damages awarded the plaintiff? As I have shown, they can not do this in any case simply because the defendant has committed a tort, but only in cases where he has committed such tort with vicious intent, that is, with actual malice, or with a deliberate and willful disregard of the plaintiff's right, so that, in the manner of committing the tort, he has wounded the just pride or feelings of the plaintiff, and humiliated her by insult and outrage by his words or conduct, when committing the tort. I can see no reason why cases like the one before us should be exceptions to this universal rule, recognized by all the courts. It is well settled, in cases arising under statutes similar to ours, that no exemplary damages can ever be given in any case, unless actual pecuniary loss has been sustained by injury to the persons, property, or means of support of the wife or plaintiff. See *Freese* v. *Tripp*, 70 Ill. 496; *Meidel* v. *Anthis*, 71 Ill. 242; *Keedy* v. *Howe*, 77 Ill. 133. It has been contended that, under statutes like ours, exemplary damages might be given in any case; but this has received no countenance from any decided case that I have seen, except *Schneider* v. *Hosier*, 21 Ohio St. 98. Some courts have held that, if the wife or friends were injured in their means of support, then exemplary damages might be given for the discomfort and mental anguish which the wife or plaintiff in the suit suffered from the tyrannical and outrageous conduct of the husband, whereby the wife or plaintiff was mortified and humiliated. This was intimated, rather than asserted, in *Goodenough* v. *McGrew*, 44 Iowa 670. All that is said on the subject in this case is: "The defendant requested the court to instruct the jury as follows: 'You can only give exemplary damages in cases where the injury complained of, and from which damages arose, was tortious in its nature; when the act of the intoxicated person was such as to warrant the recovery of exemplary damages against him, as when his act was a breach of the peace,—a willful and wanton injury.'" This instruction was refused. The court says, (page 671:)

"As the statute allows exemplary damages to be recovered, we do not think it should be restricted in its operation as required by this instruction. There are many case, where

exemplary damages should be allowed, where there is no breach of peace, and when damages could not be recovered of the intoxicated person." And again in *Peterson* v. *Knoble,* 35 Wis. 84, the court says: "In this case the exception taken to the charge is that it was erroneous, in directing the jury that the damages were what they might consider a just compensation to her for her feelings, and for the indignity offered her by her husband, in putting her in fear, and turning her out of doors, while he was intoxicated. It is not claimed that the turning the plaintiff out of doors was not an injury to persons, within the meaning of the statute, although no actual personal violence was used. * * * In the present case the objection taken to the charge is that it was erroneous in directing the jury that the damages were what they might consider a just compensation to the plaintiff for injury to her feelings and for indignity offered by her husband in putting her in fear, and turning her out of doors."

We do not think this was error. It is true, under a similar statute in Ohio, the court has held that actions by the wife against the seller of intoxicating liquors, for injuries to the " person " of the plaintiff occasioned by the drunkenness of her husband, to whom the liquors were sold, are not to be sustained without showing an assault, or some actual violence, or some physical injury, to the person or health, and that it is not sufficient to show mere mental anguish, disgrace, or loss of society or companionship. *Mulford* v. *Clewell,* 21 Ohio St. 191. But in this case we have the physical injury.

But what seems to be the true construction of our statute, and of like statutes, is that exemplary damages are to be given by the jury only when the defendant (the liquor dealer) has, in committing the tort complained of,—that is, in selling intoxicating liquors to the husband, who was an habitual drunkard,—so conducted himself, either by his words or conduct to the plaintiff, (his wife,) as to wound her feelings, and mortify her, or cause her mental suffering, by his language, or by a willful and deliberate disregard of her right to insist that he should not sell intoxicating liquors to her husband; and this view is sustained both by the weight of authority, as well as reason. Thus the syllabus in *Kreiter*

*v. Nichols*, 28 Mich. 496, is: "Exemplary damages should not be awarded under the statute, [one similar to ours] unless the act of giving or selling intoxicating drinks was willful, wanton, reckless, or otherwise deserving of punishment beyond what the requirements of mere compensation would impose." These views seem to me to be sound, except that by exemplary damages, as we have seen, is not meant damages given as a punishment to the defendant, but damages given as a compensation for wounded feelings and mental anguish caused by the manner and conduct of the defendant (the liquor dealer) in tortiously selling her husband intoxicating liquor; but no exemplary damages can be allowed because of wounded feelings arising from the way in which her husband treated her when drunk. The opinion of the court was delivered by Judge Cooley. He says, (page 499:)

"We also think the court erred in refusing to instruct the jury that exemplary damages should not be awarded unless the act of giving or selling intoxicating drinks to the husband of the plaintiff was willful. The terms 'exemplary damages,' or, as it is sometimes phrased, 'punitory' or 'vindictive damages,' is often very loosely employed in the books, and the controversy over the doctrine which permits the allowance of such damages has been very able and very persistent. But those who go further in support of such damages base the right to award them expressly on the willful or wanton conduct of the defendant,—the moral turpitude or atrocity of the act,—which renders it proper that damages by way of punishment should be inflicted beyond what would be measured by way of compensation."

He then shows that, to justify exemplary damages generally, the conduct of the defendant must be wanton and malicious, or gross and outrageous. The same views have been held in other cases. Though we have seen that different views were held in *Peterson* v. *Knoble*, 35 Wis. 84, yet in another case in Wisconsin the court seems to have held views like those expressed by Judge Cooley. In *Wightman* v. *Devere*, 33 Wis. 581, the court says: "Exemplary damages might be recovered when the evidence show a state of facts which would warrant the assessment of such damages. Whether there were any circumstances of aggravation in the

defendant's conduct which justified the giving of exemplary damages was a question for the jury, upon all proofs in the case." The aggravating circumstances which justified the awarding of exemplary damages were to be found in the conduct of the defendant, (the liquor dealer,) not in that of the drunken husband. This, it seems to me, was the correct view.

So, in *Franklin* v. *Schermerhorn*, 8 Hun 115, the court decided, as stated in the syllabus: "The verdict of the jury was for $175.00. Held, that it was not a case for exemplary damages; that although the jury, in this class of cases, have the right to give exemplary damages, yet they should only be given when there are circumstances of abuse or aggravation proved on the part of the vendor of the liquor, which were wanting in this case." The court says, on page 118: "The case was not one for exemplary damages, so far as we can see from the evidence contained in the bill of exceptions; and, if the question came before us upon the stated case, we should feel bound to grant a new trial for excessiveness of damages. The jury, in this class of cases, have power to give exemplary damages, but they clearly should not be allowed to do so in ordinary cases, where nothing is proved but the simple sale of a single glass of liquor under ordinary circumstances. Exemplary damages should only be given when there are circumstances of abuse or aggravation in the case proved on the part of the vendor of liquor. The plaintiff's husband was not intoxicated solely by the liquor sold him at the defendant's house; but in the same afternoon and evening, it appears, he had purchased and drank liquor at three other places before he drank at the defendant's hotel." A new trial was awarded by the appellate court.

So, in *Bates* v. *Davis*, 76 Ill. 223, the court says, on page 223: "The evidence tends to show that the defendant endeavored to prevent Davis from getting liquor at his place,— frequently refused him, and instructed his clerk to refuse him. The evidence wholly fails to lay any foundation for exemplary damages." The court set aside a verdict for $300.00, regarding it as a fine of that amount imposed on the defendant for the benefit of the plaintiff. A new trial was awarded.

In *Freese* v. *Tripp*, 70 Ill. 496, the case shown in evidence was not a proper one for exemplary damages, as I have stated the law. The court says, (page 500:) "The anguish or pain of mind and wounded feelings from which the plaintiff suffered, is not a matter for the consideration of the jury." And on page 501: "Exemplary damages are not awarded as a punishment in this action, for the reason the statute provides the public shall avail itself of its punitive provisions, which are fine and imprisonment in the county jail; the penalty of imprisonment to be enforced by indictment. Putting money in the plaintiff's pocket would be no satisfaction to the public for a violated penal statute."

These views are proved in *Meidel* v. *Anthis*, 71 Ill. 242. The fourth point of the syllabus is: " While it is true that the statute allows exemplary damages to be awarded to the wife in a suit for injury occasioned by the sale of intoxicating liquors to the husband, such damages can only be by way of example, as a warning to deter the defendant and others from similar transactions, and not by way of punishment; and aggravating circumstances must be shown." The court, on page 247, says: " We concede that this court is committed to the doctrine that, in certain actions of tort at common-law, the jury can go beyond the question of mere compensation, and give damages by way of punishment, though eminent-law writers protest, and insist that this was not a principle of the ancient and genuine common-law. It is insisted, by that law, the civil remedy for a wrong done should not be punitive of the wrong-doer as well as compensative to the sufferer;" referring to 3 Pars. Cont. 170; 2 Greenl. Ev. 242. The court then says: " Though this court is committed to the other doctrine, still the question remains, under this statute, can the jury give exemplary damages by way of punishment of the offender?" And this question is answered as stated in the syllabus we have quoted in this case. As an example of a case where exemplary damages could properly be given the court put this case : Where the husband has been an habitual drunkard, and is endeavoring to overcome the habit by total abstinence, and he is persuaded by the liquor seller to drink, in such a case the court says he would be a proper object on

whom to inflict exemplary damages. They conclude by saying : "The intent is to be regarded, and some aggravating circumstances shown;" meaning, obviously, in the manner and circumstances under which the defendant sold intoxicating liquors to the husband. This case has been frequently approved in other Illinois cases. See *Kellerman* v. *Arnold*, 71 Ill. 632; *Fentz* v. *Meadows*, 72 Ill. 540; *Albrecht* v. *Walker*, 73 Ill. 69.

These decisions seem to me to be right, so far as they require aggravating circumstances to attend the sale of intoxicating liquor to the husband before exemplary damages can be given. But their definition of exemplary damages seems to me to make it amount simply to damages given by way of punishment to the defendant for his public offence. According to the Illinois decisions, they held themselves bound to give this meaning to exemplary damages. The attempt to distinguish them from punitive damages proper seems to me very unintelligible, and, I think, may be regarded as abandoned in *Roth* v. *Eppy*, 80 Ill. 284, point 8 of syllabus. In fact, the unanswerable reasons given in these Illinois cases why a defendant should not be punished in a civil action of this description apply equally strongly to any common-law tort, and the Gordian knot should have been cut by holding that punishment could not be inflicted on a defendant in any civil suit,—a conclusion to which the courts must come to preserve any sort of consistency in the law. But of this question I have already disposed.

The point to which I direct attention is that these Illinois cases held, in effect, that exemplary damages can not be given a wife in a suit of this sort, unless she proves that the defendant has sold her husband intoxicating liquors under other than ordinary circumstances; and that, to justify the giving of such damages, the circumstance attending the selling must have made it especially vicious on the part of the defendant, and that the unnatural and vicious conduct of the drunken husband to his wife is no ground for awarding such exemplary damages, and is in fact a matter not to be considered by the jury. These views, expressed perhaps more clearly in *Franklin* v. *Schermerhorn*, 8 Hun 115, than elsewhere, are supported by the decided weight of au-

thority, and it seems to me clearly by reason, especially when it is borne in mind that it is very properly held that such statutes are highly penal in their character, introducing remedies unknown to the common-law, and in which the plaintiff has necessarily great advantage over the defendant, and that they should receive a strict construction. See *Meidel* v. *Anthis*, 71 Ill. 241 ; *Fentz* v. *Meadows*, 72 Ill. 540 ; *Freese* v. *Tripp*, 70 Ill. 496 ; *Hays* v. *Phelan*, 4 Hun 733.

In *Koerner* v. *Oberly*, 56 Ind. 284, the court held that, in a suit of this character, the anxiety of mind, sorrow, and loss of her husband's society could not enter into the measure of damages in any case. The court, in this case, went still further, and held that, if the sale was made by the defendant under circumstances rendering it a penal offence, exemplary damages could never be allowed ; for in such case the provision in the statute-law authorizing exemplary damages to be given would be unconstitutional and inoperative. This would be, certainly, it seems to me, good law, if it were true that by exemplary damages was meant, as construed by many courts, damages added to that suffered by the plaintiff in order to punish the defendant for his public crime ; but, construed as I have done the meaning of the words " exemplary damages " as used in the statute, the giving of them, in a proper case, would not make the provision of the law unconstitutional, even though the sale of the liquor by the defendant was also a penal offence, and as such punishable as a misdemeanor.

The statute of limitations having been pleaded in this case, and the issues on it being one of the issues before the jury, they could not assess any damages for injuries of any sort to her means of support suffered by the wife more than one year before the service on the defendant of the summons in this action ; that is, prior to February 27, 1884. He was drowned by the falling into the Kanawha river, when drunk, on March 26, 1884, or 27 days afterwards. Now, if exemplary damages can not be allowed, the plaintiff could not possibly, on the case as stated in the declaration, be entitled to as much as his full wages for these 27 days. His full wages for 27 days, as a carpenter, according to the testimony, would, at the rate of $1.50 to $2.50 a day when at work,

amount to from $39.00 to $56.00 if at work all the time. If, then, no exemplary damages could be given in this case on the facts which were proven before the jury, it would be impossible that the loss, by injury to the means of support of the wife from the drunkenness of the husband could exceed his wages for more than one month.

The plaintiff's case could not possibly be considered as proving more than that her husband earned no wages during the month of March, 1884, because of drunkenness caused by the defendant's unlawfully selling him intoxicating liquor. In fact, this is a stronger statement of the plaintiff's case than the evidence before the jury on the trial would justify. If no exemplary damages could be allowed by the jury in this case, their verdict could not be more than a full month's wages of the plaintiff's husband, say $50.00. The evidence was very scant to show that she really suffered anything in her means of support, in the last 27 days of her husband's life, by reason of his intoxication caused by intoxicating liquors furnished him by the defendant. The certificate on this subject of the court below is "that the defendant did, within a year before the bringing of this suit, (that is, within 27 days before the death of the plaintiff's husband,) cause some injury to the plaintiff's means of support by selling her deceased husband whisky when in a state of intoxication, but he did not sell the decedent the whisky which caused the drunkenness which occasioned his drowning. But there was some evidence tending in some degree (slight, however,) to prove a sale by the defendant to the decedent on the day of drowning." The material facts of the case bearing on the question whether the jury could legally give the plaintiff exemplary damages in this case are that she married Thomas Pegram in the fall of 1870; that he was then an habitual drunkard, and continued such up to the time of his death, March 26, 1884, getting drunk whenever he could get whisky, and on an average once or twice every week." I do not say that marrying an habitual drunkard would preclude her necessarily from recovering exemplary damages in such an action as this; but I do say that, as exemplary damages are damages beyond all the pecuniary loss in her means of sup-

port which she has sustained from the unlawful selling of intoxicating liquors to her husband, was given to compensate her for mental anguish, arising, not from the drunkenness of her husband, but from the sense of degradation and mortification caused by the insulting language used by the defendant to her when she was protesting against his selling her husband intoxicating liquors, or by his manner of selling intoxicating liquors to her husband after she had notified him in writing not to do so, indicating that he did so from actual malice, or from a wanton, deliberate, and willful disregard of her rights, the evidence necessary to show that there were aggravating circumstances attending the unlawful sale of whisky to her husband, such as would justify a jury in giving damages beyond her actual pecuniary loss, because of her mental anguish, would have to be much stronger where she, by marrying an habitual drunkard, had shown she had much less mental sensibility than women generally.

A woman of ordinary sensibilities would suffer mental anguish from the conduct of a defendant, a liquor seller, to her, in selling liquor to her husband, in disregard of her written notice not to do so, when such a woman as the plaintiff, so wanting the ordinary sensibilities of her sex, would suffer no mental anguish, and who would be, therefore, fully compensated when she received full compensation for her pecuniary loss to her means of support resulting from the wrongful sale of intoxicating liquors to her husband. But, the conduct of the liquor seller to even such a woman, in disregarding her written notice not to sell intoxicating liquors to her husband, might be so rude and insulting as to cause her mental anguish, and to justify a jury, if she was, by the defendant's tort, injured in her means of support, in giving her exemplary damages to compensate her for her mental anguish, caused by such rude and insulting manner of committing the tort by the defendant. In this case, she says she gave this written notice to the defendant herself, and he told her to go home and attend to her own business.

The defendant positively denies the truth of this statement, or that he ever got such written notice from her, and avers that, on the contrary, she told him he might sell liquor to her husband when not too much under the influence of intoxicat-

ing liquors, which she denies. The jury may have believed her statement, rather than his; and, if they did, his conduct, when served by her with such written notice, in telling her to go home and attend to her own business, was so rude and insulting, when it was followed up by the sales of intoxicating liquors to her husband, injuring her in her means of support, as the jury from the evidence could have well found, that the jury might have given her exemplary damages, provided she had brought her suit promptly for such tort in wrongfully selling such intoxicating liquor to her husband. But if she waited for years after such tortious sales, and injury to her means of support, accompanied by such insulting conduct to her, she could not recover, either for the injury to her means of support, nor exemplary damages for such insulting conduct to her when committing the tort, if the defendant pleaded the statute of limitation of one year to such an action. In this case, she waited for more than six years, from 1878 to 1885, before she brought her action ; and the defendant pleaded the statute of limitations of one year. She, therefore, as a matter of course, could not recover any damages, much less exemplary damages, for any tort committed by the defendant more than one year prior to the institution of this suit; that is, for any tort committed by the defendant prior to February 27, 1884. Of course, therefore, no exemplary damages could he given the plaintiff because of any insulting language by the defendant to her when she served the written notice on him, more than six years before this suit was brought.

Were there any aggravating circumstances attending any sales of intoxicating liquors by the defendant to the plaintiff's husband after the 27th of February, 1884, which would justify the awarding to her of exemplary damages? The whole proof of the plaintiff's witnesses in reference to such sales is that three or four such sales were made by the defendant. There is not a particle of proof to show that there were any aggravating circumstances attending these sales. On the contrary, the proof is clear that, on several occasions after the 27th of February, 1884, the defendant refused to sell intoxicating liquors to the plaintiff's husband, because he was drunk. This, certainly, did not indicate actual malice,

or a wanton, deliberate, and willful disregard of the rights and known wishes of the plaintiff. There was, in this case, not the slightest ground for awarding exemplary damages against the defendant; for there was an entire failure to prove the circumstances under which any sale was made to the plaintiff's husband of intoxicating liquors within a month of his death. They were made without actual, as distinguished from legal, malice, and with no vicious intent, so far as the evidence shows. And, this being the case, the jury could not rightfully give the plaintiff exemplary damages; and, as they could not give her damages for injury to her means of support after her husband's death, it was impossible, under the law and the evidence, that the verdict could have been fairly $1,000.00. If she was entitled to a verdict, her damages ought not to have exceeded $50.00, the full wages of her husband from the 27th of February till his death. I do not suppose the jury, in awarding the plaintiff $1,000.00 damages, intended to give her any exemplary damages; but I suppose nearly all of it was given as damages which resulted to the plaintiff's means of support by the drowning of her husband, which, we have seen, they could not legally allow as damages in this suit.

I have made no reference to the various instructions which are copied into the record as given or refused to the jury by the court, and as excepted to by the defendant below, which are set out in a bill of exceptions headed " Bill of Exceptions No. 2," and which purports to be signed by the judge, because this bill of exceptions No. 2, and these instructions, constitute no part of the record before us. This bill of exceptions is in no manner referred to on the record-book, and, in fact, its existence is negatived by it. The only entry on the record-book in reference to any bill of exceptions is worded as follows : " Be it remembered that, on the trial of the above-entitled cause, the defendant, John G. Stortz, took a bill of exceptions, marked ' Bill of Exceptions No. 1,' to the ruling and action of the court in overruling the motion and refusing to set aside the verdict of the jury, and grant him a new trial, which bill of exceptions was signed, sealed, and saved to him, and made a part of the record in this action." This bill of exceptions No. 1 is the one setting forth

all the evidence in the case before the jury; and, as we can not know what instructions were given or refused by the court, they not being stated in this bill of exceptions No. 1, we have taken no notice of them. That they are no part of the record simply because so copied into the record sent us by the clerk is shown by these West Virginia cases: *Phelps* v. *Smith*, 16 W. Va. 522; *Hilleary* v. *Thompson*, 11 W. Va. 113; *King* v. *Burdett*, 12 W. Va. 688; *Sweeney* v. *Baker*, 13 W. Va. 160; *Ramsburg* v. *Erb*, 16 W. Va. 778, 786; *Park* v. *Petroleum Co.*, 25 W. Va. 108; *Bank* v. *Showacre*, 26 W. Va. 49; *Handy* v. *Scott*, Id. 710.

That the plaintiff's husband was beastly drunk, and in consequence thereof fell into the Kanawha river, and was drowned, was allowed by the court to be proven to the jury. It is true, the defendant below made no objection to this proof being allowed to go to the jury. It was idle for him to do so, as the court had, by overruling his demurrer to the first count in the declaration, really decided that it was a legitimate ground on which to ask a verdict from the jury; and, no doubt, this was the basis of their verdict. It was evidence that ought not to have gone to the jury.

The amendment of a declaration at the bar, without noting on the record interlineations or erasures made in the original declaration, which appears to have been done in this case, is a practice much to be condemned, as it renders it impossible to ascertain what was the original declaration before thus mutilated and altered. In this case it has done no special harm, as there is no necessity to ascertain what was the original declaration before altered.

I would say, too, that the instructions set out in what is called bill of exceptions No. 2, but which is no part of the record, are, as printed, some of them, such as the court never gave, as it would be absurd to suppose it possible they could have been given. They have been misprinted, or blundering has been done in the drawing up of these instructions or bill of exceptions. I refer specially to what are called instructions No. 2 and No. 1. Attention is called to this, so that such errors may be avoided at the next trial.

Leave should be given the plaintiff, if she asks it, to amend her declaration.

For the reasons I have stated, the judgment of the court below, rendered February 19, 1886, must be set aside, reversed, and annulled, and the plaintiff in error must recover of the defendant in error his costs in this Court expended ; and this Court must set aside the verdict of the jury, and award a new trial, as asked for by the defendant below; the costs of the former trial to abide the final decision of the case ; and this case must be remanded to the court below to be further proceeded with according to the principles laid down in this opinion, and, further, according to the principles governing courts of law.

REVERSED. REMANDED.